UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

RONALD E. POWELL; ROBERT O'TOOLE; ROBERT WILSON; BRIAN JORDAN; DONALD G. SCHAPER; AND WILLIAM R. SEEHAFER, as trustees of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, on behalf of that plan and other similarly situated benefit plans,

     *Plaintiffs*,

 v.

OCWEN FINANCIAL CORPORATION; OCWEN LOAN SERVICING, LLC; OCWEN MORTGAGE SERVICING, INC.; ALTISOURCE PORTFOLIO SOLUTIONS, S.A.; ALTISOURCE RESIDENTIAL CORPORATION; ALTISOURCE ASSET MANAGEMENT CORPORATION; ASSURANT, INC.; STANDARD GUARANTY INSURANCE COMPANY; AMERICAN SECURITY INSURANCE COMPANY; VOYAGER INDEMNITY INSURANCE COMPANY; AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA; CROSS COUNTRY HOMES SERVICES, INC.; HOMESURE OF AMERICA, INC.; HOMESURE SERVICES, INC.; and HOMESURE PROTECTION OF VIRGINIA, INC.,

     *Defendants*.

---

Case No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

## I.     INTRODUCTION

1.     This is a civil enforcement action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U. S. C. § 1001 *et seq*.

2.     The conduct at issue here relates to the widespread securitization of subprime mortgages that precipitated the 2008 financial crisis. The misconduct in subprime mortgage securitization and the harm it caused is well-known and has been the subject of much litigation. Most of that litigation has now concluded or is in its last throes. Defendants' misconduct came later, after the housing bubble burst, subprime mortgage lending collapsed, homeowners' equity disappeared and millions went underwater, defaults on mortgages and foreclosures became rampant, and investments in mortgages became toxic assets.

3.     Plaintiffs are trustees of the United Food & Commercial Workers Union & Employers Midwest Pension Plan ("the Plan"), a benefit plan subject to the protections of ERISA. Like many other private benefit plans subject to the protections of ERISA ("benefit plans"), the Plan invested in residential mortgages through financial instruments known as mortgage-backed securities.

4.     Benefit plans invested in securitized mortgages either directly, as did the Plan here, or through entities whose underlying assets include plan assets by reason of one more more benefit plans' investment in the entity. 29 C.F.R. §2510.3-101(f)(2)(iii).

5.     The Plan invested in securitized mortgages held in two trusts created by subprime lender American Home Mortgage Investment Corporation ("American Home"). The Plan acquired a Class VI-A-1 Note issued by American Home Mortgage Investment Trust 2004-4 ("Trust 2004-4"), CUSIP Number 02660TCJ0 for $320,408.00. The Plan acquired a Class 111-A-3 Note, CUSIP Number 02660TGD9 issued by American Home Mortgage Investment Trust 2005-3 ("Trust 2005-3") for $900,000. The Plan has held both investments continuously since 2006.

6.      A securitization trustee is the legal owner of the mortgages. The Plan and other investors are the beneficial or equitable owners of the mortgages.

7.      Because of the Plan's beneficial ownership interest in the securitized mortgages held in Trust 2004-4 and Trust 2005-3 (together, "the American Home trusts"), the mortgages are plan assets.

8.      Defendant Ocwen Financial Corporation was the manager or "servicer" of the securitized mortgages in the American Home trusts. Ocwen abused the role of servicer, a role previously thought to be ministerial, to profit from the foreclosure crisis. Ocwen's self-enrichment was at the expense of the Plan and other benefit plans that invested in securitized mortgages.

9.      Millions of American families depend upon those benefit plans for health care and retirement income, and millions were harmed by Ocwen's conduct.

10.     Ocwen exercised sweeping, unchecked control of the management and disposition of securitized mortgages, and was a fiduciary under ERISA to the benefit plans that invested in those mortgages. As a fiduciary to benefit plan investors in securitized mortgages, Ocwen owed those benefit plan investors a duty of diligence and undivided loyalty. Instead, Ocwen consistently acted to increase its own profits to the detriment of investors.

11.     Ocwen sabotaged mortgage modifications and otherwise pushed struggling homeowners into needless default and foreclosure, which greatly increased the plans' losses. Ocwen did so because Ocwen profited more from mortgages in default or foreclosure than from performing mortgages.

12.     Ocwen charged excessive or otherwise illegal fees for late payments, partial payments, bounced checks and the like. Ocwen treated a homeowner's next monthly payment as partial payment if the payment did not include those fees, a practice known as fee pyramiding. Ocwen charged excessive premiums for force-placed insurance and excessive charges for services associated with default and foreclosure, such as home inspections, appraisals, and maintenance

and marketing of foreclosed homes.  Ocwen split profits with force-placed insurers, home warranty companies and other vendors, or took commissions or other payments that are *per se* breaches of fiduciary duty.

13.     Ocwen used the control of securitized mortgages to take illegal profits, and Ocwen's breach of fiduciary duty caused enormous losses on securitized mortgages in which the Plan and other benefit plans invested. That misconduct, and those losses and ill-gotten profits, are the subject of this action.

14.     Under the governing documents of securitization trusts, investors, the beneficial owners of the securitized mortgages, are effectively unable to bring legal actions to enforce their rights against third parties. The securitization trustees, as legal owners of the securitized mortgages, have legal authority to act on behalf of investors.

15.      The securitization trustees have conflicting loyalties. The financial institutions involved in mortgage securitization and servicing are connected by a complex network of legal and financial relationships. Many securitization trustees, or sibling subsidiaries of the same corporate parent, are servicers for other trusts and sponsors for still more. Diligent enforcement of investor rights across all trusts would be in the best interest of investors, but would be ruinous for many financial institutions. Willful blindness and complicit passivity by securitization trustees has allowed financial institutions involved in mortgage securitization to avoid those consequences and visit losses instead on investors, the beneficial owners of the mortgages. Securitization trustees have failed to protect investors, and that failure has left investors defenseless against servicers' misconduct.

16.     But the provisions in the governing documents that have stymied claims by investors against servicers are void as against public policy with respect to claims on behalf of benefit plans for breach of fiduciary duty under ERISA.

17.     Plaintiffs bring this action against Ocwen and its co-defendants on behalf of a class of trustees of benefit plans that invested in securitized mortgages serviced by Ocwen. On behalf of the families that depend upon those benefit plans, Plaintiffs seek to recover losses from Ocwen's breach of fiduciary duties, to disgorge Ocwen's profits from prohibited self-dealing, and to disgorge the profits from other defendants that knowingly participated in those prohibited transactions.

18.     Plaintiffs also seek to enjoin Ocwen and related defendants from receiving any consideration from any party in connection with transactions that involve plan assets, a bright line violation of the statute, and other equitable relief.

## II.     JURISDICTION AND VENUE

19.     Plaintiffs are benefit trustees and thererfore fiduciaries of the Plan empowered to bring an action to (1) recoup losses and obtain other appropriate relief for breach of fiduciary duty under 29 U.S.C § 1132(a)(2) and 29 U.S.C § 1109 and (2) to obtain appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3).

20.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (ERISA). The district courts of the United States have exclusive jurisdiction over claims for breach of fiduciary duty under ERISA. 29 U.S.C. § 1132(e)(1).

21.     This Court has personal jurisdiction over each Defendant because each Defendant can be found in and transacts business in this District.  In addition, many acts prohibited by ERISA occurred in this District.

22.     Venue is proper in this District because some of Defendants' conduct for which Plaintiffs seek relief occurred in this district and Defendants may be found in this district. 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

## III.     PARTIES

### A. PLAINTIFFS

23.     Plaintiffs Ronald E. Powell, Robert O'Toole, Robert Wilson, Brian Jordan, Ronald G. Schaper and William R. Seehafer are trustees and therefore fiduciairies of the Plan, which has its principal offices in Chicago, Illinois.

### B. DEFENDANTS

24.     Ocwen Financial Corporation is a publicly traded Florida corporation that maintains its principal place of business in West Palm Beach, Florida.  William C. Erbey owned 16.1% of Ocwen Financial Corporation on December 31, 2016.

