# EXHIBIT J



## INFORMATIONAL NOTICE

## CONCERNING RECEIPT OF "JANUARY 23RD NOTICE" FROM GIBBS & BRUNS LLP ON BEHALF OF CERTAIN INSTITUTIONAL INVESTORS

Date:   February 24, 2015

From:  Wells Fargo Bank, N.A., as Trustee (defined below) of the Trusts (defined below)

To:     Holders of securities, notes or certificates (the "**Certificateholders**") issued by those certain residential mortgage-backed securitization trusts listed on Schedule 1 hereto (each a "**Trust**" and collectively, the "**Trusts**").

**THIS INFORMATIONAL NOTICE (THE "NOTICE") CONTAINS IMPORTANT INFORMATION THAT MAY BE OF INTEREST TO THE BENEFICIAL HOLDERS OF THE SUBJECT SECURITIES LISTED ON SCHEDULE 1.  IF APPLICABLE, ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE REQUESTED TO EXPEDITE RE-TRANSMITTAL OF THIS NOTICE TO SUCH BENEFICIAL HOLDERS IMMEDIATELY.**

This Notice is given to you by Wells Fargo Bank, N.A., in its capacity as trustee, indenture trustee, custodian, and/or in any other agency capacity (the "**Trustee**") under the Pooling and Servicing Agreements, Indentures and/or related Servicing Agreements (collectively, the "**Governing Agreements**") governing the Trusts.  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Governing Agreements.

### Notice of Ocwen Financial Corp.'s Alleged Failure to Perform

The Trustee is in receipt of a letter dated January 23, 2015 (the "**January 23rd Notice**") from the law firm of Gibbs & Bruns LLP ("**G&B**") which states that G&B represents holders or investment managers for holders (the "**G&B Holders**") of at least 25% of the voting rights in certificates issued by 119[1] trusts (the "**Affected Trusts**")[2], which include, among others, the

---

[1] It is the Trustee's current understanding that there are four (4) trusts on Exhibit A to the January 23rd Notice that may have been included therein incorrectly.  The relevant master servicer and/or trustee is conferring with G&B to confirm whether the January 23rd Notice should apply to these four (4) trusts.  The four (4) trusts are as follows:  HVMLT 2006-3, GSAMP 2007-HS1 (HSBC1), MABS 2006-FRE2 and HVMLT 2005-16.

[2] A list of the Affected Trusts can also be found at the following website:
http://www.gibbsbruns.com/certificateholders-issue-notice-of-non-performance-identifying-alleged-failures-by-

Trusts. The Trustee has not confirmed the accuracy of the percentages stated in the January 23rd Notice. A copy of the January 23rd Notice is attached hereto as *Exhibit A* (excluding Exhibits B through M (redacted exhibits are available upon request after a certification of holdings)).

Pursuant to the January 23rd Notice, on behalf of the G&B Holders, G&B provided notice to the Trustee and other addressees, including Ocwen Financial Corp. ("**Ocwen**"), of alleged ongoing events of default for the Affected Trusts caused by Ocwen's purported failure to observe and perform, in material respects, the covenants and agreements imposed on it by the Governing Agreements. Certificateholders are referred to the January 23rd Notice for the specific allegations made by the G&B Holders.[3]

By letter to G&B dated January 26, 2015 (the "**Ocwen Response**"), on which the Trustee, among others, was copied, Ocwen, through its attorneys, denied any basis for a default under the Governing Agreements and stated that it would review the exhibits mentioned in the January 23rd Notice and respond once it completed its review. A copy of the Ocwen Response is attached to this Notice as *Exhibit B*.[4]

On behalf of the G&B Holders, G&B replied to the Ocwen Response on January 26, 2015 asserting, among other things, that Ocwen had sixty (60) days to respond to the January 23rd Notice (the "**G&B Reply**"). A copy of the G&B Reply is attached to this Notice as *Exhibit C*.

By letter dated February 11, 2015 (the "**Request for Production**"), Ocwen, through its attorneys, requested that G&B "produce any and all information, data, or modeling material that purports to support [the G&B Holders'] accusations" in connection with the January 23rd Notice, including production of particular categories of information set forth in Exhibit A to the Request for Production. A copy of the Request for Production is attached to this Notice as *Exhibit D*.

The January 23rd Notice and related correspondence described above remain under review. ***As of the date of this Notice, the Trustee has not made a determination as to (i) whether or not the acts and omissions alleged in the January 23rd Notice have occurred, (ii) whether or not such alleged acts and omissions (if in fact they occurred) constitute material breaches of the Governing Agreements, or (iii) whether or not any default or Event of Default has occurred and is continuing under the Governing Agreements.***

**This Notice is NOT intended to be a comprehensive summary or restatement of the January 23rd Notice, the Ocwen Response, the G&B Reply, the Request for Production or the relevant law or legal procedures. Certificateholders and other potentially interested persons are urged to review carefully the January 23rd Notice, the Ocwen**

---

Ocwen-financial-corporation-as-servicer-or-master-servicer-to-perform-covenants-and-servicing-agreements-in-119-residential-mortgage-backed-securities-trusts-01-23-2015/.

[3] After issuing the January 23rd Notice, the G&B Holders requested that such notice be deemed given on the later of (a) January 23, 2015 or (b) the first date occurring on or before March 24, 2015, that would cause the applicable notice and cure periods that are sixty (60) days or less, if any, in respect of the alleged defaults to lapse on March 24, 2015.

[4] The Ocwen Response is also available at: http://shareholders.ocwen.com/releases.cfm.

Response, the G&B Reply, and the Request for Production, and to consult with their own legal and financial advisors, including with respect to pursuing any rights and remedies (if any) that may be available to them under the Governing Agreements.

This Notice is also available on the Trustee's website at www.ctslink.com.

<u>**General Information**</u>

Certificateholders and other persons interested in the Trusts should not rely on the Trustee, or on counsel or other advisors retained by the Trustee, as their sole source of information.

The Trustee does not make any recommendations or investment, accounting, financial, legal or tax advice by or on behalf of the Trustee, or its directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that the Trustee reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by the Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

The Trustee expressly reserves its rights under each applicable Governing Agreement, including without limitation, any right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by the Trustee in performing its duties, indemnities owing or to become owing to the Trustee, compensation for the Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder (including, without limitation, the G&B Holders), to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

Notice recipients may contact the Trustee via (1) email at bill.fay@wellsfargo.com, or (2) mail addressed to Wells Fargo Bank, N.A., 9062 Old Annapolis Road, Columbia, MD 21045, Attn: William Fay, Vice President – Default & Restructuring.

The Trustee may conclude that a specific response to particular inquiries from individual Certificateholders is not consistent with equal and full dissemination of information to all Certificateholders.

Wells Fargo Bank, N.A., as Trustee of the Trusts

**SCHEDULE 1**

**ABFC 2004-OPT4**

| Class | CUSIP[5] |
|-------|----------|
| A-1 | 04542BHB1 |
| A-2 | 04542BHC9 |
| M-1 | 04542BHD7 |
| M-2 | 04542BHE5 |
| M-3 | 04542BHF2 |
| M-4 | 04542BHG0 |
| M-5 | 04542BHH8 |
| M-6 | 04542BHJ4 |
| M-7 | 04542BHK1 |
| CE | ABF04OP4C |
| R1 | ABF4OP4R1 |
| R2 | ABF4OP4R2 |
| P | ABF04OP4P |

**ABFC 2005-WMC1**

| Class | CUSIP |
|-------|-------|
| R | ABF05WM1R |
| A-1 | 04542BNX6 |
| A-2A | 04542BNY4 |
| A-2B | 04542BNZ1 |
| A-2C | 04542BPA4 |
| A-2D | 04542BPB2 |
| A-2MZ | 04542BPC0 |
| M-1 | 04542BPD8 |
| M-2 | 04542BPE6 |
| M-3 | 04542BPF3 |
| M-4 | 04542BPG1 |
| M-5 | 04542BPH9 |
| M-6 | 04542BPJ5 |
| M-7 | 04542BPK2 |
| M-8 | 04542BPL0 |
| M-9 | 04542BPM8 |
| M-10 | 04542BPN6 |
| M-11 | 04542BPP1 |

---

[5] No representation is made as to the correctness of the CUSIPs either as printed on the Certificates or as contained in this Notice. Such numbers are included solely for the convenience of the Certificateholders.

| M-12 | 04542BPQ9 |
|------|-----------|
| B-1 | 04542BPR7 |
| B-2 | 04542BPS5 |
| CE | ABF5WM1CE |
| R-X | ABF5WM1RX |
| P | ABF05WM1P |

## ABSHE 2004-HE3

| Class | CUSIP |
|-------|-------|
| R | 04541GJL7 |
| B-IO | 04541GJH6 |
| A1 | 04541GJM5 |
| A1A | 04541GJN3 |
| A2 | 04541GJP8 |
| A2A | 04541GJQ6 |
| A3 | 04541GJR4 |
| A3A | 04541GJS2 |
| M1 | 04541GJT0 |
| M2 | 04541GJU7 |
| M3 | 04541GJV5 |
| M4 | 04541GJW3 |
| M5 | 04541GJX1 |
| M6 | 04541GJY9 |
| M7 | 04541GJZ6 |
| X | 04541GJJ2 |
| P | 04541GJK9 |