25.     Ocwen Mortgage Servicing, Inc. is a U.S. Virgin Islands corporation with headquarters in Christiansted, U.S. Virgin Islands. Ocwen Mortgage Servicing, Inc. is a wholly owned subsidiary of Ocwen Financial Corporation.

26.     Ocwen Loan Servicing, LLC is a Delaware limited liability company with headquarters in West Palm Beach, Florida. Ocwen Loan Servicing LLC is a wholly owned subsidiary of Ocwen Mortgage Servicing, Inc.

27.     Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, Inc. are collectively referred to herein as "Ocwen" or "the Ocwen Defendants." The Ocwen Defendants have shared employees and offices and file a consolidated financial statement with Ocwen Financial Corporation's public disclosures. Ocwen Financial Corporation directs and participates in the operation of all the Ocwen Defendants, and the Ocwen Defendants otherwise operate as a common enterprise. The conduct of any Ocwen entity can be attributed to all the Ocwen Defendants.

28.     Altisource Portfolio Solutions, S.A. is a Luxembourg corporation with principal offices in Luxembourg. William C. Erbey owned 32.56% of the shares on March 20, 2017.

29.     Altisource Residential Corporation is a Maryland corporation with its principal place of business in Christiansted, U.S. Virgin Islands. As of April 7, 2014, William C. Erbey owned 4.4% of Altisource Residential.  Erbey was required to resign as Chairman of the Board in 2014.  Altisource Portfolio Solutions S.A. owned 7.7% of Altisource Residential Corporation as of April 12, 2017.

30.     Altisource Asset Management Corporation is a U.S. Virgin Islands corporation with its principal place of business in Christiansted, U.S. Virgin Islands.  It is a subsidiary of Altisource Residential Corporation.   William C. Erbey owned 47.1% of Altisource Asset Management Corporation as of April 12, 2017.

31.     Altisource Portfolio Solutions, S.A, Altisource Residential Corporation, and Alstisource Asset Management Corporation are referred to collectively herein as "Altisource" or "the Altisource Defendants."

32.     Assurant, Inc. is a Delaware corporation with its principal place of business in New York, New York.

33.     Standard Guaranty Insurance Company is a Delaware company with its principal place of business in Atlanta, Georgia.  It is authorized to do business across the United States except Alaska, Connecticut, Maine, Massachusetts, New York, Pennsylvania, Texas, and Wyoming.  It is an underwriting entity of Assurant, Inc.

34.     American Security Insurance Company is a Delaware company with its principal place of business in Atlanta, Georgia.  It is authorized to do business across the United States except New Hampshire.  It is an underwriting entity of Assurant, Inc.

35.     Voyager Indemnity Insurance Company is a Georgia company with its principal place of business in Atlanta, Georgia.  It is authorized to do business in Georgia.  It is an underwriting entity of Assurant, Inc.

36.     American Bankers Insurance Company of Florida is a Florida company with its principal place of business located in Miami, Florida.  It is authorized to do business across the United States.  It is an underwriting entity of Assurant, Inc.

37.     Assurant, Inc., Standard Guaranty Insurance Company, American Security Insurance Company, Voyager Indemnity Insurance Company, and American Bankers Insurance Company of Florida are referred to collectively herein as "Assurant" or "the Assurant Defendants."

38.     HomeSure Services, Inc. is a Florida corporation with its principal place of business located in Fort Lauderdale, Florida.

39.     Cross Country Home Holdings, Inc. is a Florida corporation with its principal place of business located in Fort Lauderdale, Florida.  It is a subsidiary or affiliate of HomeSure Services, Inc.

40.     HomeSure of America, Inc. is a Florida corporation with its principal place of business located in Fort Lauderdale, Florida.  It is a subsidiary or affiliate of HomeSure Services, Inc.

41.     HomeSure of Virginia, Inc. is a Virginia corporation with its principal place of business located in Fort Lauderdale, Florida.  It is a subsidiary or affiliate of HomeSure Services, Inc.

42.     HomeSure Services, Inc., Cross Country Home Holdings, Inc., HomeSure of America, Inc., and HomeSure of Virginia, Inc. are referred to collectively herein as "the HomeSure Defendants."

## IV.     MORTGAGE SECURITIZATION AND THE PLAN'S INVESTMENT

43.     Mortgage securitization is a mechanism for investing in pools of mortgages without the burden of management and, in theory, with less risk than direct ownership of a smaller number of whole mortgages would present.  Mortgage securitization has been a frequent subject of

litigation in the federal courts since the financial crisis, and numerous court decisions explain the process.

44.     Mortgage securitizations are structured to allow investors to realize significant advantages under federal tax laws as "real estate mortgage investment conduits" ("REMICs") or other pass-through entities.

45.     Mortgage securitizations are structured either as New York common law trusts or Delaware Statutory Trusts.

46.     Securitization trustees are legal owners and investors are equitable or beneficial owners of securitized mortgages held in New York common law trusts and Delaware Statutory Trusts alike.

47.     Both of the American Home trusts are Delaware Statutory Trusts. The legal effect of the governing documents for the American Home trusts are identical for purposes of this action.

48.     American Home created the American Home trusts in a series of transactions that culminated in the sale to the American Home trusts of a number of mortgages that American Home originated or purchased from correspondent lenders that originated mortgages for American Home to buy.

49.     Trust 2004-4 conveyed legal title to the mortgages, along with related legal rights, to a securitization trustee  "as trustee for the benefit of the Holders of the Notes" in the Granting Clause of an Indenture agreement (the "Trust 2004-4 Indenture") between Trust 2004-4 and the securitization trustee dated December 21, 2004. A copy of the Trust 2004-4 Indenture is appended hereto as Exhibit A and incorporated herein by reference.

50.     Trust 2005-3 conveyed legal title to the mortgages, along with related legal rights, to a securitization trustee "as trustee for the benefit of the Holders of the Notes" in the Granting Clause of an Indenture agreement (the "Trust 2005-3 Indenture") between Trust 2005-3 and the

securitization trustee dated September 20, 2005. A copy of the Indenture is appended hereto as Exhibit B and incorporated herein by reference.

51.     The Trust 2004-4 Indenture provides that the trust "shall not engage in any business other than as set forth with respect thereto in the Trust Agreement and other than financing, purchasing, owning and selling and managing the Mortgage Loans…and the issuance of the Notes and Certificates in the manner contemplated by this Indenture…and all activities incidental thereto." Trust 2004-4 Indenture, section 3.22.

52.     The Trust 2005-3 Indenture provides the same. Trust 2005-3 Identure, section 3.22.

53.     Neither of the American Home trusts have any assets or liabilities other than the mortgages and related rights and duties, and at no time have either of the American Home trusts engaged in the production or sale of a product or service other than the investment of capital in mortgages.

54.     The Trust 2004-4 Indenture provides that Trust 2004-4 would issue non-recourse Notes to investors for payment of principal and interest on the securitized mortgages. The obligation "is limited in right of payment to amounts available from the trust estate as provided in the Indenture" and the amount of payment "may be less than the amount shown on the face" of the notes. Indenture, exhibit A-1.

55.     Trust 2005-3 provides the same. Trust 2005-3 Indenture, Exhibit A-1.

56.     The governing documents of Trust 2004-4 include a Servicing Agreement (the "Trust 2004-4 Servicing Agreement"), also dated December 21, 2004, between Trust 2004-4, the securitization trustee, and American Home Mortgage Servicing, Inc., a wholly owned subsidiary of American Home, for management of the securitized mortgages in the estate of Trust 2004-4. A copy of that agreement is appended hereto as Exhibit C and incorporated by reference herein.

57.     The governing documents of Trust 2005-3 also include a Servicing Agreement (the "Trust 2005-3 Servicing Agreement"), dated September 21, 2005, between Trust 2005-3, between

American Home, the securitization trustee, Wells Fargo Bank, N.A. as Master Servicer, and American Home Mortgage Servicing, Inc., for management of the securitized mortgages in the estate of Trust 2005-3. A copy of that agreememt is appended hereto as Exhibit D and incorporated by reference herein.