## MABS 2003-OPT2

| Class | CUSIP |
|-------|-------|
| A-1 | 57643LBC9 |
| A-2 | 57643LBD7 |
| A-3 | 57643LBE5 |
| M-1 | 57643LBF2 |
| M-2 | 57643LBG0 |
| M-3 | 57643LBH8 |
| M-4 | 57643LBJ4 |
| M-5 | 57643LBK1 |
| CE | MAB3OPT2C |
| R-1 | MAB3OP2R1 |
| R-2 | MAB3OP2R2 |
| P | MAB3OPT2P |

**MABS 2004-OPT1**

| Class | CUSIP |
|-------|-----------|
| A-1 | 57643LCE4 |
| A-2 | 57643LCF1 |
| A-3 | 57643LCG9 |
| M-1 | 57643LCH7 |
| M-2 | 57643LCJ3 |
| M-3 | 57643LCK0 |
| M-4 | 57643LCL8 |
| M-5 | 57643LCM6 |
| M-6 | 57643LCN4 |
| M-7 | 57643LCP9 |
| CE | MAB4OPT1C |
| R | MAB4OP1R2 |
| P | MAB4OPT1P |

**MSAC 2003-SD1**

| Class | CUSIP |
|-------|-----------|
| A-1 | 61746RCE9 |
| A-2 | 61746RCK5 |
| M-1 | 61746RCF6 |
| M-2 | 61746RCG4 |
| B-1 | 61746RCH2 |
| B-2 | 61746RCJ8 |
| X | MSI003SDX |
| P | MSI003SDP |
| R | MSI03SDRU |

**MSAC 2006-HE1**

| Class | CUSIP |
|-------|-----------|
| A-1 | 617451DN6 |
| A-2 | 617451DP1 |
| A-3 | 617451DQ9 |
| A-4 | 617451DR7 |
| M-1 | 617451DS5 |
| M-2 | 617451DT3 |
| M-3 | 617451DU0 |
| M-4 | 617451DV8 |
| M-5 | 617451DW6 |
| M-6 | 617451DX4 |
| B-1 | 617451DY2 |
| B-2 | 617451DZ9 |

| B-3 | 617451EA3 |
| P | MSC06HE1P |
| X | MSC06HE1X |
| R | MSC6HE1R1 |

## MSAC 2007-HE4

| Class | CUSIP |
| --- | --- |
| A-1 | 61753VAA0 |
| A-2a | 61753VAB8 |
| A-2b | 61753VAC6 |
| A-2c | 61753VAD4 |
| A-2d | 61753VAE2 |
| M-1 | 61753VAF9 |
| M-2 | 61753VAG7 |
| M-3 | 61753VAH5 |
| M-4 | 61753VAJ1 |
| M-5 | 61753VAK8 |
| M-6 | 61753VAL6 |
| B-1 | 61753VAM4 |
| B-2 | 61753VAN2 |
| B-3 | 61753VAP7 |
| X | MORGN07HE4X |
| P | MORGN07HE4P |
| R | MORGN07HE4R |
| RX | MORG07HE4RX |

## SABR 2006-FR1

| Class | CUSIP |
| --- | --- |
| A-1 | 81375WJQ0 |
| A-2A | 81375WJR8 |
| A-2B | 81375WJS6 |
| A-2C | 81375WJT4 |
| M-1 | 81375WJU1 |
| M-2 | 81375WJV9 |
| M-3 | 81375WJW7 |
| B-1 | 81375WJX5 |
| B-2 | 81375WJY3 |
| B-3 | 81375WJZ0 |
| X | SAB06FR1X |
| P | SAB06FR1P |
| R | SAB06FR1R |

**SABR 2006-FR2**

| Class | CUSIP |
|-------|-------|
| A-1 | 81376VAA5 |
| A-2 | 81376VAB3 |
| A-3 | 81376VAC1 |
| M-1 | 81376VAD9 |
| M-2 | 81376VAE7 |
| M-3 | 81376VAF4 |
| B-1 | 81376VAG2 |
| B-2 | 81376VAH0 |
| B-3 | 81376VAJ6 |
| B-4 | 81376VAK3 |
| B-5 | 81376VAL1 |
| X | SAB06FR2X |
| P | SAB06FR2P |
| R-I | SAB6FR2R1 |
| R-II | SAB6FR2R2 |

**SABR 2006-FR3**

| Class | CUSIP |
|-------|-------|
| A-1 | 813765AA2 |
| A-2 | 813765AB0 |
| A-3 | 813765AC8 |
| M-1 | 813765AD6 |
| M-2 | 813765AE4 |
| M-3 | 813765AF1 |
| B-1 | 813765AG9 |
| B-2 | 813765AH7 |
| B-3 | 813765AJ3 |
| B-4 | 813765AK0 |
| B-5 | 813765AL8 |
| X | SAB06FR3X |
| P | SAB06FR3P |
| R-I | SAB6FR3R1 |
| R-II | SAB6FR3R2 |

**Exhibit A**

January 23, 2015

<u>Via Federal Express</u>

The Bank of New York Mellon
101 Barclay Street
New York, New York 10286
Attention: Structured Finance
Corporate Trust Administration

Corporate Trust Office
Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, New York 10013
Attention: Structured Finance
Agency & Trust

Corporate Trust Office
Citibank, N.A.
111 Wall Street, 14th Floor/Zone 3
New York, New York 10005
Attention: Structured Finance Services

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705
Attention: RMBS Trust Administration

Corporate Trust Office (RMBS)
HSBC Bank USA, N.A.
452 Fifth Avenue
New York, New York 10018
Attention: Corporate Trust (RMBS)

Deutsche Bank Trust Co. Americas
60 Wall Street
New York, New York 10005
Attention: RMBS Trust Administration

U.S. Bank National Association
One Federal Street, Third Floor
Boston, Massachusetts 02110
Attention: Corporate Trust (SFS)

U.S. Bank National Association
209 South LaSalle Street, Suite 300
Chicago, Illinois 60604
Attention: Corporate Trust (RMBS)

U.S. Bank National Association
One Wall Street, Suite 1600
New York, New York 10005
Attention: Structured Finance
Department

U.S. Bank National Association
100 Wall Street, 16th Floor
New York, New York 10005
Attention: Corporate Trust (RMBS)

Corporate Trust Office
U.S. Bank National Association
60 Livingston Avenue
St. Paul, Minnesota 55107
Attention:  Corporate Trust (RMBS)

U.S. Bank National Association
One Federal Street, Third Floor
Boston, Massachusetts 02110
Attention: Corporate Trust (RMBS)

Wells Fargo Bank, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attention: RMBS Corporate Trust

Timothy M. Hayes
General Counsel
Ocwen Financial Corporation
2002 Summit Boulevard NE
Atlanta, Georgia  30319

**Re:    HOLDERS' NOTICE TO SECURITIES ADMINISTRATOR, TRUSTEE, SERVICER, AND/OR MASTER SERVICER, AS APPLICABLE, OF OCWEN'S FAILURE TO PERFORM PURSUANT TO §§ 7.01, 7.1, 8.01, OR 6.14, AS THE CASE MAY BE, OF POOLING AND SERVICING AGREEMENTS PERTAINING TO THE 119 RESIDENTIAL MORTGAGE BACKED SECURITIES TRUSTS LISTED ON THE ATTACHED EXHIBIT A**

Dear Sir or Madam:

Unless otherwise indicated, all capitalized terms used in this letter have the meaning ascribed to them in those certain Pooling and Servicing Agreements (PSAs) governing the 119 Residential Mortgage-Backed Securities ("RMBS") trusts evidenced by the Mortgage Pass-Through Certificates ("Certificates") listed on the attached Exhibit "A" (the "Trusts").

Our firm represents holders or investment managers for holders ("Holders") of at least 25% of the Voting Rights in Certificates issued by the Trusts, each of whom is copied on this correspondence.[1]   Each of the Holders has authorized our firm to send this Notice of Non-Performance on their behalf.

Pursuant to Section 7.01, 7.1, 8.01, or 6.14, as the case may be, of the applicable PSAs, the Securities Administrator, Trustee, Servicer, and/or Master Servicer, as applicable, are hereby notified of an ongoing Event of Default for all Trusts in Exhibit A, caused by Ocwen Financial Corp.'s ("Ocwen") failure to observe and perform, in material respects, the covenants and agreements imposed on it as Servicer and/or Master Servicer by the PSAs.[2]

Specifically, in violation of Section 3.01, 3.1, or 11.01, as the case may be, of the applicable PSAs, Ocwen has repeatedly failed and refused to carry out its contractual obligation to prudently service the mortgage loans for and on behalf of the Certificateholders.[3]   Instead of meeting its basic obligations under the PSAs, Ocwen has engaged in the following practices, each of which is designed to enrich Ocwen and related parties, including Altisource and Home Loan Servicing Solutions Ltd., at the expense of both investors and borrowers.

---

[1]     Our clients have previously verified their 25% holdings in connection with prior correspondence to the Trustees concerning the 119 Trusts.

[2]     The citations and quotations provided in this letter are representative only.  Substantially similar provisions appear in PSAs for each of the Trusts.  This Notice of Non-Performance is issued pursuant to each of the excerpts of the relevant Event of Default provisions identified in Exhibit B.  For the avoidance of doubt, this Notice is issued with respect to each of Ocwen's operating affiliates engaged in mortgage servicing, including without limitation Ocwen Mortgage Servicing, Inc. and Ocwen Loan Servicing, LLC.

[3]     *See, e.g.,* CBASS-2006-CB5 § 3.01 ("For and on behalf of the Certificateholders, from and after the Closing Date the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans…").  A compilation of each PSA's prudent servicing provision is set out in Exhibit C hereto.