58. The role of Wells Fargo Bank, N.A. as master servicer for Trust 2005-3 under the governing documents was almost exclusively to supervise American Home Mortgage Servicing, Inc. as servicer. Wells Fargo Bank, N.A. did little if anything to supervise American Home Mortgage Servicing, Inc. or successor servicers, and did nothing at all to hold any servicer accountable on behalf of investors. The role of the "master servicer" for Trust 2004-4 and of the "servicer" for Trust 2005-3 were effectively the same.

59. The securitization trustees had express contractual authority to act on investors' behalf, and investors were effectively denied any power to act on their own behalf. The Granting Clause of the Trust 2004-4 Indenture conveyed to the securitization trustee "all present and future claims, demands, causes and choses in action in respect" to the securitized mortgages and related rights and interests. Trust 2004-4 Indenture, Granting Clause (k). Investors cannot bring legal claims unless the holders of at least 25 percent of the balance on the notes first "made a written request to [the securitization trustee] to institute such Proceeding…in its own name as [securitization trustee] hereunder" and met certain other requirements, and the securitization trustee failed to act. Trust 2004-4 Indenture, section 5.06

60. The Trust 2005-3 Indenture also conveyed to the securitization trustee "all present and future claims, demands, causes and choses in action in respect of" the securitized mortgages and related rights and interests." Trust 2005-3 Indenture Granting Clause (g). The Trust 2005-3 also denied investors any right to bring legal claims on their own behalf unless the holders of 25 percent of the balance of the notes "made a written request to the [securitization trustee] to institute

such Proceeding…in its own name as [securitization trustee] hereunder" and met other requirements, and the securitization trustee failed to act. Trust 2005-3 Indenture, Section 5.06.

61.     The percentage of investors required under the "no-action" clauses to demand that the securitization trustee act on investors' behalf is usually unobtainable: investors are spread across the world, are generally unknown to each other, and many for various reasons are averse to litigation. In practice, investors are defenseless against misconduct by servicers except through action by the securitization trustee.

62.     Despite overwhelming evidence of pervasive misconduct by mortgage servicers in general and by Ocwen in particular, the securitization trustees for both of the American Home trusts did nothing to investigate Ocwen's misconduct or to hold Ocwen accountable for that misconduct.

63.     The provisions of the governing documents for the American Home trusts that are legally significant here—the separation of legal ownership and equitable or beneficial ownership, the limited function of securitization trusts as mortgage investment conduits, the comprehensive powers granted servicers, and dependence of investors on securitization trustees to act on investors' behalf—were included in governing documents of the trusts for other securitized mortgages that Ocwen serviced and continues to service, and Ocwen's conduct was identical with respect to securitized mortgages across all trusts, New York common law trusts and Delaware Statutory Trusts alike.

## V.     THE ROLE OF THE SERVICER

64.     Mortgage servicers are responsible for managing, or "servicing," securitized mortgages.  Mortgage servicers send bills and notices to homeowners, collect payments, maintain escrow accounts for taxes and insurance, foreclose on homes upon default, and maintain and sell foreclosed homes. Servicers have broad authority to engage in loss mitigation for mortgages in default or in danger of default, which includes the power to modify mortgages to avoid foreclosure.

65.     The powers granted the master servicer under the Trust 2004-4 Servicing Agreement are comprehensive: the "Master Servicer shall supervise, or take such actions as are necessary to ensure, the servicing and administration of the Mortgage Loans and any REO Property in accordance with this Servicing Agreement and its normal servicing practices, which generally shall conform to the standards of an institution prudently servicing mortgage loans for its own account and shall have full authority to do anything it reasonably deems appropriate and desirable in connection with servicing and administration." Trust 2004-4 Servicing Agreement, section 3.01.

66.     The powers granted the servicer of the securitized mortgages in Trust 2005-3 are the same. Trust 2005-3 Servicing Agreement, Section 3.01.

67.     For performing mortgages – the norm before the housing bubble burst – servicing seldom necessitated the sweeping discretionary powers granted by the governing documents of securitization trusts. Instead, mortgage servicing typically required only the rote application of clear procedures, an unglamorous, back-office function. Servicing of mortgages in default or danger of default, however, is "discretion-intensive." A.J. Levitin and T. Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 4 (Winter 2011).

68.     The compensation for servicers did not align the interest of servicers and investors in securitized mortgages once the housing bubble burst. The various ways in which the servicers are compensated are affected by factors within the servicers' discretionary control. The compensation of servicers created many opportunities for self-dealing at the expense of investors.

69.     The servicer receives a servicing fee, a percentage of the unpaid principal balance on the mortgages in a securitization trust, generally 50 basis points for subprime mortgages. Servicers deduct the servicing fee from the homeowner payments that the servicer pays, directly or indirectly, to investors. The master servicing fee is thus an incentive to servicers to keep mortgages in the trust and not reduce the principal, even where principal reduction would be the

most effective loss mitigation measure to avoid foreclosure and protect investors from unnecessary losses.

70.     Servicers "may retain additional servicing compensation in the form of prepayment charges…, tax service fees, fees for statement of account or payoff, late payment charges, or otherwise, to the extent such fees are collected from the related Mortgagors or, with respect to a Liquidated Mortgage Loan, to the extent such fees have accrued." Trust 2004-4 Servicing Agreement, section 3.15(b). These "ancillary fees" provide little incentive to servicers to help homeowners remain current or become current in their mortgage payments.  Fees for late or partial payments or bounced checks are typically five percent of the payment, an amount well in excess of the costs to servicers that result from such payments by homeowners.

71.     Ancillary fees are charged to homeowners, which makes default by already struggling homeowners more likely, or are deducted from the proceeds of foreclosure before any payment to the trust or investors.

72.     Servicers are also "reimbursed" for the costs associated with foreclosure, such as home inspection, appraisals, title searches, home maintenance costs, and marketing foreclosed homes. Such foreclosure costs are collected in full by servicers from the proceeds of foreclosure before any payment to investors.

73.     Servicers are thus highly likely to collect ancillary fees and foreclosure costs, even fees and costs that are wildly inflated, not legally allowed, or for services not really provided. Servicers can largely impose fees and costs for mortgages in default or foreclosure in almost any amount at will, legal or not, without legal challenge. Homeowners in non-recourse states cannot be held liable for any deficiency on foreclosure, and in states that allow mortgagees to collect deficiencies from foreclosure, deficiencies are usually uncollectable and rarely pursued. Illegal or inflated ancillary fees and foreclosure costs, therefore, usually are paid from the proceeds of foreclosure sales, and thus effectively are taken from investors' pockets.

VI.     **AMERICAN HOME'S RISE AND FALL, AND OCWEN'S ACQUISITION OF SERVICING RIGHTS FOR THE AMERICAN HOME TRUSTS.**

74.     American Home grew explosively during the subprime mortgage bubble and became the nation's tenth-largest mortgage lender. The lending practices that allowed American Home's explosive growth doomed American Home to fail.

75.     American Home originated mortgages to borrowers with no down payment and no documented income. According to a personal account by a borrower published in *The New York Times*, an American Home loan officer told the borrower not to disclose substantial alimony or child support obligations on his application. According to American Home employees, managers told employees not to decline loans where they knew that the application included fraud. A report by the Office of Comptroller of the Currency in 2010 named American Home one of the worst subprime and low-documentation mortgage lenders in the nation based upon foreclosure rates for mortgages originated from 2004 to 2007.

76.     The end came quickly for American Home when the subprime bubble burst. American Home announced on July 31, 2007, after investment banks issued margin calls or otherwise demanded immediate payment on outstanding debt, that the company would no longer originate or buy mortgages. The company laid off almost 90 percent of its employees on August 3, 2007, and closed all but its thrift and mortgage-servicing businesses. The company entered bankruptcy on August 6, 2007.