**A.      Use of Affiliated Vendors and Pervasive Conflicts of Interest**

Ocwen's servicing practices are plagued by fundamental conflicts of interest caused by Ocwen's use of affiliated vendors to carry out a variety of servicing-related activities, from valuation and auction/bidding services, to property preservation and inspections. Instead of servicing the mortgage loans for and on behalf of the Certificateholders, Ocwen instead seeks to maximize its own servicing fees and the fees of affiliated vendors, including Altisource and Home Loan Servicing Solutions Ltd.

Because these vendors are affiliates of Ocwen, rather than entities at true "arms length" from Ocwen, the terms on which Ocwen engages these vendors are materially worse than those it could obtain from true third parties. These excessive costs are not in Certificateholders' best interests, but rather in Ocwen's, as is evident from the fact that these practices increase revenues and income at Ocwen's affiliates while materially reducing cash flows to the Trusts and their Certificateholders. There is abundant evidence of Ocwen's self-dealing and misconduct in this regard. Most recently, Ocwen entered into a consent order with the New York Department of Financial Services ("DFS") after the DFS's investigation of Ocwen uncovered pervasive conflicts of interest in Ocwen's servicing activities. As part of that consent order, Ocwen has been required to make a $150 million cash payment, and Mr. William C. Erbey, the chairman of Ocwen and several related parties including Altisource and Home Loan Servicing Solutions Ltd., has stepped down from any role whatsoever at Ocwen or any related party. This consent order was the result of the lengthy investigation described below.

In February of 2014, Benjamin Lawsky, Supervisor of DFS, wrote to Ocwen raising serious issues about "potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated."[4] Mr. Lawsky stated that DFS's review "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies." Describing this as a "tangled web of conflicts," Mr. Lawsky specifically questioned the relationships and "potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ('Altisource Portfolio'), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the 'affiliated companies') all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen." Mr. Lawsky also expressed concern that ownership of stock in these various companies by Ocwen's management "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's shareholders as a result." Finally, Mr. Lawsky noted Ocwen relied heavily on affiliated companies for its information management systems and, importantly, for its procurement of third-party services.

On April 21, 2014, Mr. Lawsky again wrote to Ocwen, this time to question conflicts of interest arising from Ocwen's use of Hubzu, an auction website owned by its affiliate,

---

[4]        A copy of this letter is available at http://www.dfs.ny.gov/about/press2014/pr140226-letter.pdf.

Altisource, to auction properties in foreclosure.[5]  Mr. Lawsky noted that Ocwen "appear[ed] to be charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers."[6]  Mr. Lawsky also questioned the propriety of requiring homeowners and investors to use Hubzu to market properties, when there might be other lower-cost providers, as well as the fees Hubzu charged Ocwen to market properties through its website.

The Holders have a separate set of concerns about Ocwen's use of the Hubzu website:  it appears that properties owned by Ocwen-serviced RMBS Trusts are shunted into Hubzu's auction process, while those that are not Ocwen-serviced are listed as being sold through traditional means.  Recently, we reviewed the online listings for 283 properties available for sale by Hubzu in the twenty largest cities in the United States.  Of those:

- 241 were properties where Ocwen was listed as the seller; 42 were properties where Ocwen was not the seller.

- Of the 241 properties where Ocwen was the seller, 93% were coded to be sold at auction, with only 6% coded for traditional sales (including brokered short sales).

- In contrast, of the 42 homes where Ocwen was not the seller, only 23% were coded to be sold at auction, while the remaining 77% were coded for traditional sales.

Brokered sales (including brokered short sales) facilitated by knowledgeable realtors generally yield far more value to investors than do auctions of foreclosed properties.  Ocwen's consistent decision to *favor* auction sales for Trust-owned mortgages is not in the best interest of Certificateholders; instead, it is a practice designed to create significant, auction-based revenue for its affiliate, Hubzu.  Furthermore, Ocwen and its affiliated vendors like Hubzu and Altisource also extract even more fees during the auction process, including fees for property preservation and for valuation and appraisal-related services.  Absent resort to auction, the fee in a short sale would generally be earned by an unaffiliated real estate broker.[7]  The use of brokered sales (including brokered short sales) facilitated by knowledgeable realtors where Ocwen was *not* the servicer confirms that, where the true best interests of the mortgage-owner are concerned, brokered and short sales are (and should be) preferred.

The DFS's lengthy investigation of Ocwen culminated in the announcement of a consent order between Ocwen and DFS on December 22, 2014 (the "DFS Consent Order").[8]  In

---

[5]    A copy of this letter is available at http://www.housingwire.com/ext/resources/files/Editorial/Lawsky-Letter-to-Ocwen-RE-Altisource-Hubzu.pdf.

[6]    *See also* Exhibit H hereto, which provides thousands of loan-level examples of unexplained expenses in connection with Hubzu auctioned REO properties.

[7]    Ocwen's use of Altisource affiliate REALHome Services and Solutions, Inc. as Ocwen's default real estate agency, as documented by the DFS Consent Order, raises separate, additional concerns.

[8]    The DFS Press Release is available at http://www.dfs.ny.gov/about/press2014/pr1412221.htm.  The DFS Consent Order is available at http://www.dfs.ny.gov/about/eambco.htm.

announcing the DFS Consent Order, the DFS documented a series of fundamental conflicts of interest inherent in Ocwen's servicing activities, each of which independently constitutes a material and ongoing breach of Ocwen's prudent servicing obligations under Section 3.01 of the PSAs. These inherent conflicts of interest have enriched Ocwen and related parties to the detriment of both certificateholders and borrowers. Among the pervasive conflicts of interest identified by the DFS are the following:

- "Despite Mr. Erbey's holdings in [related parties including Altisource Portfolio], Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15 percent of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014."

- "Ocwen's close business relationship with related companies is particularly evident in its relationship with Altisource Portfolio, which has dozens of subsidiaries that perform fee-based services for Ocwen. In one example, Altisource Portfolio subsidiary Hubzu, an online auction site, hosts nearly all Ocwen auctions. *In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers — charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.*"

- "Conflicts of interest are also evident at other levels of the Ocwen organization. For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer."

In sum, as a result of its ownership and management structure and, indeed, its very business model, Ocwen has repeatedly and materially failed to service the mortgage loans for and on behalf of the Certificateholders. Instead, Ocwen's servicing activities have been used to maximize its own fees and those of related parties in which Mr. Erbey has major ownership stakes, including Altisource and Home Loan Servicing Solutions Ltd. Every dollar Ocwen has paid to Altisource and Home Loan Servicing Solutions Ltd. for unnecessary or overpriced servicing related functions has enriched Mr. Erbey and other shareholders of those Ocwen affiliates to the immediate and direct detriment of the Trusts and Certificateholders. This *pervasive* self-dealing and unjust enrichment of Ocwen's corporate affiliates constitutes a fundamental breach of Ocwen's basic prudent servicing obligations under the PSAs.

**B.**     **Imprudent Modification Practices**

The PSAs require that Ocwen use reasonable best efforts to foreclose upon or otherwise liquidate mortgage collateral (which may include a short sale or REO acquisition) where the mortgage continues to be in default and where satisfactory arrangements for collection of delinquent payments cannot be made.   Applicable provisions of the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties. Instead of prudently servicing the mortgage loans by foreclosing upon or otherwise liquidating mortgage collateral when a prudent servicer would do so, Ocwen instead repeatedly engages in net present value ("NPV")-negative modifications in order to maximize its servicing fees and prematurely recoup advances.  Ocwen's imprudent modification practices are summarized in the sections and tables below.  Individually, and certainly collectively, these practices demonstrate systematic and devastating breaches of Ocwen's obligations as servicer—not just in the 119 Trusts in Exhibit A, but also in *thousands* of other Ocwen-serviced RMBS trusts.

**(i)**     **Re-Default Rates and Severity of Modifications**

As our clients have previously notified the Trustees, Ocwen's imprudent modification practices result in materially higher re-default and re-modification rates when fairly compared to modifications performed by other servicers.[9]  We have engaged a highly qualified non-agency servicing expert to analyze a massive amount of publicly available loan-level information for Ocwen and non-Ocwen serviced loans across thousands of non-agency RMBS trusts (the "Servicing Expert"), including the Trusts in Exhibit A.  The Servicing Expert has compared all modifications performed by Ocwen with modifications performed by other servicers from 2012-2013 in non-agency RMBS trusts for which loan-level data was publicly available.  In total, the Servicing Expert analyzed approximately 73,000 modifications performed by Ocwen, and 174,000 modifications performed by all other servicers, as set out in the table below:

| Payment Decrease % | NON-OCWEN | | | | | OCWEN | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | # Loans | % of Total | 12M Re-Default Rate | WA Avg Pymt Reduction | WA Loss % | # Loans | % of Total | 12M Re-Default Rate | Diff to Non-Ocwen | WA Avg Pymt Reduction | WA Loss % |
| a.  1 - 20% | 40,363 | 23% | 22.7% | 10.6% | 13.9% | 11,650 | 16% | 28.9% | 6.3% | 11.1% | 18.2% |
| b. 21 - 30% | 27,939 | 16% | 18.2% | 25.4% | 16.7% | 7,836 | 11% | 24.2% | 6.1% | 25.2% | 21.4% |
| c. 31 - 40% | 34,631 | 20% | 15.0% | 34.7% | 18.8% | 8,947 | 12% | 21.0% | 5.9% | 35.1% | 24.9% |
| d. 41 - 50% | 27,965 | 16% | 12.0% | 44.9% | 24.8% | 9,990 | 14% | 17.1% | 5.1% | 45.2% | 30.3% |
| e. 51 - 60% | 22,208 | 13% | 9.4% | 54.7% | 31.8% | 10,754 | 15% | 14.6% | 5.2% | 55.1% | 38.3% |
| f. 61+% | 21,331 | 12% | 8.3% | 67.7% | 45.0% | 23,586 | 32% | 9.4% | 1.1% | 70.2% | 55.2% |
| Total | 174,437 | 100% | 15.3% | 36.5% | 23.3% | 72,763 | 100% | 17.4% | 2.1% | 45.9% | 35.9% |

*Source: CoreLogic LoanPerformance and US Treasury MHA Data as of September 2014; Created 1/8/2015;*
*12M Re-Default = OTS 60, 90+, FC, REO, Liquidated (12 Months after Loan Modification)*

---

[9]     *See, e.g.,* the Holders' correspondence to the Trustees dated June 28, 2013 and July 17, 2013 (showing Ocwen's re-modification rate was <u>twice</u> as large as other major subprime servicers – 28% versus 14%).  Each of these letters to the Trustees is incorporated into this Notice as if fully set forth herein.