77.     A private equity firm, Wilbur Ross & Co. LLC, purchased American Home Mortgage Servicing, Inc. from bankruptcy in November, 2007, and renamed the corporation Homeward Residential Holdings, Inc. ("Homeward") in February, 2008.

78.     On December 27, 2012, Ocwen acquired Homeward from Wilbur Ross & Co. LLC.

79.     At all times relevant to this action, the securitized mortgages in the American Home trust's estate in which the plan held a beneficial ownership interest were serviced by Ocwen or by

Homeward, the liabilities of which Ocwen assumed. Any reference in this Complaint to Ocwen's conduct refers also to the conduct of Homeward.

80.     Homeward and Ocwen, as successors to American Home Mortgage Servicing, Inc., stood in the shoes of American Home Mortgage Servicing, Inc. and assumed all of the rights, powers and liabilities of American Home Mortgage Servicing, Inc. as servicer for the securitized mortgages in the American Home trusts.

## VII.     OCWEN'S STATUS AS A FIDUCIARY UNDER ERISA

81.     Congress enacted ERISA in 1974 to safeguard the continued well-being and security of millions of Americans who depend on the nation's benefit plans.

82.     A person is a fiduciary with respect to a benefit plan "to the extent … [he] exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A).

### A. THE STATUS OF SECURITIZED MORTGAGES AS PLAN ASSETS

83.     The ERISA statute delegates authority to the Secretary of Labor to define "plan assets." 29 U.S.C. § 1002(42) ("[T]he term 'plan assets' means plan assets as defined by such regulations as the Secretary may prescribe."). Under Department of Labor regulations, "in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940, its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity" where the entity is not "primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital." 29 C.F.R. § 2510.3-101(a)(2) and (c)(1).

84.     "A profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust are equity interests," 29 C.F.R. § 2510.3-101(b), and thus plan assets of a benefit plan that invests in those entities.

85.     Under the Delaware statute, a "beneficial owner [in a Delaware Statutory Trust] shall have an undivided beneficial interest in the property of the statutory trust and shall share in the profits and losses of the statutory trust…. " Title 12 Del. Code § 3805(a).

86.     Under the governing documents of both American Home trusts, the American Home trusts granted the securitization trustee legal title to the securitized mortgages and all related property interests "as trustee for the benefit of [investors]." Trust 2004-3 Indenture, Section Granting Clause; Trust 2005-3 Indenture, Granting Clause. The governing documents state throughout that securitization trustees are to act for the benefit of investors.

87.     The Department of Labor issued an advisory opinion in 1996 that specifically addressed the application of the regulation's "look through" rule, 29 U.S.C. § 2510.3-101(b)(1), to mortgages in securitization trusts and advised that "when a plan indirectly retains investment management services by investing in a pooled investment vehicle, the assets of the vehicle should be viewed as plan assets and managed in accordance with the fiduciary responsibility provisions of ERISA." DOL Advisory Opinion 96-23A.

### B. OCWEN'S DISCRETIONARY CONTROL OVER PLAN ASSETS

88.     Ocwen, as successor servicer, was contractually granted and has exercised sweeping discretionary control over the securitized mortgages held in the American Home trusts and, therefore, is a fiduciary to the benefit plans that invested in those securitizations.

89.     Even without such comprehensive contractual powers, Ocwen's conduct would confer status as fiduciary to benefit plan investors with respect to the securitized mortgages. The definition of fiduciary is liberally construed and functional.  If a person exercises control over plan assets, regardless of formal contractual delegation of authority, that person is a fiduciary to the plan.

90.     Control of plan assets sufficient to pilfer or otherwise engage in self-dealing, as Ocwen has done, confers fiduciary status.

91.     Ocwen's misconduct was the same with respect to all securitized mortgages over which Ocwen had discretionary control, without regard to any differences in language in the governing documents of the securitization trusts.

## C. OCWEN'S FIDUCIARY DUTY TO THE ERISA PLANS

92.     The duty that ERISA imposes on fiduciaries is the highest known to the law.  It is a far cry from the "ripping eyeballs out" and "getting paid" culture of the financial institutions involved in mortgage securitization. G. Smith, *Why I Am Leaving Goldman Sachs*, The New York Times (op-ed) (March 14, 2012) (internal quotation marks omitted) (*available at* http://www.nytimes.com/2012/03/14/opinion/why-i-am-leaving-goldman-sachs.html?_r=0).

93.     The "prudent man" standard of care ERISA imposes on a fiduciary requires the fiduciary to "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

94.     The duty of exclusive loyalty requires a fiduciary to "discharge his duties with respect to the plan solely in the interests of the participants and beneficiaries of the plan." 29 U.S.C. §1104(a).

95.     A fiduciary is required to avoid "prohibited transactions," certain transactions with such inherent risk of self-dealing that the transactions are *per se* breaches of fiduciary duties. Prohibited transactions are defined by 29 U.S.C. §1106(b)(1) & (3).

96.     The statute specifically identifies several transactions between benefit plans and "parties in interest" that are prohibited.  29 U.S.C. § 1106(a).[1]  A "party in interest" generally

---

[1] 29 U.S.C § 1106, provides, in relevant part:

(a)  Transactions between plan and party in interest. Except as provided in section 1108 of this title:

(1)  A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

includes any fiduciary to the plan, any entity that provides services to the plan, and anyone related to the foregoing.  *See* 29 U.S.C. § 1002(14). All defendants herein are parties in interest with respect to the mortgages in which the Plan and other benefit plans invested.

97.     The prohibitions of 29 U.S.C. §1106 reach almost every transaction between benefit plans and parties in interest.  The statute excepts reasonable compensation for services rendered and the "reimbursement of expenses properly and actually incurred in the performance of [a party in interest's] duties with the plan," 29 U.S.C. § 1108.

98.     The statute establishes a blanket prohibition, easily applied, on any fiduciary receiving any compensation, even reasonable compensation taken in good faith, from third parties for transactions that involve assets of the plan to which the fiduciary owes the fiduciary obligation. 29 U.S.C. §1106(b)(3).

99.     The statute provides that the Department of Labor may issue individual and class prohibited-transaction exemptions. 29 U.S.C. §1108(a).  The conduct at issue herein does not conform to the safeguards against self-dealing that are conditions of any prohibited transaction exemption issued by the Department of Labor with respect to mortgage securitization or mortgage servicing.

## VIII.     THE STATUTORY PROHIBITION ON EXCULPATION FROM FIDUCIARY DUTIES AND LIABILITIES

100.     ERISA provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty

---

(A)   sale or exchange, or leasing, of any property between the plan and a party in interest;

(B)   lending of money or other extension of credit between the plan and a party in interest;

(C)   furnishing of goods, services, or facilities between the plan and a party in interest;

(D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E)    acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

under [the fiduciary duty provisions of ERISA] shall be void as against public policy." 29 U.S.C. § 1110(a) (internal citations omitted).

101.    Any clause in the governing documents that provides that investors cannot bring a legal action without a demand on the securitzation trustee by a certain percentage of investors is void as against public policy with respect to claims for breach of fiduciary duty on behalf of benefit plans.

102.    Any contractual provision that purports to relieve Ocwen or related defendants of the duty to manage mortgages in which benefit plans invested with undivided loyalty to benefit plan beneficiaries and participants and with "skill, care, prudence, and diligence," 29 U.S.C. § 1004(a)(1)(B), or that limits liability for breach of that duty, is void as against public policy.

103.    Any contractual provision that purports to relieve Ocwen or any party of responsibility or liability for the duty not to engage in or allow prohibited transactions is void as against public policy.

## IX.    SPECIFIC ALLEGATIONS OF OCWEN'S BREACH OF FIDUCIARY DUTY UNDER ERISA

### A. OCWEN'S AND ALTISOURCE'S MORTGAGE SERVICING EMPIRE

104.    William C. Erbey founded Ocwen in the eighties as a specialty servicer for distressed mortgages. Ocwen grew ten-fold after the financial crisis began. Beginning in 2009, Ocwen began to acquire mortgage-servicing rights from other servicers.[2] Ocwen's servicing portfolio grew from 351,595 residential loans with an aggregate unpaid principal balance of $50

---

[2] In September 2012, Ocwen acquired Litton Loan Servicing, LP, from Goldman Sachs and assumed that partnership's mortgage rights and all liabilities of that partnership.