As this table shows, approximately *47%* of Ocwen's modifications reduced the borrower's payments by more than 50%[10], while only 25% of modifications for all other servicers reduced the borrower's payments by more than 50%. This differential demonstrates Ocwen's reliance on <u>extreme</u> and <u>imprudent</u> modifications, including extreme forgiveness or deferment of principal. In the Trusts listed in Exhibit A, for example, Ocwen has slashed $78 million in principal from mortgage balances since November 2013.[11] A trust-by-trust schedule of such principal forgiveness is attached hereto as Exhibit D. Ocwen's extreme modifications, alone, are evidence of its imprudent servicing practices and its failure to service the loans for and on behalf of Certificateholders, its fundamental duty under the PSAs.

In addition, a comparison of Ocwen's modifications to those of other servicers for similar payment reduction percentages demonstrates that Ocwen's 12-month re-default rate is *higher with respect to every category of payment reduction percentages*. For example, even when Ocwen reduces the borrower's payments by 1% to 20%, its 12-month re-default rates are 28.9%, compared to 22.7% for modifications performed by other servicers that also reduced the borrower's payments by 1% to 20%. When Ocwen reduces the borrower's payment by 51% to 61%, its re-default rates are 14.6%, compared to 9.4% for modifications performed by other servicers that also reduced the borrower's payments by 51% to 61%.

Likewise, when comparing losses passed through to the trusts at the time of loan modification, again after controlling for similar payment reduction percentages, Ocwen's modifications *consistently pass through higher losses to the trusts*. For example, with respect to modifications that reduce the borrower's payments by 61% or more, the weighted average loss severity to Ocwen-serviced trusts is 55%, compared to 45% in non-Ocwen serviced trusts. This result holds for each of the payment reduction percentages shown in the table above.

In sum, this data shows two fundamental deficiencies in Ocwen's modifications. First, Ocwen's modifications, including principal forgiveness and forbearance, are much more extreme than modifications performed by other servicers. Second, when compared to other servicers' modifications on an apples-to-apples basis (by controlling for the magnitude of the borrower's payment reduction), Ocwen's modifications result in <u>significantly</u> higher re-default rates and cause significantly greater losses to the RMBS trusts for which it acts as servicer.[12]

---

[10]     That is, 15% of Ocwen's modifications reduced the borrower's payment by 51% - 60%, and 32% of Ocwen's modifications reduced the borrower's payment by 61% or more.

[11]     As discussed in detail below, because Ocwen has used this principal forgiveness to settle claims brought by regulators for Ocwen's servicing misconduct, all principal forgiveness in the Trusts for which Ocwen claims credit toward the CFPB is subject to disgorgement to the Trusts.

[12]     These results are robust, and hold true even if one were to look at only subprime trusts.

(ii)     **Modifications Motivated By Premature Recovery of Advances**

Contrary to Ocwen's public assertions, these extreme and imprudent modification practices are *not* associated with improved investor or homeowner outcomes. Quite the opposite. These practices instead appear to be driven by Ocwen's desire to recover advances at the time of modification. Exhibit E hereto presents all of the advances that Ocwen has recovered on loans that it has modified in the Trusts. These advances total to approximately $260 million in the Trusts.

Clearly, under the PSAs, any modification Ocwen performs because of its desire to prematurely recoup advances, rather than maximize investor outcomes, constitutes a violation of its duty under the PSAs to service the loans for and on behalf of Certificateholders. Exhibit F hereto presents 1,022 examples of specific loan modifications in the Trusts identified by the Servicing Expert that have *no conceivable rationale* other than the premature recovery of advances.[13] In connection with each of these inexplicable modifications, all of which resulted in a default, Ocwen recouped servicing advances. These examples of wholly improper modifications are characterized by one or more of the following four traits, which are also listed in Exhibit F:

a.    The Modification almost *immediately* fails;
b.    The Modification actually *increased* the borrower's principal and interest payment;
c.    The Modification was to a borrower who *had not made a payment in 4+ years* (and Ocwen was the servicer throughout that period); or
d.    The Modification was the *4th+ failed attempt* to modify the loan.

Although these modifications are inexplicable from the perspective of sound servicing, one common thread weaves them together – Ocwen recouped advances, totaling up to approximately $20 million for just these 1,022 loans. *See* Exhibit F. Each of the loan modifications set out in Exhibit F constitutes imprudent servicing and has materially harmed the Trusts by depriving the Trusts of cash flows that would have resulted from prudent servicing practices.

Although Exhibit F presents extensive loan-level examples of Ocwen's wholly improper modifications, the following loans are representative of Ocwen's failure in this regard:

**Loan # 0112092573  ACE 2006-SD2   serviced by Ocwen since inception**
- Borrower made 8-11 payments. It became bank owned by September 2007, then oddly modified to current in December 2008 and subsequently modified three additional times. Borrower never made a single payment after receiving each of the four modifications.

---

[13]     Because the Servicing Expert's loan-level analyses are extensive, and span thousands of rows in Excel files, each of the Exhibits is being provided on an attached Thumb Drive.

- The 3rd Ocwen modification seems to have been quickly reversed but the loss to investors was never made whole.  Ocwen should have made investors whole on the $157,508 loss passed through to the trust.
- Modification #4 caused investors to take an additional $191,754 loss, bringing the cumulative loss up to $349,261.  (This was a $350,000 loan)
- At each modification, Ocwen recoups all advances, which after four modifications totals $244,042.
- Based on photos of the home available on the internet (inside/outside), it appears in very good condition. The latest Ocwen BPO (9/2014) has the home valued at $510,000, which is higher than the $279,000 purchase price in 2003 and higher than the $341,086 actual balance owed by the borrower.

### Loan #11206607  RASC 2007-KS3  serviced by Ocwen since 9/2013
- Borrower stops paying in March 2007.
- Ocwen modified the loan in February 2014, forgiving $100,617 in principal and $408,760 in debt.
- Ocwen reduces the borrower's P&I payment from $3,183 to $998.
- Ocwen recoups at least $69,757 in advances.
- Even with a 69% reduction in monthly payment, debt forgiveness, and a rising home value, borrower never makes a payment.

### Loan #141033096 MABS 2004-OPT1 serviced by Ocwen since 2/2013
- Ocwen modifies the loan in April 2014, forgiving $21,338 in principal and $96,518 in debt.  Ocwen increases the borrower's P&I payment from $1,194 to $1,465.
- Ocwen recoups at least $48,584 in advances.
- Borrower never makes a payment.

### Loan #6000174641 MABS 2005-FRE1 serviced by Ocwen since 9/2010
- Ocwen modifies the loan for the 3rd time in February 2014, capitalizing $41,543.  Ocwen increases the borrower's P&I payment from $606 to $705.
- Ocwen recoups at least $32,638 in advances.
- Borrower never makes a payment.

### Loan #3027608379 MSHEL 2007-2 serviced by Ocwen since 5/2011
- Ocwen modifies the loan in May 2013, forgiving $161,448 in principal and $356,681 in debt.  Ocwen decreases the borrower's P&I payment from $1,865 to $381.
- Ocwen recoups at least $146,468 in advances.
- Borrower never makes a payment, even with a payment of $381.

In addition, as set out in full in Section F, below, Ocwen's recovery of advances at the time of modification is not permitted by the majority of the Trusts' PSAs, but Ocwen has recovered in excess of $150 million in advances on modified loans in Trusts whose contracts

squarely prohibit that practice. That large amount would be even more staggering if this calculation were extended beyond the Trusts listed in Exhibit A to the thousands of other RMBS trusts that Ocwen currently services. There is no "prudent servicing" defense to the recovery of advances where the contracts expressly prohibit it. This is a clear breach of contract, a servicer default, and one that requires the Trustees to immediately demand that Ocwen return to the Trusts all advances improperly recouped in this way.