In December 2012, Ocwen acquired Homeward Residential, Inc., as set forth in the body of the Complaint, and assumed that corporation's mortgage servicing rights and all liabilities of the corporation.

In March 2013, Ocwen purchased all mortgage servicing rights from Ally Financial.

billion at the end of 2009 to 2,861,918 residential loans with an aggregate unpaid principal balance of $464.7 billion by the end of 2013.

105.    Also in 2009, Ocwen divested various fee-based servicing business lines to the Altisource Defendants. The services performed by Altisource included home valuations, property preservation, sale of foreclosed homes, mortgage charge-off collection services, and insurance services.

106.    Erbey owned approximately 15 percent of Ocwen's stock as of December 19, 2014. Erbey owned approximately 26 percent of Altisource's stock from 2012 until 2014, according to an Order entered by the Securities and Exchange Commission on January 20, 2016. Erbey also held substantial stock options for both Ocwen and Altisource. As of December 19, 2014, Erbey was CEO of Ocwen Financial Corporation, Executive Chairman of Ocwen Loan Servicing, LLC, and Chairman of the Boards of Altisource and three affiliates or subsidiaries of Altisource. Several Ocwen employees left Ocwen to become employees and board members of Altisource. Other Ocwen executives held substantial investments in Altisource shares. The Chief Risk Officer of Altisource was also the Chief Risk Officer of Ocwen and reported directly to Erbey in both positions.

107.    Ocwen used the separate corporate existence of the Altisource Defendants to channel profits from self-dealing.

108.    Deference to the corporate form with respect to Ocwen and the Altisource Defendants and all related subsidiaries would run contrary to the explicit purposes of ERISA. Ocwen and the Altisource Defendants are alter egos for purposes of the fiduciary duties imposed by the statute.

## B. THE HARM TO ERISA PLAN INVESTORS FROM OCWEN'S AND ALTISOURCE'S SERVICING PRACTICES

109.    Ocwen's and Altisource's servicing practices resulted in great profits for Ocwen and Altisource, and caused great harm both to homeowners and to investors.   Ocwen and

Altisource intentionally pushed homeowners into distress or kept homeowners in distress, and caused avoidable foreclosures, so Ocwen and Altisource could charge excessive and illegal fees.

110.   Ocwen sabotaged mortgage modifications that would give homeowners in distress sustainable mortgages, mortgages that homeowners could pay in full and on time. Sustainable mortgages would have reduced foreclosures and increased the net present value of the mortgages to the advantage of investors. Foreclosures on subprime mortgages result in the loss of more than half of the value of mortgages to investors, the beneficial owners of securitized mortgages.

111.   Ocwen sabotaged those modifications because ancillary fees and foreclosure costs made distressed mortgages much more profitable to Ocwen than performing mortgages.

112.   Ocwen charged illegal and excessive fees and expenses, either directly or through Altisource or third parties, such as the Assurant Defendants and the HomeSure Defendants.

113.   Ocwen regularly claimed not to have received or to have lost documents required for mortgage modifications.

114.   Ocwen routinely backdated letters that announced deadlines for homeowners to provide documents required for modification that often had come and gone before the letter was sent.

115.   Ocwen failed to provide homeowners a "single point of contact." Instead, homeowners with the patience to remain on hold indefinitely spoke with a different Ocwen employee each time.

116.   Ocwen proceeded with foreclosure proceedings and sales while Ocwen pretended to work in good faith with homeowners to modify their mortgages to avoid foreclosure, and sometimes completed foreclosure sales when homeowners were within deadlines announced by Ocwen to submit documents to support applications for mortgage modification.

117.    Ocwen engaged in "mass denial sweeps" in which Ocwen denied homeowners mortgage modifications for the stated reason that necessary documents were missing, or the documents that had been submitted were out of date.

118.    The effect of Ocwen's conduct was to frustrate, confuse and discourage homeowners who tried in good faith to save their homes from foreclosure, which resulted in avoidable foreclosures and caused enormous unnecessary losses for investors.

119.    Ocwen's conduct quickly attracted the attention of federal and state regulatory agencies and has kept their attention.

120.    On December 5, 2012, Ocwen Loan Servicing entered a Consent Order with the New York State Department of Financial Services. Consent Order Under New York Banking Law § 44, *In the Matter of Ocwen Loan Servicing, LLC* (NYDFS Dec. 5, 2012) (*available at* http://www.dfs.ny.gov/about/ea/ea121205.pdf).   The Consent Order was based upon an examination that found that Ocwen had (1) failed to provide homeowners with a single point of contact who was familiar with each assigned homeowner's circumstances; (2) proceeded simultaneously with foreclosure proceedings and loan modification (dual-tracking); (3) failed to conduct an independent review of loan modification denials; and (4) failed to monitor "third-party vendors."

121.    On February 26, 2014, Judge Rosemary M. Collyer of the United States District Court for the District of Columbia entered a consent judgment in an action brought by the U.S. Consumer Financial Protection Bureau ("CFPB") and attorneys general or banking regulators of 49 states and the District of Columbia against Ocwen Financial Corporation and Ocwen Loan Servicing, LLC. Consent Judgment, Dkt. No. 12, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation*, No. 13-cv-2025 (RMC) (D.D.C. Feb. 26, 2014) (*available at* https://nationalocwensettlement.com/Portals/0/Documents/ConsentJudgement.pdf).        The settlement also covered Litton Home Servicing LP and Homeward Residential Holdings LLC,

formerly American Home Mortgage Servicing, Inc., both of which Ocwen had purchased. The complaint alleged violations of federal and state law that included Ocwen's (1) failure to apply payments accurately and to maintain accurate account statements; (2) imposition of unauthorized fees; (3) imposition of force-placed insurance when Ocwen knew that the homeowner already had adequate coverage; (4) failure to provide accurate and timely information about loan modifications or other loss mitigation services; (5) referral of loans to foreclosure while homeowners pursued loan modification efforts in good faith; (6) failure to honor in-process trial modifications; (7) provision of false or misleading reasons for the denial of loan modifications; (8) improper denial of loan modifications to eligible homeowners; and (9) filing of false documents with courts and regulatory agencies, which included the false attestations in affidavits known as "robo-signing."

122. Ocwen and the New York State Department of Financial Services entered a second Consent Order on December 19, 2014. Consent Order Under New York Banking Law § 44, In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC (NYDFS Dec. 22, 2014) (available at http://www.dfs.ny.gov/about/ea/ea141222.pdf). An independent compliance monitor retained pursuant to the earlier order found that Ocwen (1) initiated foreclosure proceedings without legal authority to do so; (2) made incorrect statements to the court in foreclosure proceedings; (3) pursued foreclosure when modification applications were still pending (dual-tracking); (4) failed to designate a single point of contact for homeowners; and (5) routinely backdated letters to homeowners, which included letters that imposed deadlines on homeowners that had come and gone before the letters were sent. The Department's review also found "widespread conflicts of interest with related parties," the Altisource Defendants. As discussed above, Erbey was the Executive Chairman and largest shareholder of Ocwen and also the Chairman of the Boards of Directors and largest shareholder of each of the Altisource Defendants. Other Ocwen executives and directors also held significant investments in both Ocwen and Altisource. "Conflicts of interest are evident at other levels of the Ocwen organization," the

Consent Order said. The Chief Risk Officer for Altisource Portfolio Solutions was also the Chief Risk Officer for Ocwen and reported directly to Erbey in both capacities.  Ocwen contracted with Altisource to perform fee-based services, often for more than Altisource charged other customers. These "charges [] were passed on to borrowers and investors." Ocwen also contracted with Altisource to perform services that Altisource lacked the capacity to perform properly when more capable vendors were available.