(iii)    **Stop Advance Practices Immediately After Modification**

The Servicing Expert has also analyzed publicly available data for each modification performed by Ocwen in the Trusts and has identified a paradox in Ocwen's advance and modification practices that can <u>only</u> be explained by Ocwen's attempt to maximize its own servicing fees and financial performance, at the expense of the Trusts and Certificateholders. Specifically, the Servicing Expert has discovered that even after a modification, Ocwen's systems very often continue to apply a "Stop Advance" tag to the loan, such that, if the borrower immediately defaults after a modification, Ocwen refuses to advance on that loan. This practice is not tenable, because the modification is, by definition, required to be net present value positive. A finding that a modification is NPV positive should, in virtually every case, cause Ocwen to advance principal and interest immediately after a borrower default if that default occurs shortly after a modification.[14]

Despite this clear logic and requirement, Ocwen consistently refuses to advance on loans for which it has recently claimed to provide a NPV-positive modification. Exhibit G hereto compiles 812 examples of mortgage loans in the Trusts for which Ocwen had no conceivable basis to refuse to advance funds after modifications, but nonetheless continued to apply a "Stop Advance" tag to the loan in its systems. Ocwen's refusal to advance on these loans, and on many others, is another example of its pervasive disregard of its servicing obligations under the PSAs.

Although Exhibit G presents extensive loan-level examples of Ocwen's failure to advance shortly following a modification, the following loans are representative of Ocwen's failure in this regard:

**Loan #001912697  MSAC 2006-HE1**
- Ocwen advances on this loan from boarding (4/2012) to loan modification (6/2013). BPO during this period ranges from $246,000 to $267,000.
- In June 2013, Ocwen defers $185,071 and recoups at least $16,443 in advances (pre-Ocwen boarding advances unknown). Ocwen reduces the borrower's P&I payment from $1,232 to $667. After this loan modification, advances outstanding are $0.00.
- Borrower defaults shortly after modification and Ocwen does not advance. In March 2014, BPO rises from $267,000 to $328,000 and then in June 2014 to

---

[14]     *See also* Section F, below, which explains why it is similarly untenable for Ocwen to attempt to justify the recoupment of advances at the time of modification on the view that such advances are "nonrecoverable." The same logic applies to Ocwen's advancing obligations immediately following a purportedly NPV-positive modification.

$348,000. Even after the valuation increases $81,000, Ocwen still does not advance.
- Property is located in California (Non-Judicial Foreclosure state).

**Loan #666566   NHEL 2006-6**
- Ocwen advances on this loan from boarding (4/2012) to loan modification (3/2014).
- In March 2014, Ocwen modifies the loan, forgiving $483,068 in debt and capitalizing $288,214.  Ocwen recoups $9,658 in advances.
- Borrower defaults shortly after modification and Ocwen does not advance.  In August 2014, BPO rises from $346,000 to $450,000 and Ocwen still does not advance.
- Property is located in New York (Judicial Foreclosure state).

**Loan #0324621  SASC 2007-TC1**
- Ocwen advances on this loan up to loan modification (5/2013).
- In May 2013, Ocwen modifies the loan, deferring $87,400.
- Ocwen recoups $18,107 in advances.
- Borrower defaults shortly after modification and Ocwen does not advance.  In July 2014, BPO rises from $297,000 to $389,000 and Ocwen still does not advance.
- Property is located in Texas (Non-Judicial Foreclosure state).

**C.     Failure to Account for Principal and Interest to the Trusts**

The Servicing Expert has also compared Ocwen's publicly available loan-level data on its servicing with the Trusts' remittance reports, to ascertain whether Ocwen is performing its obligations to account accurately for Trust cash flows and assets.  What the Servicing Expert has found is shocking.  In many instances, Ocwen's own data simply does not reconcile with the data in the remittance reports.  For example, with respect to many liquidated loans, the loan-level data created and made publicly available by Ocwen indicates that materially higher cash flows *should have flowed* into the Trusts than what the Trusts' remittance reports indicate was received. Somehow, between Ocwen's receipt of trust cash and its remittance of funds to the Trustees, millions and millions of dollars simply disappear, without explanation or any ability to trace what happened to them.

Exhibit H presents 2,033 loan-level examples of these material discrepancies in cash flows in loans held by the Trusts; that is, Ocwen's underline own data shows that materially higher amounts of cash should have flowed to the Trusts.  Just with respect to these 2,033 loans, the Servicing Expert has identified approximately $21 million in cash flow shortfalls to the Trusts, or approximately $10,600 per loan.

Likewise, as set out in Exhibit H, the Servicing Expert has identified 2,410 loans associated with Hubzu-facilitated liquidations, for which Ocwen's own data failed to account for

Ocwen Notice of Non-Performance
January 23, 2015
Page 12

approximately $24 million in mysterious expenses.  That is to say, setting aside the discrepancies between Ocwen's own data and the Trusts' remittance reports, the Servicing Expert was unable to reconcile Ocwen's own data <u>without</u> assuming that $24 million in additional, <u>undisclosed</u> expenses were actually incurred in connection with the loan's liquidation.  These expenses amounted to approximately $10,000 per loan.  Finally, as set out in Exhibit H, the Servicing Expert has also identified 1,090 loans associated with non-Hubzu liquidations, for which Ocwen's own data similarly failed to account for approximately $7 million in mysterious expenses.  As Exhibit H shows, Ocwen's failure to account for loan-level and Trust-level cash flows is systematic.

Although Exhibit H presents extensive loan-level examples of Ocwen's failure to account for principal and interest to the Trusts, the following loans are representative of Ocwen's failure in this regard:

**Loan  #324655711  SABR 2006-FR1**
- Ocwen sells REO property for $625,199 in October 2011
- Payoff Cash: $572,313  Payoff Expenses: $64,738,  Resolution Proceeds Net of Advances: $507,575
- Investors received $371,489 in principal at resolution, which is $136,086 less than what Ocwen should have passed through to the trust.

**Loan #324650365  SABR 2006-FR1**
- Ocwen accepted a short payoff in December 2013.
- Payoff Cash: $282,493, Payoff Expenses: $45,230, Resolution Proceeds Net of Advances: $237,263.
- Investors received $196,311 in principal at resolution, which is $40,951 less than what Ocwen should have passed through to the trust.

**Loan #1155160  TBW 2006-3**
- Ocwen liquidates loan in November 2013
- Payoff Cash: $281,496,  Payoff Expenses: $73,873,  Resolution Proceeds Net of Advances: $207,623
- Investors received $173,347 in principal at resolution, which is $32,276 less than what Ocwen should have passed through to the trust.

We note that this analysis was undertaken using publicly available data and remittance reports; we suspect, therefore, that a full forensic audit might well disclose that many more millions of dollars are missing and cannot be accounted for.  Ocwen's systematic failure to account for Trust cash flow constitutes an egregious violation of its duty to prudently service the mortgage loans and must be rectified immediately.

Ocwen Notice of Non-Performance
January 23, 2015
Page 13

**D.    Poor Recordkeeping and Failure to Comply With Applicable Laws and Regulations**

Ocwen has failed to maintain accurate and adequate loan and collateral files as required by the PSAs and in a manner consistent with prudent mortgage servicing standards. Not only is it impossible to reconcile Ocwen's publicly available loan-level data with the Trusts' remittance reports, but Ocwen has also failed to maintain systems adequate to communicate with borrowers effectively and to carry out the most ministerial duties of a prudent mortgage servicer.

Recently, the DFS informed Ocwen that in the course of its investigation into Ocwen, it "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of hundreds of thousands of letters to borrowers, likely causing them significant harm."[15] Mr. Lawsky also noted that the issue had been raised by an employee to management, but was ignored for over five months, demonstrating, according to Mr. Lawsky, "a troubling corporate culture that disregards the needs of struggling borrowers." Ocwen has now openly admitted it backdated foreclosure letters.[16]

The backdating problem is but one of many examples of Ocwen's poor recordkeeping. Many of the allegations made by the CFPB and State Attorneys General against Ocwen (claims that Ocwen settled using over $2 billion in the Certificateholders' money, *see below* at Section G, related to poor recordkeeping practices, including, among other things:[17]

- "Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;"

- "Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen;"

- "Failing to provide accurate information about loan modifications and other loss mitigation services;" and

- "Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information."

---

[15]    *See* October 21, 2014 Letter from Benjamin M. Lawsky to Timothy Hayes, Ocwen General Counsel. This letter is available for download at www.dfs.ny.gov/about/press2014/pr141021-ltr.pdf.

[16]    *See* Ocwen's Third Quarter 2014 Earnings Call Transcript, attached as Exhibit I; *see also* Ocwen's October 24, 2014 "Open Letter to Homeowners Concerning Letter Dating Issues," attached as Exhibit J. As discussed above, Ocwen has now entered into such a settlement, pledging to pay a $150 million cash penalty to the DFS for these and other violations.

[17]    *See* CFPB, State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners For Servicing Wrongs, December 19, 2013, *available at* http://www.consumerfinance.gov/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/

Most recently, in the DFS Consent Order, the DFS concluded, among other things, that:

- "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. *As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records.*"

- "*Ocwen's core servicing functions rely on its inadequate systems.* Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. *With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has ballooned to more than 8,400 such codes.* Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function."

- "*Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans.* Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors ..."

Ocwen's poor recordkeeping practices are directly related to its repeated failures to comply with applicable laws and regulations in carrying out its most basic servicing functions. For example, according to DFS, its investigation of 478 New York loans that Ocwen had foreclosed on revealed "*1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan.*" Among the violations were the following:

- "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- failing to ensure that its statements to the court in foreclosure proceedings were correct;

- pursuing foreclosure even while modification applications were pending ('dual tracking'); and

- failing to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty; and failing to assign a designated customer care representative."