123.    On April 20, 2017, the CFPB filed a second complaint against Ocwen, this time in the Southern District of Florida.  Complaint, Dkt. No. 1, *Consumer Fin. Prot. Bureau v. Ocwen Fin.    Corp.*,    No.    17-CV-80495    (S.D.    Fla.    Apr.    20,    2017)    (*available    at* http://files.consumerfinance.gov/f/documents/20170420_cfpb_Ocwen-Complaint.pdf).    The complaint alleged that Ocwen (1) improperly calculated loan balances; (2) misapplied borrower payments; (3) failed to process escrow and insurance payments correctly; (4) failed to investigate consumer complaints properly; (5) illegally foreclosed upon loans; (6) charged improper late fees; (7) charged fees for work that homeowners denied had been done and for which Ocwen had no documentation; (8) imposed force-placed insurance and sometimes foreclosed on homeowners whose hazard insurance was cancelled because of Ocwen's failure to disburse funds from the homeowners' escrow accounts; (9) improperly created escrow accounts for homeowners who paid taxes and hazard insurance premiums directly; (10) imposed force-placed flood insurance on homeowners who already had flood insurance or were not required to have flood insurance; (11) routinely sent misleading solicitations to homeowners for at least 109 "add-on" products such as home warranty products, credit monitoring or theft protection, and sometimes enrolled homeowners in add-on products without homeowners' consent; (12) wrongfully charged foreclosure fees; (13) commenced foreclosure proceedings and conducted foreclosure sales when homeowners had applications for modification under review, or were within deadlines set by

Ocwen to provide additional information; and (14) conducted foreclosure sales on homeowners who were performing on loan modifications.

124. Also on April 20, 2017, the Commissioner of Banks of North Carolina, on behalf of North Carolina and six other states, entered a Cease and Desist Order against Ocwen for mishandling homeowners' escrow accounts for taxes and insurance. Cease and Desist Order, *In the Matter of Ocwen Loan Servicing, LLC*, No. 17:025:MBB (N.C. Comm'r of Banks Apr. 20, 2017) (*available at* http://nccob.gov/public/docs/News/Press%20Releases/OcwenOrder17_025.pdf). The Cease and Desist Order included findings of fact that Ocwen faced "numerous substantiated consumer complaints regarding escrow accounts that have been mismanaged, resulting in significant harm to consumers, and request for reimbursement of monies wrongfully withheld or misapplied."

125. Also on April 20, 2017, the Division of Banks of the Commonwealth of Massachusetts issued a temporary cease and desist order against Ocwen. Findings of Fact and Temporary Order to Cease and Desist and Order to Show Cause and Notice of Right to a Hearing, In the Matter of Ocwen Loan Servicing, LLC, No. 2017-001 (Mass. Div. of Banks Apr. 20, 2017) (*available at* http://www.mass.gov/ocabr/banking-and-finance/laws-and-regulations/enforcement-actions/2017-dob-enforcement-actions/ocwen04202017.html). The Massachusetts order found, based upon a coordinated examination by several state mortgage regulators, that Ocwen (1) "engaged in a pattern and practice of unsafe and unsound loan servicing by manipulating the lender-placed force-placed insurance market and artificially inflating the premiums and then passing the improperly inflated premiums onto consumers"; (2) collected unearned commissions and other benefits through its arrangements with the insurers, which included contracts to perform services of dubious benefit to the insurers at inflated prices; (3) failed to make timely payments from escrow accounts to taxing authorities and insurers; (4) overcharged homeowners for property inspections conducted by Altisource; (5) charged other inflated fees in

"related party transactions" with Altisource; and (6) conducted short sales through another subsidiary of Altisource, which increased fees but did not increase the likelihood that "the borrower and investor receive a market price for the short sale."

126.    In all, 22 states filed cease-and-desist orders on April 20, 2017, and nine more have filed orders since.

127.    Ocwen's conduct has also been the subject of much litigation by homeowners.  In April of 2015, Ocwen paid homeowners $140 million, or 12.5 percent of premiums during the class period, to resolve allegations that it charged excessive premiums on force-placed insurance and entered into an exclusive agreement with insurance companies for inflated premiums in return for illegal kickbacks.

128.    The conduct of which Ocwen has been accused and paid millions of dollars to resolve caused avoidable foreclosures, which greatly harmed benefit plan investors in securitized mortgages, and improperly reduced the proceeds of foreclosures that were paid to securitization trusts and investors.

129.    In addition to the harm to the Plan and other benefit plan investors caused by Ocwen's breach of fiduciary duty, Ocwen used the control of mortgages that are or were benefit plan assets to profit in breach of Ocwen's fiduciary duties.

130.    Even if Ocwen's conduct described in these state and federal proceedings was the result of incompetence rather than greed, which state and federal regulatory authorities appear very generously to have assumed, the conduct breached Ocwen's duty to act with the care, skill, prudence and diligence that a prudent man would have used in the circumstances, as required by ERISA, and constituted prohibited self-dealing that is a *per se* breach of fiduciary duties.

### C. ERBEY'S CONSIDERATION FOR CONTRACTS BETWEEN OCWEN AND ALTISOURCE

131.    Erbey was the largest shareholder in Ocwen, and an even larger shareholder in each of the Altisource Defendants. He personally and actively controlled and dominated all of the Ocwen and Altisource Defendants.

132.    Ocwen and the Altisource Defendants entered contracts for the Altisource Defendants to perform fee-based services that involved mortgages that were benefit plan assets.

133.    Altisource charged impermissible fees, fees for services not needed or not actually performed, and excessive fees. Altisource charged more for services than the market rate and more than Altisource charged other customers for the same services.

134.    Ocwen – controlled by Erbey – had little incentive to challenge Altisource's fees or to seek cheaper fees from other sources, and did not do so.

135.    Ocwen contracted with Altisource to perform services that Altisource lacked the capacity to perform properly.

136.    Ocwen structured transactions, such as the contracts with the Assurant Defendants described below, to generate profits for Altisource and enrich Erbey personally.

137.    All of these contracts were prohibited transactions within the meaning of 29 U.S.C. § 1106(b)(1) and (3).

138.    The Altisource Defendants knowingly participated in Ocwen's prohibited transactions and breach of fiduciary duty to benefit plans that invested in mortgages that Ocwen serviced.

### D. OCWEN'S DIRECT OR INDIRECT CONSIDERATION FROM THE ASSURANT DEFENDANTS, HOMESURE DEFENDANTS AND OTHER ADD-ON PRODUCT VENDORS

139.    The Assurant Defendants provided force-placed insurance for homes that were subject to mortgages that Ocwen serviced. Force-placed insurance is meant to protect against

hazards that would diminish the value of the home as collateral for the mortgage, supposedly where the homeowner's own insurance has been cancelled or lapsed, or is inadequate.

140. Ocwen either charged the premiums to homeowners or was reimbursed for the premiums from the proceeds of foreclosure before any payment to investors.

141. Ocwen entered into exclusive contracts with the Assurant Defendants to provide force-placed insurance for premiums that were several times higher than the coverage available to homeowners, and significantly higher than other available force-placed insurance. The Assurant Defendants also imposed insurance that exceeded homeowners' mortgages, or for hazards for which homeowners were not required to have insurance.

142. Ocwen had little incentive to find cheaper insurance and did not attempt to do so.

143. The Assurant Defendants paid a percentage of the premiums they collected to Ocwen, either directly or indirectly through payments to the Altisource Defendants. The payments were sometimes paid openly and sometimes disguised as payments for services provided to the Assurant Defendants by Ocwen or Altisource, such as reinsurance.

144. The HomeSure Defendants provide home warranty and service plans to homeowners whose mortgages are serviced by Ocwen.

145. Ocwen deceptively marketed the home warranty products and include charges for the products in monthly mortgage statements. Ocwen sometimes charged homeowners for home warranty products that the homeowners did not agreed to purchase.