Likewise, on January 13, 2015, the Los Angeles Times reported that the state of California was "seeking to suspend the mortgage license of [Ocwen]" because it had failed to

cooperate with the State's investigation of Ocwen's compliance with applicable law.[18]   This article included a comment from a representative of California's Department of Business Oversight, which explained Ocwen's failures, as set out in the following excerpt from the article:

> *"...The state agency has twice imposed the $1,000 maximum penalty it is allowed on a licensee that fails to provide information.*
>
> *Dresslar, the department's spokesman, said that from January 2013 to the end of October, the agency received 261 complaints against Ocwen, of which 37 included issues under the Homeowners Bill of Rights.*
>
> *They failed to comply with requests for information. They failed to comply with a subpoena for information. They violated a lawful order from the commissioner. And they failed to comply with an order from an administrative law judge," Dresslar said. "We can't countenance that kind of behavior."*

Ocwen's pervasive failures to carry out the most basic of its duties – to maintain accurate loan-level information, timely and accurately communicate with borrowers, and appropriately account for cash flows to the Trusts – have exacerbated the Trusts' losses and would, in and of themselves, constitute Events of Default under the PSAs.  These poor recordkeeping practices have resulted in systematic violations of law in carrying out its most basic servicing duties, including foreclosure related activities.  These violations of law, which have been documented in the DFS Consent Order, among other places, likewise constitute Events of Default under the PSAs.

**E.    Poor Trust Performance**

We have engaged a highly qualified economic consulting firm (the "Economics Expert") to conduct an econometric study that compares the performance of subprime and Alt-A RMBS trusts serviced by Ocwen with similar trusts serviced by others.  In order to isolate the impact of Ocwen's servicing practices on trust performance, the Economics Expert controlled for any relevant differences between Ocwen serviced trusts and non-Ocwen serviced trusts, including credit characteristics such as average borrower FICO, region, types of loans in the portfolio, etc.  As such, the Economics Expert properly sought to compare the "marginal" impact of Ocwen's servicing practices on trust performance, holding other relevant factors constant.

A summary of this econometric study, and its results, was prepared by the Economics Expert and is attached hereto as Exhibit K.  As set out in Exhibit K, this study showed that across approximately 2,000 RMBS trusts issued from 2004 through 2008 for which data was available, trusts serviced by Ocwen performed statistically significantly *worse* than those serviced by others, after controlling for relevant differences in trust collateral.  The 2,000 trusts in the econometric study had more than $700 billion in cash flows from 2009 through 2013.  After

---

[18]    This article is available at http://www.latimes.com/business/la-fi-ocwen-mortgage-license-20150113-story.html.

controlling for relevant factors in this population of trusts, this analysis found—with a 99% level of confidence—that "Ocwen-serviced deals have statistically significantly lower returns." Ex. K at 4.   Specifically, the econometric study showed that Ocwen-serviced trusts returned approximately *1% less in cash* to investors *every year* from 2009 through 2013, compared to trusts serviced by others.   *Id.* at 3-4.   The results of this econometric study show that Ocwen's imprudent servicing practices have indeed harmed the Trusts by reducing Trust cash flows and investor returns.

The compound effect of this 1% annual marginal servicing difference across the massive cash flows in the sample population of 2,000 RMBS trusts is staggering.   The study demonstrates that, if the trusts (and loans) serviced by Ocwen had instead been serviced by other servicers, *they would have returned approximately <u>$26 billion</u> more to investors than they actually returned*.   This calculation is set out in Exhibit L hereto, which was prepared by the Economics Expert.   Even with respect to just the 119 Trusts in Exhibit A, this analysis indicates *more than $1 billion* in deficient Trust performance.

As this study demonstrates, Ocwen's imprudent servicing practices and systematic conflicts of interest have materially harmed certificateholders by reducing trust cash flows.

**F.      Recouping Advances At Time of Modification in Violation of the PSAs**

As mentioned above at Section B(ii), many of Ocwen's imprudent modification practices appear to be motivated by a desire to recoup advances at the time of modification, and Ocwen has recouped, to date, over *$260 million* at the time of modification in just the Trusts listed in Exhibit A.

With respect to certain of the Trusts, the PSAs expressly permit Ocwen to recover advances at the time of modification.   For example, Section 3.09(a)(vi)(C) of ACE 2005-SD3 states that the Servicer is permitted to make withdrawals from the Collection Account for …. "<u>any P&I Advance or Servicing Advance</u> made with respect to a delinquent Mortgage Loan <u>which Mortgage Loan has been modified by the Servicer</u> in accordance with the terms of this Agreement; <u>provided that the Servicer shall only reimburse itself for such P&I Advances and Servicing Advances at the time of such modification</u>."   Though Ocwen is still bound by its duty to engage in prudent, NPV-positive modifications, PSAs of this type permit Ocwen to recover advances upon its modification of a loan.

However, at least 77 of the Trusts <u>do not contain this permissive term</u> and so in fact <u>prohibit</u> the Servicer from recouping advances at the time of modification.   Exhibit M hereto provides a list of the Trusts' PSA provisions in this regard, together with a Trust-by-Trust schedule of prematurely recovered advances, and identifies whether advances are explicitly recoverable at the time of modification.   As stated above, the Servicing Expert has analyzed publicly available loan-level data for the Trusts, and has identified every instance where Ocwen recovered an advance at the time of modification.   This data shows that Ocwen recovers advances at the time of modification <u>whether or not the PSAs permit it</u>.   Ocwen simply ignores the governing agreements.

As set out in Exhibit M, with respect to the 77 Trusts which do not permit Ocwen to recoup advances at the time of modification, Ocwen has recovered *over $153 million* in advances at the time of modification. Ocwen is obligated to make these Trusts whole for its premature recovery of these advances. A loan-by-loan schedule of advances that Ocwen has recouped at the time of modification for the Trusts is separately listed in Exhibit E.

We understand that Ocwen may take the position that its recovery of advances at the time of modification is justified on the basis that such advances are deemed "nonrecoverable." This argument is meritless. An advance lien sits at the top of the waterfall. When a loan is modified to mitigate losses, it must be NPV positive when compared to foreclosure. Accordingly, any *properly* modified loan will be one for which existing advances (which, again, sit at the top of the waterfall) *necessarily* will be recoverable in the event the loan is liquidated. This is and must be true so long as the net present value of the expected proceeds from the collateral exceed the amount of the outstanding advance. By definition, a modification should only increase the net present value of the expected proceeds from the collateral. Therefore, it is theoretically and practically impossible for a modification, itself, to result in an advance becoming Nonrecoverable.

**G.    Use of Trust Assets to Resolve Investigations Into Ocwen's Poor Servicing**

In December of 2013, Ocwen entered into a regulatory settlement with the CFPB.[19] In order to resolve the CFPB's claims that Ocwen violated laws and regulations in its foreclosure practices, Ocwen agreed to provide $2.2 billion in "borrower relief," almost entirely in the form of principal forgiveness on Trust-owned mortgages. Ocwen's use of Trust property to pay penalties for its own alleged misconduct raises serious issues of self-dealing, unjust enrichment, and breach of its obligation to service mortgages solely in the best interests of the Certificateholders and the Trusts. The structure of this settlement allowed Ocwen to shift to the RMBS Trusts and their investors the costs of remedying conduct that Ocwen, alone, committed. Despite the public disclosure of this settlement, and Ocwen's statements that it will actually pay only $62 million of the total $2.2 billion remedial penalty assessed against it, the Trustees have taken no steps to investigate the allegations that led the CFPB to impose the penalty nor have they required Ocwen to repay the Trusts for the assets Ocwen unlawfully used to pay its own penalty.

Since the December 2013 announcement of the CFPB Settlement, Ocwen has forgiven over $78 million in Trust principal that it was entitled to claim as "credit" on its settlement obligations. Having compromised its independence and integrity, and used its servicing activities to enrich itself (by avoiding its own substantial monetary penalties), Ocwen breached its obligation as servicer and is again in default of its obligation. The only cure possible is for Ocwen to disgorge to the Trusts every penny of principal it forgave and used to claim credit on

---

[19]    A copy of this consent judgment is available for download at http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf

its settlement. A summary of principal forgiveness for each Trust is attached as Exhibit D. Ocwen is obligated to disgorge that entire amount to the Trusts.

**H.   Conclusion**

Each of these failures to perform Ocwen's covenants and agreements violated the prudent servicing and/or master servicing obligations imposed on Ocwen by PSA §§ 3.01, 3.1 or 11.01, as the case may be. Each of these failures to perform Ocwen's covenants and agreements has materially affected the rights of the Certificateholders. Each of these failures to perform constitutes a continuing Event of Default pursuant to each PSA. *See supra* Footnote 2.

The Holders below therefore demand that Ocwen immediately cure these endemic and grievous defaults in its obligations under the PSAs. By this letter, the Holders further notify the Securities Administrator, Trustee, Servicer, and/or Master Servicer, as applicable, of Ocwen's failure to perform its covenants and agreements, and of a continuing Event of Default pursuant to each PSA.

The Holders also reserve all other rights and remedies they may have, individually and under the PSAs, as a result of the matters described in this letter. Please contact me should you wish to discuss this matter further.