146. Home warranty products are service agreements between homeowners and a home warranty company for the home warranty company to perform certain maintenance, repairs, or replacement of household appliances, heating and air conditioning systems, plumbing and electrical systems, and the like. Home warranty products are generally unnecessary, and the charge for those products is often excessive. Home warranty companies, including the HomeSure Defendants, have been the subject of frequent consumer complaints.

147.    The HomeSure Defendants divide the payments for the home warranty products with Ocwen or pay Ocwen a commission or other compensation.

148.    The payments to Ocwen or Altisource from the Assurant Defendants and from the HomeSure Defendants constitute "consideration for [Ocwen's] own … account from a[] party dealing with such plan in connection with a transaction involving the assets of the plan," and are thus prohibited transactions.  29 U.S.C. § 1106(b)(3).

149.    According to the 2017 CFPB complaint against Ocwen, Ocwen marketed more than 109 add-on products and included charges for the products in homeowner's monthly payments. The add-on products included identity theft protection, credit monitoring, and other financial advisory products and services. Certainly most and probably all of the add-on product vendors paid Ocwen commissions or other compensation for marketing the products and for processing payments for the products. The commissions or other compensation that add-on product vendors have paid Ocwen are prohibited transactions.

150.    The Assurant Defendants and the HomeSure Defendants are parties in interest and knowingly participated in Ocwen's prohibited transactions and breach of fiduciary duty to benefit plans that invested in mortgages that Ocwen serviced.

### E.  OCWEN'S AND BENEFIT PLAN INVESTORS' ADVERSE INTERESTS FROM OCWEN'S MORTGAGE LENDING

151.    Ocwen is also a mortgage lender and owns mortgages, such as home equty loans or lines of credit, that are junior to securitized mortgages that Ocwen servies.

152.    Ocwen's ownership interest in such junior mortgages creates even more opportunities for self-dealing. Adding debt secured by the same home makes default on the more senior mortgages more likely, to the disadvantage of investors in those senior mortgages.

153.    The reduction in principal on more senior mortgages increases the collateral for holders of junior mortgages.

154.    Any modification by Ocwen of a senior mortgage that is a plan asset on a home on which Ocwen holds an interest in a junior mortgage constitutes dealing with plan assets for Ocwen's own interest.

155.    An Ocwen affiliate, Homeward Residential, Inc, refinances mortgages. Performing mortgages – mortgages that are neither in default nor delinquent – are profitable to mortgage investors. A refinance of a performing mortgage is thus detrimental to the interests of investors in the mortgage that is refinanced.

156.    Another Ocwen affiliate, Liberty Home Equity Solutions, Inc., offers reverse mortgages for older homeowners with significant equity in their homes.  A reverse mortgage makes default on existing senior mortgages more likely.

157.    Ocwen's marketing of reverse mortgages to homeowners whose mortgages Ocwen services in which benefit plans invested uses benefit plan assets for Ocwen's profit in breach of Ocwen's fiduciary duty under ERISA.

### F.  OCWEN'S PRINCIPAL REDUCTIONS TO SETTLE REGUATORY ENFORCEMENT ACTIONS FOR OCWEN'S MISCONDUCT

158.    "Court documents paint a brutal portrait of Ocwen's servicing practices," an article in National Mortgage News said of the allegations of the recent legal actions against Ocwen by CFPB and state regulators. The allegations of previous enforcement actions have also been harsh, but the sanctions imposed on Ocwen have never been as harsh as the criticisms of Ocwen's misconduct would suggest.

159.    The Consent Order entered in 2013 with the CFPB, 49 states and the District of Columbia required that Ocwen go forth and sin no more, and follow more detailed servicing guidelines required in an earlier settlement with other mortgage servicers. The Order required Ocwen to pay $127 million to a "consumer relief fund," which would be distributed to homeowners on whose homes Ocwen had foreclosed from January 1, 2009 until December 21, 2012.

160.   Ocwen also agreed to reduce $2 billion in principal on mortgages that Ocwen serviced but in which Ocwen held no beneficial ownership interest.

161.   Ocwen entered a Consent Order on February 17, 2017 with the Commissioner of Business Oversight of the State of California for similar allegations of misconduct by Ocwen. Ocwen agreed to make cash payments of $27 million to homeowners and the Department for "penalties, costs and fees," and to provide "Debt forgiveness of One Hundred and Ninety-Eight Million Dollars ($198,000,000) through loan modification" for California homeowners. The debt forgiveness required by the California Consent Order was also on mortgages that Ocwen serviced but in which Ocwen had no beneficial ownership interest.

162.   Ocwen acknowledged that it paid nothing toward the principal reduction that was required because of its misconduct: "Principal forgiveness does not involve an expense to Ocwen other than the operating expense incurred in arranging the modification, which is part of Ocwen's role as loan servicer," Ocwen said in a December 19, 2013 filing with the Securities and Exchange Commission.

163.   The settlements provided Ocwen an incentive to reduce principal by more than was required as risk mitigation to avoid foreclosure, which would violate prudent servicing standards and harm investors.

164.   Ocwen has reduced and continues to reduce the principal on mortgages that are benefit plan assets to satisfy regulatory orders entered against Ocwen for Ocwen's misconduct.

165.   For such principal reductions on mortgages in which benefit plans invested, Ocwen "receives consideration . . . in connection with a transaction involving the assets of the plan." Such modifications are therefore prohibited transactions under 29 U.S.C. § 1106(b)(3).

X.    **CLASS ACTION ALLEGTIONS**

166.   Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(1) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of trustees of all benefit plans that invested

in securitized mortgages serviced by Ocwen, and were damaged by Defendants' breaches of fiduciary duties. The class period is from six years before this action was filed until the present. Excluded from the class are any officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, or assigns of any of those defendants or any of those defendants' predecessors in interest in any entity in which those defendants or any predecessor in interest has a controlling interest.

167.    The members of the class are so numerous that joinder of all class members is impractical. While the exact numbers of class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands, if not tens of thousands, of trustees of benefit plans that invested in securitized mortgages serviced by Ocwen during the class period. The class of trustees is ascertainable from records that relate to the administration of the Trusts.

168.    Plaintiff's claims are typical of the claims of the members of the class as all members of the class are similarly affected by Defendants' wrongful conduct in violation of ERISA that is complained of herein.

169.    Common questions of law and fact exist as to the trustees of all benefit plans that invested in the securitized mortgages serviced by Ocwen and those questions predominate over any question of law or fact that solely affects the trustees of any single benefit plan investor. Among the questions of law and fact common to the class are:

170.    (a)    whether securitized mortgages that Ocwen serviced were plan assets of the benefit plans that invested in those securitized mortgages and whether Ocwen has or had discretionary control of those securitized mortgages;

171.

172.    (b)    whether Ocwen failed to act prudently and loyally in servicing securitized mortgages in which benefit plans invested;

173.

174.    (c)    whether Ocwen systematically forced homeowners into foreclosure when other procedures would have been more beneficial to benefit plan investors;

175.

176.    (d)    whether Ocwen systematically charged excessive ancillary fees and foreclosure costs ultimately paid by benefit plan investors;

177.

178.    (e)    whether Ocwen and the Altisource Defendants are alter egos or otherwise related entities for purposes of the fiduciary duties imposed by ERISA;

179.

180.    (f)    whether Ocwen systematically paid excessive fees to the Altisource Defendants, the Assurant Defendants, and the HomeSure Defendants

181.

182.    (g)    whether Ocwen received compensation or payments from those defendants that are prohibited transactions under ERISA;

183.

184.    (h)    whether the Altisource Defendants, the Assurant Defendants and the HomeSure Defendants knowingly participated in prohibited transactions;

185.

186.    (i)    whether reduction in principal by Ocwen on securitized mortgages in which benefit plans held a beneficial ownership interest in order to satisfy regulatory enforcement orders against Ocwen are a prohibited transaction under ERISA;

187.

188.    (j)    whether Ocwen, the Altisource Defendants, the Assurant Defendants and the HomeSure Defendants were unjustly enriched through prohibited transactions for which Ocwen and other defendants should pay restitituion; and

189.