Very truly yours,

*Kathy Patrick*

Kathy Patrick

**Enclosure** (electronic versions of Exhibits A through M)

**Cc.**

Stephen Ahrens (BlackRock Financial Management Inc. and its advisory affiliates)
Mr. Cory Nass (Kore Advisors, L.P.)
Mr. William Ding (Metropolitan Life Insurance Company)
Mr. Rick LeBrun (Pacific Investment Management Company LLC)
Mr. Paul de Francisci (Sealink Funding Limited, acting through its investment manager
       Neuberger Berman Europe Limited)

Counsel to the Trustees and/or Master Servicers (by e-mail)
Counsel to Ocwen Financial Corp. (by e-mail)

## Exhibit A
## (List of 119 Trusts)

| | | | |
|---|---|---|---|
| ABFC 2004-OPT4 | DBALT 2007-RMP1 | MALT 2006-2 | RASC 2006-EMX3 |
| ABFC 2005-WMC1 | FFML 2004-FF3 | MSAC 2003-SD1 | RASC 2006-EMX4 |
| ABFC 2006-HE1 | FFML 2005-FF1 | MSAC 2004-HE4 | RASC 2006-EMX6 |
| ABSHE 2003-HE5 | FHLT 2006-A | MSAC 2006-HE1 | RASC 2006-KS5 |
| ABSHE 2004-HE3 | GSAA 2006-16 | MSAC 2006-HE2 | RASC 2006-KS6 |
| ACE 2002-HE1 | GSAA 2007-10 | MSAC 2007-HE4 | RASC 2006-KS8 |
| ACE 2004-FM2 | GSAA 2007-8 | MSAC 2007-HE5 | RASC 2007-KS1 |
| ACE 2004-OP1 | GSAMP 2003-NC1 | MSHEL 2007-2 | RASC 2007-KS3 |
| ACE 2005-SD3 | GSAMP 2004-OPT | MSM 2006-8AR | RAST 2005-A10 |
| ACE 2006-SD2 | GSAMP 2005-WMC1 | MSM 2006-9AR | RAST 2005-A13 |
| ACE 2006-SD3 | GSAMP 2006-HE6 | NHEL 2006-6 | RAST 2005-A16 |
| AHMA 2005-1 | GSAMP 2007-H1 | RAAC 2005-SP2 | RAST 2006-A15 |
| AHMA 2006-4 | GSAMP 2007-HS1 | RAAC 2007-SP1 | RAST 2006-A16 |
| AHMA 2007-4 | GSR 2005-AR7 | RAAC 2007-SP3 | RAST 2006-A2 |
| ARMT 2005-10 | GSR 2006-10F | RALI 2004-QS1 | RFMSI 2006-S2 |
| BAFC 2007-3 | GSR 2006-4F | RALI 2005-QA13 | RFMSI 2006-SA1 |
| BALTA 2005-4 | GSR 2007-2F | RALI 2005-QS1 | RFMSI 2007-SA4 |
| BSABS 2006-AC1 | HVMLT 2003-1 | RALI 2005-QS11 | SABR 2006-FR1 |
| CBASS 2001-CB4 | HVMLT 2005-4 | RALI 2006-QA7 | SABR 2006-FR2 |
| CBASS 2004-CB3 | HVMLT 2005-7 | RALI 2007-QA2 | SABR 2006-FR3 |
| CBASS 2004-CB4 | HVMLT 2005-16 | RAMP 2005-RS7 | SABR 2006-FR4 |
| CBASS 2004-CB7 | HVMLT 2006-3 | RAMP 2006-RS2 | SASC 2004-13 |
| CBASS 2005-CB1 | HVMLT 2006-SB1 | RAMP 2006-RS6 | SASC 2006-GEL3 |
| CBASS 2006-CB5 | MABS 2003-OPT2 | RAMP 2006-RZ2 | SASC 2007-TC1 |
| CBASS 2006-CB9 | MABS 2004-OPT1 | RAMP 2007-RS1 | SVHE 2005-3 |
| CBASS 2007-CB3 | MABS 2005-FRE1 | RASC 2001-KS1 | SVHE 2006-NLC1 |
| CMLTI 2007-SHL1 | MABS 2006-AM1 | RASC 2004-KS12 | TBW 2006-1 |
| DBALT 2005-1 | MABS 2006-AM3 | RASC 2005-AHL1 | TBW 2006-3 |
| DBALT 2005-AR2 | MABS 2006-FRE2 | RASC 2005-AHL3 | TMST 2007-3 |
| DBALT 2006-AR1 | MALT 2006-1 | RASC 2005-EMX3 | |

# Exhibits B through M

## (*See* Enclosed USB Flash Drive)

**Exhibit B**



## ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019-6142

tel +1-212-506-5000
fax +1-212-506-5151

WWW.ORRICK.COM

January 26, 2015

Richard A. Jacobsen
(212) 506-3743
Rjacobsen@orrick.com

*VIA EMAIL AND FEDERAL EXPRESS*

Kathy Patrick, Esq.
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002

Dear Ms. Patrick:

We represent Ocwen Financial Corporation and respond to your letter on behalf of certain hedge funds and other RMBS investors to trustees and master servicers, dated January 23, 2015, in connection with 119 RMBS trusts (the "Trusts"), which are serviced by Ocwen. The letter purports to describe certain contractual breaches that you contend could result in Events of Default under the Trust transaction documents. These are essentially the same baseless allegations that you have already asserted on behalf of some of these same investors in their failed attempt to block the transfer of servicing from OneWest to Ocwen. As you know, those claims were thoroughly reviewed by an independent expert firm retained by the Trustees, and after reviewing that expert report, the Trustees cleared the transfer to Ocwen. The allegations are as groundless now as they were then.

Ocwen denies that there is any basis for a default under the Trust agreements, and it will respond, at the appropriate time, after it has had a chance to review the exhibits mentioned in your letter. In the meantime, however, because it is apparent that your letter was drafted in an inflammatory tone, with misleading content, and coordinated with media release so as to create wildly false impressions, we make the following initial points in response.

As a threshold matter, your letter overlooks that, as servicer for the Trusts, Ocwen's obligations under the various agreements are to service the loans to the benefit of the Trusts as a whole and in accordance with the terms of the pertinent governing agreements. Ocwen does not, will not, and indeed may not accede to the special interests of your institutional investor clients, based on their particular tranche positions, to the detriment of the Trusts as a whole.

Your letter obscures the ultimate objective of your investor clients: to stop servicers from modifying loans and force them to foreclose on and evict as many struggling homeowners as quickly as possible. While knee-jerk foreclosures may redound to the special economic interests of your clients, they are not in the best interests of the Trusts as a whole, not consistent with industry practice, and therefore prohibited under the servicing agreements.



ORRICK

Kathy Patrick, Esq.
January 26, 2015
Page 2

Contrary to the suggestions in your letter, all of Ocwen's mortgage loan modifications, including principal reductions, are designed to be Net Present Value positive. As a result, Ocwen's approach makes sound economic sense because, again, it seeks to service loans in the best interest of the Trusts as a whole.

Perhaps most egregious is your clients' continuing objection to the principal reduction modification targets in the government's national mortgage settlements with RMBS issuers and servicers. Indeed, Ocwen's national mortgage settlement provides that such modifications shall be done subject to, and within the confines of, the servicing agreements.

We note that your clients' ill-conceived effort to push foreclosures and stop principal reduction is not directed solely at Ocwen but is part of their ongoing industry-wide pro-foreclosure campaign, which has been roundly criticized by numerous national housing, consumer protection and civil rights groups as anti-consumer and contrary to good public policy.

Ocwen continues to be committed to meeting all of its servicing obligations in accordance with its contractual arrangements in the over 2,500 Trusts that it services, and in full cooperation and compliance with its industry regulators. Your clients, on the other hand, are asking Ocwen to turn its back on the Trusts as a whole, on the borrowers, and on public policy. Ocwen declines to do so and reserves all its rights and remedies.

Sincerely,

Richard A. Jacobsen

cc:     (via Email and Federal Express)
        The Bank of New York Mellon, Corporate Trust Administration
        Citibank, N.A., Corporate Trust Office, Structured Finance Agency & Trust
        Citibank, N.A., Corporate Trust Office, Structured Finance Services
        Deutsche Bank National Trust Company, RMBS Trust Administration
        Deutsche Bank Trust Co. Americas, RMBS Trust Administration
        HSBC Bank USA, N.A., Corporate Trust Office (RMBS)
        U.S. Bank National Association, Corporate Trust (SFS)
        U.S. Bank National Association, Corporate Trust (RMBS)
        U.S. Bank National Association, Structured Finance
        Wells Fargo Bank, N.A., RMBS Corporate Trust

**Exhibit C**



Kathy D. Patrick
kpatrick@gibbsbruns.com
713.751.5253

January 26, 2015

**Via E-mail**

Mr. Richard Jacobsen
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
rjacobsen@orrick.com

### Re:  Notice of Non-Performance Issued on Ocwen Serviced Trusts

Dear Mr. Jacobsen:

We are in receipt of the letter Ocwen released to the media and then sent to us.

Ocwen's letter does not respond to the facts and data provided to Ocwen in the Notice of Non-Performance; instead it resorts to false attacks on the investors. We refute those false statements below and encourage Ocwen to respond, promptly, to the facts and serious concerns raised in the investors' Notice.

Ocwen is fully aware that the Notice of Non-Performance is the result of a months-long investigation performed by two independent experts that began *after* the OneWest transfers to which Ocwen's letter refers. The investigation was premised on an extensive review of data on loans held in the trusts, including data reported to investors and Trustees by Ocwen. The investigation was instituted to address a marked lack of transparency regarding Ocwen's servicing of mortgage loans, because the data Ocwen reported in a database made available to investors could not be reconciled with remittance reports Ocwen provided to the Trustees.