190.    (k)    whether and to what extent benefit plan investors have suffered damages as a result of Ocwen's breach of the duties under ERISA, and the proper measure of damages.

191.

192.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impractical. The claims on behalf of some benefit plans may be relatively small and the burden of individual litigation would make it impossible for trustees of some benefit plan investors in securitized mortgages serviced by Ocwen to redress the wrongs done to those benefit plans and would create the risk of establishing incompatible standards of conduct for Ocwen and the other defendants. There will be no difficulty in the management of this action as a class action.

193.    Plaintiffs will fairly and adequately protect the interests of class members. Plaintiffs have no interests antagonistic to or in conflict with the class of trustees of benefit plans that invested in securitized mortgages serviced by Ocwen. Plaintiffs will vigorously protect the interests of absent class members. Plaintiffs have retained counsel who are competent and have extensive experience in complex, class action, and specifically mortgage securitization and servicing litigation, and are well familiar with the fiduciary duty requirements of ERISA.

194.    Plaintiffs have standing to represent the class of Trustees because (i) Plaintiffs suffered injury as a result of Defendants' alleged misconduct and, (ii) Defendants' conduct implicates the same set of concerns for all securitized mortgages that Ocwen serviced -- regardless of the particular trust where the securitized mortgages are held -- as the conduct alleged to have caused Plaintififfs' injuries. This is so because Defendants' conduct was uniformly imprudent and

self-interested, across all trusts whose securitized mortgages Ocwen serviced and not dependent on the idiosyncratic characteristics of any particular trust that held securitized mortgages.

XI.     COUNTS

### COUNT ONE

**Breach of Fiduciary Duty**
**In Violation of 29 U.S.C. § 1109**
**(Against the Ocwen Defendants)**

195.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

196.    As set forth above, Ocwen was a fiduciary of the ERISA plans and breached its fiduciary duties in the following ways:

- Ocwen systematically forced homeowners into default and foreclosure when other procedures would have been more beneficial to benefit plan investors;

- Ocwen systematically charged excessive or improper ancillary fees and received payment for excessive or improper foreclosure costs ultimately paid by benefit plan investors;

- Ocwen systematically reduced principal on mortgages that are plan assets to satisfy regulatory enforcement orders pertaining to its own misconduct, to the detriment of benefit plan investors;

- Ocwen systematically paid excessive or improper fees to Defendants and other vendors for which Ocwen received kickbacks to the detriment of benefit plan investors; and

- Ocwen systematically failed to perform other duties and discretionary acts to the detriment of benefit plan investors.

197.

198.    The benefit plans have suffered losses as a result of Ocwen's breaches of fiduciary duties and Defendants have been unjustly enriched.

199.    Plaintiffs, as fiduciaries of the ERISA plans, are authorized by 29 U.S.C. §§ 1132(a)(2) & (a)(3) to seek to require that Defendants make good to the plans any losses to the plans that resulted from Defendants' breaches of fiduciary duties, the disgorgement of any profits

made through use of the assets of the plan, and other appropriate relief for Ocwen's breaches of its fiduciary duties to the benefit plans.

**COUNT TWO**

**Prohibited Transactions**
**In Violation of 29 U.S.C. § 1106(b)**
**(Against The Ocwen Defendants, the Altisource Defendants,**
**the Assurant Defendants and the HomeSure Defendants)**

200.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

201.    As set forth above, the Ocwen Defendants, Altisource Defendants, Assurant Defendants, and the HomeSure Defendants engaged in numerous transactions prohibited by 29 U.S.C. § 1106(b).

202.    The benefit plans suffered losses as a result of the prohibited transactions and Defendants have been unjustly enriched.

203.    Plaintiffs, as fiduciaries of the benefit plans, are authorized by 29 U.S.C. § 1132(a)(3), to seek appropriate equitable relief from fiduciaries and non-fiduciary parties in interest for engaging in prohibited transactions.

204.    Plaintiffs seek both injunctive relief – to proscribe future prohibited transactions – and restitution for unjust enrichment from all Defendants.

## XII.        PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment and order other relief as follows:

a.       Enter judgment in favor of the class and against Ocwen for losses to benefit plans caused by Ocwen's breaches of fiduciary duty, as detailed above, and to disgorge any monies obtained from prohibited transactions that involved plan assets;

b.       Enter judgment in favor of Plaintiffs and against the Altisource Defendants for restitution of profits from any prohibited transaction between Ocwen and the Altisource Defendants, which includes any fees in excess of what would be available in a comparable transaction between unrelated parties at arm's length, with the liability of the Altisource Defendants for such transactions joint and several with the liability of Ocwen;

c.       Enter judgment in favor of Plaintiffs and against the Assurant Defendants and the HomeSure Defendants for restitution of payments in violation of 29 U.S.C. § 1106, which includes any commissions, profit or fee split, kickbacks, and any other payment by the Assurant Defendants or the HomeSure Defendants to Ocwen or the Altisource Defendants, and profits from any premiums that were more than reasonable, with the liability of the Assurant Defendants and the HomeSure Defendants for such transactions joint and several with the liability of Ocwen and the Altisource Defendants;

d. Enter judgment in favor of plaintiffs, on behalf of the class, to disgorge any reduction in principal on mortgages in which benefit plans held a beneficial interest in order for Ocwen to comply with any regulatory enforcement orders directed to Ocwen's misconduct;

e.       Enter a declaratory judgment and a preliminary and permanent injunction as follows:

   (1)       That no Defendant pay, and that neither Ocwen nor any Altisource Defendant or subsidiary receive, any consideration in connection with a transaction that involves any mortgage that is a benefit plan asset;

   (2)       That Ocwen not charge any fee in connection with a transaction that involves any mortgage that is a benefit plan asset that is not required or is more than reasonable, and any contract that requires such payment be declared void;

   (3)       That Ocwen and the Altisource Defendants take every measure necessary to eliminate common ownership or control between Ocwen and any of the Altisource Defendants;

   (4)       That neither Ocwen nor any subsidiary of Ocwen extend a mortgage on any home with a mortgage that Ocwen services that is a plan asset, and that Ocwen divest itself of any ownership interest in any mortgage on any home with a mortgage that Ocwen services that is a plan asset;

   (5)       That Ocwen not charge any homeowner with a mortgage that Ocwen services that is a plan asset for any service not specifically allowed in the homeowner's mortgage contract or or for a fee that is not reasonable; and

   (6) That Ocwen not claim any reduction in principal on any mortgages that are benefit plan assets as satisfaction of any regulatory enforcement order directed to Ocwen's misconduct.

f.       Award Plaintiffs all costs of this action, including attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1);

g.       Enjoin Defendants from concealing, removing, encumbering or disposing of assets which may be required to pay the judgment imposed by the Court; and

h.       Order such other relief for Plaintiffs and benefit plan investors in securitized mortgages serviced by Ocwen as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by a jury.

Dated:     March 5, 2018

Respectfully submitted,
LOWEY DANNENBERG, P.C.

Barbara J. Hart
David C. Harrison
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel:     (914) 997-0500
Fax:     (914) 997-0035
E-mail: bhart@lowey.com
E-mail: dharrison@lowey.com

GUTTMAN, BUSCHNER & BROOKS PLLC
Elizabeth H. Shofner
lshofner@gbblegal.com
Justin S. Brooks (JB 2085)
jbrooks@gbblegal.com
41-30 46th Street, Apt. 1-O
Sunnyside, NY  11104
Tel: 202-800-3001
Fax: 202-827-0041

Reuben A. Guttman*
rguttman@gbblegal.com
Traci L. Buschner*
tbuschner@gbblegal.com
R. Bradley Miller*
bmiller@gbblegal.com
2000 P Street, N.W., Suite 300
Washington, DC 20036
Tel: 202-800-3001
Fax: 202-827-0041

Jonathan D. Karmel
jon@karmellawfirm.com
221 N. La Salle Street, Suite 1550
Chicago, IL 60601
Tel: 800-459-6264
Fax: 312 641-0781

*Pro Hac Vice Motions to be filed shortly.