The Notice of Non-Performance cites thousands of examples of specific loans where the investors allege Ocwen's servicing has not conformed to Ocwen's contracts, including the failure to account accurately for trust cash flows, improper recovery of servicer advances, and modifications that do not appear to have been conducted in the best interests of investors or borrowers (including many purported modifications of troubled loans that actually raised borrowers' payments). Your letter ignores these allegations, as well as the serious concerns raised about Ocwen's affiliated transactions, but all of these issues must be addressed promptly.

Ocwen's suggestion that our clients oppose loan modifications is false.  These investors have worked openly for nearly five years to reform mortgage servicing.  A key component of

their efforts has been to *encourage* modifications that work, because those modifications benefit both investors and borrowers. Beginning with the Bank of America settlement and continuing through their settlement with JPMorgan, our clients have negotiated settlements that set clear standards to ensure modifications are evaluated promptly, processed predictably, and performed competently. The servicing reforms our clients obtained in the Bank of America settlement *increased* loan modifications in the settlement trusts. Recent analysis confirms the performance of those trusts has improved significantly when compared to other trusts that were not subject to the reforms, a result that benefitted both investors and borrowers.

The issues raised in the Notice of Non-Performance simply do not concern modifications in general. Instead, they arise from specific concerns about the way Ocwen implements modifications and the purposes for which it does so. The investigation disclosed that Ocwen's modifications re-default at rates higher than comparable modifications performed by other servicers. Ocwen, as noted above, also implements modifications that are baffling on their face, including modifications that result in higher (not lower) payments for borrowers. In addition, Ocwen's use of modifications of trust-owned mortgages to "pay" its regulatory settlement is, the Notice contends, not consistent with Ocwen's acknowledged obligation to service the loans solely in the best interest of the trusts.

The investors contend these and the other practices cited in the notice are not in the best interests of the trusts and all of their investors. The Trustees (and Ocwen) have been provided with a complete set of the data that underlies the Notice, as well as extensive documentation citing specific concerns about specific loans. The Trustees now have sixty days to evaluate this information and Ocwen has sixty days to respond. The gravity of the concerns raised calls for Ocwen to respond with facts, not attacks on investors who are entitled to and have demanded only what Ocwen promised to provide in its contracts: competent and accurate mortgage servicing that is in the best interests of the trusts and investors.

Very truly yours,

Kathy Patrick

Kathy Patrick

**Exhibit D**



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019-6142

tel +1-212-506-5000
fax +1-212-506-5151

WWW.ORRICK.COM

February 11, 2015

Richard A. Jacobsen
(212) 506-3743
RJacobsen@orrick.com

*VIA E-MAIL*

Kathy D. Patrick
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, TX 7702

Dear Ms. Patrick:

On behalf of Ocwen, we write in connection with the Notice of Non-Performance (the "Notice"), dated January 23, 2015, issued on behalf of certain Certificate holders of 119 Residential Mortgage-Backed Securities Trusts. We hereby request that you produce any and all information, data, or modeling material that purports to support your clients' accusations, including but not limited to, the specific information requested in the schedule annexed hereto as Exhibit A.

Sincerely,

Richard A. Jacobsen

**EXHIBIT A**

1. All materials and data relied upon, calculations performed, assumptions or specifications made in developing the "Analysis of RMBS Deal Returns and Ocwen Servicing" (the "NERA Report") including but not limited to:
   *[Notice Reference: Exhibits K and L]*
   a. The "regression analysis model" cited in Section I of the NERA Report.
   b. The "panel dataset of annual returns constructed by deal ID and deal age" cited in Section I of the NERA Report.
   c. The complete list of "deal-specific characteristics" that were "controlled for" per Section I of the NERA Report.
   d. The complete list of "approximately 2000 deals" from "[NERA's] database for which [NERA has] cash flow and servicer information" per Section I of the NERA Report.
   e. The complete data extracts indicated in Section II of the NERA Report including:
      i. ABS Net data
      ii. INTEX data
      iii. Data from counsel
   f. All assumptions made to limit, categorize, aggregate and test these data extracts including but not limited to:
      i. The specific time period reflected in the analysis.
      ii. The process by which "approximately 2000 deals" were selected from NERA's database.
      iii. The identification of each loan's servicer(s) during the specific time period reflected in the analysis, including the treatment of all servicing transfers.
      iv. The "program [used] to identify the servicer on underlying loans for each year" as described in Section III of the NERA Report.
      v. The process by which NERA "matched the ABS Net deals with the deal list obtained from INTEX to create a master dataset that contained cash flows, servicer information and loan level characteristics of the underlying mortgages".
      vi. The complete list of "deal-level variables" created by NERA and the specific data fields and calculations used to derive each variable.
      vii. The process by which NERA "compared the servicer information for each deal from ABS Net to "other sources of servicer information".
      viii. The "other sources of servicer information" and the "deal-level servicer information, by year, as provided by counsel", as described in Section III of the NERA report.
      ix. All trust-level and loan-level identification conventions, as well as any required look-up tables or data dictionaries, required to analyze these data extracts.
   g. All assumptions used in the fixed effects regression analysis, described in Section IV of the NERA Report, including but not limited to:
      i. The complete list of "age-specific characteristics" used by NERA and the specific data sources, data fields and calculations used to derive each characteristic, as described in Section IV.A of the NERA Report.
      ii. The complete list of "indicator variables in the model for each calendar year from 2009-2012" created by NERA and the specific data sources, data fields and

calculations used to derive each variable, as described in Section IV.A of the NERA Report.

   iii. The complete "series of indicator variables" used to "model the Ocwen servicer effect" created by NERA and the specific data sources, data fields, assumptions and calculations used to derive each variable, as described in Section IV.A of the NERA Report.

   iv. The final dataset used to conduct the regression analysis.

2. All materials and data relied upon, calculations performed, assumptions or specifications made in developing the table of "73,000 modifications performed by Ocwen, and 174,000 modifications performed by all other servicers", including but not limited to:

*[Notice Reference: Page 6 of the Holder's Notice]*

   a. The complete data extracts used in the analysis from "CoreLogic Loan Performance and US Treasury MHA Data as of September 2014" per the indicated source.

   b. All assumptions made to limit, categorize or otherwise aggregate these data extracts including but not limited to:

      i. The specific time period reflected in the analysis. For example,

         1. The Notice indicates "all modifications . . . from 2012-13". Provide the beginning date (month and year) and ending date (month and year) reflected in this analysis.

         2. The Notice indicates "12M Re-Default = OTS 60, 90+, REO, Liquidated (12 Months after Loan Modification)". Provide the beginning date (month and year) and ending date (month and year) reflected in this analysis.

      ii. The identification of each loan's servicer(s) during the specific time period reflected in the analysis, including the treatment of all servicing transfers.

      iii. The determination of which trusts were included/excluded from the analysis.

      iv. The types of modification included/excluded from the analysis including applications for modification, temporary modifications, permanent modifications, etc.

      v. The treatment of loans subject to multiple modifications during the specific time period reflected in the analysis.

      vi. The specific data fields and calculations used to derive each of the values reflected in the table on Page 6 of the Holders' Notice dated January 23, 2015.

      vii. All trust-level and loan-level identification conventions, as well as any required look-up tables or data dictionaries, required to analyze the underlying data extracts.

3. All materials and data relied upon, calculations performed, assumptions or specifications made in identifying "2,033 loan-level examples of these material discrepancies in cash flows", including but not limited to:

*[Notice Reference: Exhibit H]*

   a. The complete data extracts used in this analysis.

   b. The specific time period considered in the analysis.

   c. The specific data fields and calculations used to derive each of the values reflected in Exhibit H of the Holders' Notice dated January 23, 2015.

   d. The process by which the 2,033 examples were identified.

     e.  All trust-level and loan-level identification conventions, as well as any required look-up tables or data dictionaries, required to analyze the underlying data extracts.

4. All materials and data relied upon, calculations performed, assumptions or specifications made in identifying "1,022 examples of specific loan modifications in the Trust ", including but not limited to:
   *[Notice Reference: Exhibit F]*
   a. The complete data extracts used in this analysis.
   b. The time period considered in the analysis.
   c. The specific data fields and calculations used to derive each of the values reflected in Exhibit F of the Holders' Notice dated January 23, 2015, including but not limited to:
      i. The definition of each "inexplicable reason".
      ii. The specific fields from the "Inexplicable Mods" worksheet and the calculations used to derive the values reflected in the "Estimated Advance Recovered by Ocwen" worksheet.
   d. The process by which the 1,022 examples were identified.
   e. All data used in analyzing the loans that are representative of Ocwen's alleged failure in prematurely recovering advances per Page 8 of the Holder's Notice.
   f. All trust-level and loan-level identification conventions, as well as any required look-up tables or data dictionaries, required to analyze the underlying data extracts.

5. All materials and data relied upon, calculations performed, assumptions or specifications made in identifying "812 examples of mortgage loans in the Trusts for which Ocwen had no conceivable basis to refuse to advance funds after modifications, but nonetheless continued to apply a 'Stop Advance' tag to the loan in its systems", including but not limited to:
   *[Notice Reference: Exhibit G]*
   a. The complete data extracts used in this analysis.
   b. The specific time period considered in the analysis.
   c. The specific data fields and calculations used to derive each of the values reflected in Exhibit G of the Holders' Notice dated January 23, 2015.
   d. The process by which the 812 examples were identified.
   e. All data used in analyzing the loans that are representative of Ocwen's alleged failure to advance per Pages 10-11 of the Holder's Notice.
   f. All trust-level and loan-level identification conventions, as well as any required look-up tables or data dictionaries, required to analyze the underlying data extracts.