UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
RONALD E. POWELL, et al., *as trustees of The*               :
*United Food & Commercial Workers Union &*                   :
*Employers Midwest Pension Fund, on behalf of that*          :
*plan and other similarly situated benefit plans,*           :          18-CV-1951 (VSB)
                                                             :
                                  Plaintiffs,                :          **OPINION & ORDER**
                                                             :
                        -against-                            :
                                                             :
OCWEN FINANCIAL CORPORATION, et al.,                         :
                                                             :
                                  Defendants.                :
-------------------------------------------------------------X

Appearances:

Justin Silver Brooks (Philadelphia, PA)
Elizabeth Hardeman Shofner (Sunnyside, NY)
Guttman, Buschner & Brooks PLLC

David Charles Harrison
Scott Vincent Papp
Barbara J. Hart
Lowey Dannenberg P.C.
White Plains, NY

Aaron Lee Brody
Stull Stull & Brody
New York, NY
*Counsel for Plaintiffs*

Aaron Michael Rubin (New York, NY)
Claudia Wilson Frost (Houston, TX)
Kenneth Patrick Herzinger (San Francisco, CA)
Richard Andre Jacobsen, Jr. (New York, NY)
Thomas Nill Kidera (New York, NY)
Orrick, Herrington & Sutcliffe LLP
*Counsel for Defendants Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, and Ocwen*
*Mortgage Servicing, Inc.*

Joel M. Miller
Charles Richard Jacob, III
Miller & Wrubel, P.C.
New York, NY

Isabel Polly Sukholitsky
Goulston & Storrs PC
New York, NY
*Counsel for Defendants Altisource Solutions, Inc., REALHome Services and Solutions, Inc., and Altisource Online Auctions, Inc.*

Joseph De Simone (New York, NY)
Kevin Charles Kelly (New York, NY)
Paul Whitfield Hughes (Washington, DC)
Mayer Brown LLP
*Counsel for Defendants Altisource Residential Corporation and Altisource Asset Management Corporation*

Brian Patrick Perryman (Washington, DC)
Frank G. Burt (Washington, DC)
William Glenn Merten (Washington, DC)
Katherine Leigh Villanueva (Philadelphia, PA)
Drinker Biddle & Reath LLP
*Counsel for Defendants Assurant, Inc., Standard Guaranty Insurance Company, American Security Insurance Company, Voyager Indemnity Insurance Company, and American Bankers Insurance Company of Florida*

David John Fioccola
Jessica Kaufman
Robert James Baehr
Francesca G. Cocuzza
Morrison & Foerster LLP
New York, NY
*Counsel for Defendants HomeSure Services, Inc., Cross Country Home Services, Inc., HomeSure of America, Inc., and HomeSure of Virginia, Inc.*

Christopher Russo
Traub Lieberman Straus & Shrewsbury LLP
Hawthorne, NY
*Counsel for Defendant Southwest Business Corporation*

Evan Miller (Washington, DC)
Howard Fredrick Sidman (New York, NY)
Rebekah B. Kcehowski (Pittsburgh, PA)
Jones Day
*Counsel for Defendant Wells Fargo Bank, N.A.*

2

<u>VERNON S. BRODERICK</u>, <u>United States District Judge</u>:

Plaintiffs Ronald E. Powell, Robert O'Toole, Robert Wilson, Brian Jordan, Donald G. Schaper, and William R. Seehafer ("Plaintiffs"), as trustees of The United Food & Commercial Workers Union & Employers Midwest Pension Fund (the "Fund"), bring this putative class action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., against Defendants Ocwen Financial Corporation, Ocwen Loan Servicing, LLC, Ocwen Mortgage Servicing, Inc. (collectively, "Ocwen"); Altisource Solutions, Inc., REALHome Services and Solutions, Inc., Altisource Online Auctions, Inc. (collectively, the "ASPS Subsidiaries"); Altisource Residential Corporation ("Front Yard"); Altisource Asset Management Corporation ("AAMC");[1] Assurant, Inc., Standard Guaranty Insurance Company, American Security Insurance Company, Voyager Indemnity Insurance Company, American Bankers Insurance Company of Florida (collectively, "Assurant"); HomeSure Services, Inc., Cross Country Home Services, Inc., HomeSure of America, Inc., HomeSure of Virginia, Inc. (collectively, "HomeSure"); Southwest Business Corporation ("SWBC"); and Wells Fargo Bank, N.A. ("Wells Fargo"). Plaintiffs allege Defendants committed misconduct with respect to the management of residential mortgages underlying six trusts in which the Fund invested. Plaintiffs allege claims under ERISA for breach of fiduciary duty, in violation of 29 U.S.C. §§ 1105 and 1109, and for prohibited transactions, in violation of 29 U.S.C. § 1106(b).

Currently pending before me are summary judgment cross-motions. Specifically, Ocwen and Wells Fargo (the "Moving Defendants") move for summary judgment on the grounds that the mortgages cannot be plan assets within the meaning of ERISA, and, even if they are, Ocwen

---

[1] The ASPS Subsidiaries, Front Yard, and AAMC are collectively referred to as "Altisource" or the "Altisource Defendants."

did not owe Plaintiffs a fiduciary duty under ERISA.  Plaintiffs seek partial summary judgment to establish that certain of the securities they purchased are in fact plan assets within the meaning of ERISA.  I previously decided that if the mortgages did not constitute "plan assets" under a governing Department of Labor ("DOL") regulation, then Plaintiffs could not proceed on their claims.  (Doc. 150 at 21–22.)

Because I find that no reasonable trier of fact could conclude that any of the mortgage-backed securities at issue here are plan assets within the meaning of ERISA, the Moving Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion for partial summary judgment is DENIED.

## I.    __Factual Background__[2]

This action arises from the Fund's purchase of investment instruments issued by six residential mortgage-backed securities ("RMBS") trusts.  (Defs.' 56.1 ¶ 2.)[3]  Three of these trusts, AHM-2004-4, AAHM 2005-3, and HLT 2006-HI1, (together, the "Indenture Trusts"), are

---

[2] This section is drawn from the parties' various submissions in order to provide background and context for the cross-motions for summary judgment and is not intended as a recitation of all material undisputed facts.  Unless otherwise indicated, the facts set forth in this section are undisputed.

Although Plaintiffs purport to dispute many of the facts recited in Ocwen and Wells Fargo's Local Rule 56.1 statement, many of these so-called disputes do not concern whether Moving Defendants properly establish the facts for the purposes of their summary judgment motion.  For example, Plaintiffs make arguments about the veracity or implication of those facts.  (*See, e.g.*, Doc. 247-2 ¶¶ 2 (responding by saying "Undisputed, but Plaintiffs further state that Defendant Ocwen owed fiduciary duties to Plaintiffs and [sic] breach those duties."), 270 ("Undisputed, but state that the non-payment and prepayments of mortgages could impact all of these factors.").)  These types of responses are improper, and I disregard any such improper assertions.  *See LG Capital Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 WL 3437973, at *2 (E.D.N.Y. July 29, 2019) ("The Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.") (quoting *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 945 F.3d 83 (2d Cir. 2019)); *Crump v. Fluid Handling, LLC.*, No. 17-CV-45, 2019 WL 2145929, at *2 (W.D.N.Y. Mar. 29, 2019) ("Rather than scrutinize a Rule 56.1 statement line by line, a court may simply disregard any improper assertions or inadmissible evidence."); Local Civ. R. 56.1(b) ("The papers opposing a motion for summary judgment shall include a corresponding numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.").

[3] "Defs.' 56.1" refers to Ocwen and Wells Fargo's Local Civil Rule 56.1 Statement.  (Doc. 223.)

Delaware statutory trusts each governed by its own Indenture Agreement.  (*Id.* ¶ 13.)  The remaining three trusts are "governed [by] New York law and are comprised of real estate mortgage investment conduits ("REMICs") as defined by federal and state law;" these are CSFB 2003-27, MASTR 2003-5, and GSR 2005-7F (the "REMIC Trusts," and together with the Indenture Trusts, the "Trusts").  (*Id.* ¶ 18.)  Each REMIC Trust is governed by a Pooling and Servicing Agreement ("PSA").  (*Id.*)

Plaintiffs allege that the Fund acquired the following securities issued by the Trusts:

- 320,408 units of the Class VI-A-1 Notes issued by Indenture Trust AHM 2004-4 ("2004-4");

- 900,000 units of the Class III-A-3 Notes issued by Indenture Trust AHM 2005-3 ("2005-3");

- 80,000 units of the Class M-3 Notes issued by Indenture Trust HLT 2006-HI1 ("HLT");

- 98,773 units of the Class VIII-A-1 Certificates issued by REMIC Trust CSFB 2003-27 ("CSFB");

- 168,716 units of the Class 4-A1 Certificates issued by REMIC Trust MASTR 2003-5 ("MASTR"); and

- 112,091 units of the Class 2A-6 Certificates issued by REMIC Trust GSR 2005-7F ("GSR").

(*Id.* ¶¶ 2–11.)[4]  I will refer to the relevant securities issued by the Indenture Trusts as the "At-

---

[4] The Moving Defendants' Rule 56.1 Statement states that "Plaintiffs allege" these purchases, (*see* Defs.' 56.1 ¶¶ 2–11), hence my usage of the term "allege."  Given the threshold issues the parties seek to resolve at this stage, *see infra* Pt. II, I do not need to resolve right now whether Plaintiffs did in fact purchase these securities.

Additionally, Ocwen and Wells Fargo note that, although Plaintiffs' operative pleading alleges having purchased

Issue Notes," to the relevant securities issued by the REMIC Trusts as the "At-Issue Certificates," and to the At-Issue Notes and the At-Issue Certificates collectively as the "At-Issue Securities."

Each of the At-Issue Securities carried fixed interest rates and had legal final maturity dates. (*Id.* ¶ 270.)  Each were rated by Moody's Investor Services ("Moody's") and Standard & Poors ("S&P") as investment grade at the time they were issued. (*Id.* ¶¶ 12, 275–76.)  The 2005-3 At-Issue Certificates were rated as investment grade by Moody's until October 2018, and they were rated as investment grade by S&P until October 2019. (*Id.* ¶ 283.)

A.     *Structure of the Indenture Trusts and the At-Issue Notes*

In addition to various notes, each of the Indenture Trusts also issued securities known as certificates (the "Indenture Certificates"). (*Id.* ¶ 17.)  Each of the Indenture Trust's Indenture Agreement defines the Indenture Certificates issued by that Indenture Trust as a class of security "evidencing the beneficial ownership interest in" either the "Issuer" or in "the Trust." (*Id.* ¶¶ 145 (2004-4's Agreement providing for "beneficial ownership in the Issuer"), 157 (2005-3's Agreement providing for "beneficial ownership interest in the Issuer"), 166 (HLT's Agreement providing for "beneficial ownership interest in the Trust").)  However, the distinction between "Trust" or "Issuer" is irrelevant, as the "Issuer" was always the Indenture Trust itself. (Sidman Decl. Ex. 3 at 5 (defining 2004-4 as the "Issuer"), Sidman Decl. Ex. 7 at 1 (defining 2005-3 as the "Issuer").)[5]  Each Indenture Trust's Indenture Agreement provides that "Distributions to Certificateholders shall be subordinated to the creditors of the Trust, including the Noteholders."

---

Class 4-A-1 Certificates issued by REMIC Trust CSFB 2003-27, records show that Plaintiffs in fact purchased the Class VIII-A-1 Certificates issued by this REMIC Trust. (Doc. 222 at 12 & n.2.)  The Moving Defendants' Local Rule 56.1 Statement cites undisputed record evidence in support of the Funds having actually purchased the Class VIII-A-1 Certificates. (Defs.' 56.1 ¶ 9.)

[5] "Sidman Decl." refers to the Declaration of Howard F. Sidman in Support of Ocwen and Wells Fargo's Motion for Summary Judgment and the exhibits attached thereto. (Doc. 238.)

(Defs.' 56.1 ¶¶ 148, 160, 170.)

The Indenture Agreement for 2004-4 includes an exhibit providing for the form of the At-Issue Note that the Fund purchased.  (*Id.* ¶ 144.)  This exhibit states that "[t]he Holder of this Note . . . is deemed to represent that . . . the Notes are rated investment grade or better and such person believes that the Notes are properly treated as indebtedness without substantial equity features for the purposes of the DOL Regulations, and agrees to so treat the Notes."  (*Id.*)  The Indenture Agreement for 2005-3 has a similar exhibit providing for the form of the At-Issue Note that the Fund purchased from that Trust.  (*Id.* at ¶ 156 ("The Holder of this Note . . . is deemed to represent that either (1) it is not acquiring the Note with Plan Assets or (2) . . . the Notes are rated investment grade or better and such person believes that the Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the Notes.").)

All three Indenture Trusts' Indenture Agreements have clauses entitled "No Borrowing" that forbid them in any way to "become liable, directly or indirectly, for any indebtedness except for the Notes" issued by that Trust.  (Sidman Decl. Ex. 1 at 46; Sidman Decl. Ex. 7 at 21; Sidman Decl. Ex. 20 at 16.)

2004-4's Indenture Agreement includes an exhibit setting forth the form of all "Class __-A-__" Notes.  (Sidman Decl. Ex. 1 at OCWEN_POWELL_0000300).  It provides spaces for filling the aggregate note principal balance, the principal balance of the note, and the adjustable interest rate for the note.  (*Id.*)  2005-3's Indenture Agreement includes a materially similar exhibit providing for the form of its "Class __-A-__" Notes.  (Sidman Decl. Ex. 7 at A-1-2 (providing for principal balance and an adjustable interest rate).  Likewise, HLT's Indenture Agreement includes an exhibit providing the "Form of Notes" for all "Class M-__ Notes" that

provides for the principal amount and adjustable interest rate on these Notes.  (Sidman Decl. Ex. 20 at A-2-1–2-2.)

The Class VI-A-1 Notes issued by 2004-4 had an initial note principal balance of $281,677,000 at an interest rate of 5.5%.  (Defs.' 56.1 ¶ 12.)  The Class III-A-3 Notes issued by 2005-3 had an initial note principal balance of $25,489,000 at an interest rate of 4.967%.  (*Id.*)  And the Class M-3 Notes issued by HLT had an initial note principal balance of $4,431,000 at an interest rate of 6.16%.  (*Id.*)

### B.   *Structure of the REMIC Trusts and the At-Issue Certificates*

Each of the REMIC Trusts issued "Residual-Interest Certificates," whereas the At-Issue Certificates are known as "Regular-Interest Certificates."  (*Id.* ¶¶ 20, 22, 24–28.)

### 1.   **REMIC Trust:  CFSB**

CSFB "comprise[s] five real estate mortgage investment conduits"—"Subsidiary REMIC 1, Subsidiary REMIC 2, Middle REMIC 1, Middle REMIC 2, and Master REMIC."  (Sidman Decl. Ex. 13 at 1.)  Each "Class of Certificates, other than the Class AR and Class AR-L Certificates, represents ownership of a regular interest in the Master REMIC."  (*Id.*)  By contrast, "[t]he Class AR Certificates represent ownership of the sole class of residual interest in each of Middle REMIC 1, Middle REMIC 2, and the Master REMIC," and "[t]he Class AR-L Certificates represent ownership of the sole class of residual interest in each of Subsidiary REMIC 1 and Subsidiary REMIC 2."  (*Id.*)

The Class VIII-A-1 Certificates purchased by the Fund fell into CSFB's "Middle REMIC 2."  (*Id.* at 10.)  According to a "table" in CSFB's PSA that "sets forth . . . the class designation, interest rate, and initial principal amount for each class of Middle REMIC 2 Interests," the Class VIII-A-1 Certificates represented an interest in a principal amount of $43,092,8555 at an annual

interest rate of 6%.  (*Id.* at 10, 12.)  A note below this table states that "[t]he Class MT2-R

Interest"—which is yet another interest within Middle REMIC 2, *id.* at 12,—"is the sole class of

residual interest in Middle REMIC 2.  It does not have an interest rate or a principal balance," *id.*

at 13.

After setting forth its various tables, the CSFB PSA states that "[t]he Foregoing REMIC

structure is intended to cause all of the cash from the Mortgage Loans to flow through to the

Master REMIC as a cash flow on a REMIC regular interest, without creating any shortfall . . . to

any REMIC regular interest."  (*Id.* at 17.)

In a section entitled "REMIC Provisions," the CSFB PSA states that "[t]he 'regular

interests' (within the meaning of Section 860G of the [Tax] Code) in the Master REMIC shall

consist of the Certificates (other than the Class AR and Class AR-L Certificates), . . . the Class

AR Certificates shall represent the beneficial ownership of the 'residual interest' in Middle

REMIC 1, Middle REMIC 2, and the Master REMIC," and "[t]he Class AR-L Certificates shall

represent the beneficial ownership of the 'residual interest' in each Subsidiary REMIC."  (Defs.'

56.1 ¶ 176.)  The CSFB PSA also defines "REMIC" to mean a "real estate mortgage investment

conduit within the meaning of Section 860D of the [Tax] Code."  (Sidman Decl. Ex. 13 at 64

(internal quotation marks omitted).)  A prospectus for CSFB's certificates dated September 25,

2003, states that "in general, REMIC Regular Certificates will be treated for federal income tax

purposes as debt instruments and not as ownership interests in the REMIC or its assets."  (Defs.'

56.1 ¶ 177; *see also* Doc. 253 at 112.)

CSFB's various certificates were allocated payments according to a section of the PSA

entitled "Priorities of Distribution."  (Sidman Decl. Ex. 13 at 121.)  The Class VIII-A-1

Certificates were to be paid "third" within the set of "Group VIII" Certificates.  (*Id.* at 127.)

Holders of the Class VIII-A-1 Certificates were paid from the "Group VIII Senior Principal Distribution Amount," after more senior certificates in Group VIII were paid, "until its Class Principal Balance is reduced to zero." (*Id.*) CSFB's residual interest certificates were to be paid "any remaining Available Distribution Amount" applicable to them after the regular interest certificates were paid. (*Id.* at 130, 134–39.)

### 2. REMIC Trust: MASTR

MASTR "consist[s] of two REMICs," a "Lower-Tier REMIC" and an "Upper-Tier REMIC." (Sidman Decl. Ex. 15 at 1.) Each of these REMICs had interests represented by "Regular Certificates" that "represent the 'regular interests'" within each of these two REMICs, as well as by a "Class A-LR Interest" and a "Class A-UR Interest" that represent the "single 'residual interest'" in their respective two REMICs. (*Id.*) The Class 4-A-1 Certificates purchased by the Fund represent interests in an initial principal amount of $315,640,000 at an initial pass-through rate of 5.5%. (*Id.* at 2.) The Class 4-A-1 Certificates are listed as part of a table stating the principal amount and pass-through rate for the various classes of Certificates created by the MASTR PSA, except that the "Class A-R" Certificates have only a notional amount of $100 and no pass-through rate associated with them. (*Id.*) The Class 4-A-1 Certificates are defined to fall within the category of "Regular Certificates," with the "Class A-R Certificates" being the only "Residual Certificates." (*Id.* at 3.)

Under a heading entitled "REMIC Matters," the MASTR PSA states that the first pages of the PSA "sets forth the designations as 'regular interests' or 'residual interests . . . for federal income tax purposes of all interests created" by the PSA. (*Id.* at 66.) The MASTR PSA also defines "REMIC" to mean a "real estate mortgage investment conduit within the meaning of Section 860D of the [Tax] Code." (*Id.* at 49 (internal quotation marks omitted).) The prospectus

for MASTR's certificates, dated July 28, 2003, states that "[r]egular securities will be treated as newly originated debt instruments for federal income tax purposes."  (Defs.' 56.1 ¶ 181.)

MASTR's various certificates were allocated payments according to a section of its PSA entitled "Priorities of Distribution." (Sidman Decl. Ex. 15 at 85.)  The Class 4-A-1 Certificates, which fall within MASTR's "Group 4," *id.* at 3, are to be paid in the "first" wave of distributions, "*pro rata* based on the Accrued Certificate Interest of" its relevant class, *id.* at 86. MASTR's residual interest certificates were to be paid "any remaining portion . . . of Available Funds" after the various regular interest certificates were paid.  (*Id.* at 91.)

### 3.  REMIC Trust:  GSR

GSR consisted of "three real estate mortgage investment conduits."  (Sidman Decl. Ex. 24 at 1.)  The "Residual Certificates" are defined as the "Class R1 and Class R2 Certificates." (*Id.* at 16.)  The Fund's At-Issue Certificates issued by GSR, the Class 2A-6 Certificates, came with an initial certificate balance of $29,530,000 at a certificate rate of 5%.  (*Id.* at 26.)  These At-Issue Certificates were regular interest certificates in "REMIC I-2."  (*Id.* at 23–24; Defs.' 56.1 ¶ 183.)  GSR's fund distribution scheme provides that, "after all of the other Classes of Certificates (other than the Residual Certificates) have been paid in full, the remainder, if any . . . of the Available Distribution Amount" will be distributed "to the Class R-2 Certificates to the extent such remainder is applicable to REMIC I-1 and otherwise to the Class R1 Certificates." (Sidman Decl. Ex. 24 at 31–32.)  The prospectus for GSR's certificates states that "[p]ayments received by holders of REMIC regular interests generally should be accorded the same tax treatment under the [Tax] Code as payments received on other taxable debt instruments."  (Defs.' 56.1 ¶ 184.)

### C. *The Funds' Tax Treatment of the At-Issue Securities and the Trusts' Assets*

The Funds' account statements were prepared by Comerica Bank, which categorized the Funds' various assets as either "Debt Securities," "Equity Securities," or "Short Term Investments." (*Id.* ¶ 200.) All of the Funds' account statements from November 2007 to July 2018 listed the At-Issue Securities as Debt Securities. (*Id.* ¶¶ 200–02.)

## II. <u>Procedural History</u>

Plaintiffs filed their original Class Action Complaint on March 5, 2018, (Doc. 1), and filed their First Amended Complaint ("FAC") on May 17, 2018, (Doc. 44). The FAC alleged four claims under ERISA: first, that Ocwen breached its fiduciary duty to the United Food & Commercial Workers Union ("UFCW") Plan, in violation of 29 U.S.C. § 1109; second, that Ocwen, Altisource, Assurant, SWBC, and HomeSure engaged in "prohibited transactions," in violation of 29 U.S.C. § 1106(b); third, that Wells Fargo breached its duty to the UFCW Plan as Ocwen's "co-fiduciary," in violation of 29 U.S.C. § 1105; and fourth, that Wells Fargo breached its fiduciary duty to the UFCW Plan by failing to prosecute legal actions based on Ocwen's misconduct. (FAC ¶¶ 238–50.)

On March 15, 2019, I entered an Opinion & Order resolving various motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (Doc. 150 ("MTD Order").) I determined that there were "two threshold issues" in this case "relat[ing] to whether there is a fiduciary relationship between Ocwen and the UFCW Plan," and that "the resolution" of these issues "will determine whether the FAC may proceed against any of the Defendants." (MTD Order 20.) The "first" issue is "whether the mortgages" underlying one of the "Trusts constitute 'plan assets' of the UFCW Plan" within the meaning of ERISA. (*Id.* at 21.) The "second" issue, "whether Ocwen may be considered a fiduciary of the UFCW Plan," "must be

answered in the negative if the mortgages in the" Trust at issue "do not qualify as plan assets." (*Id.* at 22.)  This follows because "[a] person is a fiduciary with respect to a plan to the extent that he or she exercises any authority or control respecting management or disposition of plan assets." (*Id.* (ellipses omitted) (quoting *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)) (internal quotation marks omitted).)

On November 21, 2019, Plaintiffs were granted leave to amend their pleadings and to file their Second Amended Complaint.  (Doc. 193.)  Plaintiffs filed the Second Amended Complaint ("SAC") on December 3, 2019.  (Doc. 200.)  The SAC pursues the same general theory of recovery as the FAC, but it added allegations that the Fund had purchased At-Issue Securities issued by an additional four Trusts:  the Indenture Trust HLT 2006-HI1, and the three REMIC Trusts.  (*See* SAC ¶¶ 53–56.)

On March 6, 2020, the Moving Defendants filed their motion for summary judgment and supporting papers, and Plaintiffs filed their motion for partial summary judgment along with supporting papers.  (Docs. 219–32, 238–39 (corrected declarations with exhibits in support of the Moving Defendants' motion for summary judgment).)  On March 9, 2020, Plaintiffs filed a notice attaching corrected versions of some of their exhibits.  (Doc. 234.)  On April 1, 2020, I granted the parties an extension of time to file opposition and reply papers.  (Doc. 237.)  On April 17 and April 18, 2020, Plaintiffs, Wells Fargo, and Ocwen filed opposition papers to each other's motions, (Docs. 241–46), and also on April 18, 2020, Plaintiffs filed various corrected filings, (Docs. 247–50).  On May 8, 2020, Plaintiffs, Wells Fargo, and Ocwen filed their reply papers on their motions.  (Docs. 252–57.)

On May 29, 2020, Plaintiffs sought leave to file a sur-reply in opposition to Ocwen and Wells Fargo's motion for summary judgment.  (Doc. 258.)  Ocwen and Wells Fargo filed a brief

in opposition on June 12, 2020, (Doc. 259), and Plaintiffs filed a reply on this motion on June 18, 2020, (Doc. 260).  On September 29, 2020, I denied Plaintiffs' motion for leave to file a sur-reply.  (Doc. 263).

### III. <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  "[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor, and may grant summary judgment only when no reasonable

trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d

Cir. 1995) (internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is

any evidence in the record that could reasonably support a jury's verdict for the non-moving

party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286

(2d Cir. 2002) (quoting Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir.2000).  "'The

principles governing admissibility of evidence do not change on a motion for summary

judgment' and district courts need only consider admissible evidence in ruling on a motion for

summary judgment." *I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019)

(quoting *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997)).

 In the event that "a party fails . . . to properly address another party's assertion of fact as

required by Rule 56(c), the court may," among other things, "consider the fact undisputed for

purposes of the motion" or "grant summary judgment if the motion and supporting materials—

including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2), (3); *see also* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by . . . citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials."); Local Rule 56.1(d) ("Each statement by the movant

or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any

statement of material fact, must be followed by citation to evidence which would be admissible,

set forth as required by Fed. R. Civ. P. 56(c).").  However, "where the movant 'fails to fulfill its

initial burden' of providing admissible evidence of the material facts entitling it to summary

judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is

presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v.*

*City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158–160 (1970)).  "Moreover, in determining whether the moving party has met

this burden of showing the absence of a genuine issue for trial, the district court may not rely

solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.

It must be satisfied that the citation to evidence in the record supports the assertion."  *Vt. Teddy*

*Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (internal quotation marks

omitted).

## IV.   <u>Discussion</u>

As discussed in the MTD Order, all of Plaintiffs' claims may only proceed if the

mortgages underlying the Trusts are "plan assets" within the meaning of the applicable

regulation, 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulation").  (MTD Order 21–22.)  The

Plan Asset Regulation provides that,

> [g]enerally, when an [ERISA] plan invests in another entity, the plan's assets
> include its investment, but do not . . . include any underlying assets of the entity.
> However, in the case of a plan's investment in an equity interest of an entity that is
> neither a publicly offered-security nor a security issued by an investment company
> registered under the Investment Company Act of 1940 its assets include both the
> equity interest and an undivided interest in each of the underlying assets of the
> entity . . . .

§ 2510.3-101(a)(2).  The Plan Asset Regulation then defines an "equity interest" to mean "any

interest in an entity other than an instrument that is treated as indebtedness under applicable local

law and which has no substantial equity features.  A profits interest in a partnership, an

undivided ownership interest in property and a beneficial interest in a trust are equity interests."

§ 2510.3-101(b)(1).  Thus, if the At-Issue Securities are (1) "treated as indebtedness under

applicable local law," and (2) "ha[ve] no substantial equity features," they cannot constitute "equity interest[s]."  *Id.*  If these criteria are met, the Funds' owning the At-Issue Securities would not cause the mortgages underlying the Trusts to be "plan assets" within the meaning of ERISA, § 2510.3-101(a)(2), and all of Plaintiffs' claims would fail.

### A.    *"Applicable Local Law"*

First, I must determine what constitutes the "applicable local law" that governs the determination of whether the At-Issue Securities are treated as indebtedness.  *See* § 2510.3(b)(1). I do not find the arguments of either party related to what constitutes applicable local law to be helpful or persuasive.  Moving Defendants say that "New York tax law" is the "local law applicable here," (Defs.' SJ 21 (internal quotation marks omitted)),[6] but they do not explain why, and they do not say if this is their position for the REMIC Trusts or for all the Trusts.  Plaintiffs, on the other hand, nowhere address which law is applicable in any of their papers.

However, it is undisputed that the Indenture Trusts are Delaware statutory trusts and that the REMIC Trusts are creatures of New York law.  (Defs.' 56.1 ¶¶ 13, 18.)  Additionally, each Trust's governing agreement setting forth the rights of holders of At-Issue Securities contains a clause providing that it is governed by New York law.  (Sidman Decl. Ex. 1 at 107; Sidman Decl. Ex. 7 at 72; Sidman Decl. Ex. 20 at 53; Sidman Decl. Ex. 13 at 200; Sidman Decl. Ex. 15 at 131; Sidman Decl. Ex. 24 at 41.)

Courts applying either Delaware or New York law will look to the terms of the contract governing the security to determine whether it is debt or equity.  *See, e.g.*, *Simons v. Cogan*, 542 A.2d 785, 789 (Del. Ch. 1987) (explaining that "creditors" are "holders of . . . debt" after analyzing the terms of the debentures setting forth the rights of bondholders), *aff'd*, 549 A.2d

---

[6] "Defs.' SJ" refers to Moving Defendants' Memorandum of Law in Support of Summary Judgment.  (Doc. 222.)

300 (Del. 1988); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) ("The question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract"); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 1295928, at *13 (Bankr. S.D.N.Y. Apr. 29, 2022) (explaining that under New York law a court considers "the plain terms of the loan agreement" to determine whether "enforceable debts" were created, and collecting cases); *In re Live Primary, LLC*, 626 B.R. 171, 198 (Bankr. S.D.N.Y. 2021) (under Delaware law, one looks to the terms of the contract to ascertain intent" as to whether an instrument constitutes "debt" or "equity"); *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) (applying a New York law analysis to assess whether contractual "equity-linked financing" related to "the performance of an equity security" or whether it "may include 'debt instruments with detachable warrants'").

Further, both New York and Delaware contract law are materially identical for present purposes. *Compare Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) ("We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language."), *and Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."), *with Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Under New York law, which governs the indentures at issue here, if a contract is unambiguous on its face, its proper construction is a question of law."), *and L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (under New York law, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."

(internal quotation marks omitted)).  Accordingly, I may apply either Delaware or New York law.  *See O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 500 n.2 (S.D.N.Y. 2015) ("where, as here, the contract law of New York and Delaware is not in conflict, the court can apply New York law even though there is a provision selecting Delaware's laws in the contract." (internal quotation marks omitted)), *aff'd*, 646 F. App'x 2 (2d Cir. 2016).  *Cf. In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009) ("In the absence of a formal rule or regulation, the Department has informally advised that 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.'" (citation omitted)).

Under Delaware law, one "looks to the terms of the contract to ascertain intent" as to whether an instrument constitutes "debt" or "equity," *In re Live Primary, LLC*, 626 B.R. 171, 198 (Bankr. S.D.N.Y. 2021) (applying Delaware law), as "[t]he question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract," *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969); *Simons v. Cogan*, 542 A.2d 785, 789 (Del. Ch. 1987) (explaining that "creditors" are "holders of . . . debt" after analyzing the terms of the debentures setting forth the rights of bondholders), *aff'd*, 549 A.2d 300 (Del. 1988).  Courts applying New York law similarly will look to governing contracts to assess whether securities such as "certificates bear characteristics of a debt instrument" or whether they are "equity."  *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp. 2d 536, 556 (S.D.N.Y. 2012) (collecting cases applying New York law).

B.    *"Treated as Indebtedness"*

### 1.  The Indenture Trusts

The Indenture Agreements for both 2004-4 and for 2005-3 contain provisions saying that any "Holder" of a "Note" issued by either of these two Indenture Trusts has agreed that "the

Notes are properly treated as indebtedness without substantial equity features for the purposes of

the DOL Regulations, and agrees to so treat the Notes." (Defs.' 56.1 ¶¶ 144, 156.)  All three

Indenture Trusts are governed by agreements that refer to the Notes as "indebtedness." (Sidman

Decl. Ex. 1 at 46; Sidman Decl. Ex. 7 at 21; Sidman Decl. Ex. 20 at 16.)  By contrast, in addition

to the At-Issue Notes—the only instruments issued by the Indenture Trusts that the Funds

purchased—each Indenture Trust also issued separate Indenture Certificates, which were

specifically stated to have created a "beneficial ownership interest in the" Indenture Trust.

(Defs.' 56.1 ¶¶ 145, 157, 166.)  Each Indenture Trust's Indenture Agreement states that

distributions to these certificate holders "shall be subordinated to the creditors of the Trust,

including the Noteholders." (*Id.* ¶¶ 147, 160, 170.)  In other words, the plain language of the

Indenture Agreements regards the At-Issue Notes as debt.[7]  Thus, "the intent of the parties" as

set forth by "the four corners of the contract[s]" governing the Indenture Trusts is to regard the

At-Issue Notes as debt.  *See Paul*, 974 A.2d at 145.

Plaintiffs argue that "[t]he specific [contractual] language" regarding the Indenture Trusts

that Defendants have cited (1) "only classifies [the At-Issue Notes] as debt for tax purposes or"

(2) "is unenforceable as a matter of law." (SJ Opp. 7.)[8]  Both arguments are incorrect.  With

regard to the former, although Plaintiffs are correct that much of the Indenture Trusts' language

speaks to regarding the At-Issue Notes as debt "for federal and state income and state and local

franchise tax purposes," (Defs.' 56.1 ¶¶ 146, 158, 168), Plaintiffs do not account for the above-

quoted Indenture Agreement language calling the At-Issue Notes "indebtedness" for all

---

[7] The question of whether the Indenture Certificates are equity is not before me, so I do not address it.  I only highlight the contrast in how the governing documents speak about the Indenture Certificates in comparison to the Notes issued by each Indenture Trust.

[8] "SJ Opp." refers to Plaintiffs' Corrected Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment.  (Doc. 247-1.)

purposes, *supra*.  With regard to the latter argument, Plaintiffs provide no support for the At-Issue Notes being unenforceable.  Rather, they cite to the Moving Defendants' own brief and to my MTD Order.  (SJ Opp. 7.)  However, nothing in either says anything about unenforceability as a matter of law, and none of Plaintiffs' other myriad filings elaborate on what would support this assertion of unenforceability.

### 2.  The REMIC Trusts

Each of the At-Issue Certificates gives its holder a securitized interest in pooled mortgages bound up in a form of trust known as a REMIC.  (*See* Sidman Decl. Ex. 13 at 1; Sidman Decl. Ex. 15 at 1; Sidman Decl. Ex. 24 at 1.)  Each At-Issue Certificate entitles its holder to receive a share of payments on a fixed principal amount at a specified rate of interest.  (Defs.' 56.1 ¶ 12.)  Further, each At-Issue Certificate was to receive payments pursuant to a prioritized pass-through scheme for distributing the money paid into the various REMICs by people who had taken out mortgage loans and were paying them back.  (*See* Sidman Decl. Ex. 13 at 17; Sidman Decl. Ex. 15 at 85; Sidman Decl. Ex. 24 at 31–32.)

New York courts have characterized this sort of arrangement, where "payments made by the borrowers of the underlying mortgages are 'passed through'" to holders of securitized interests under a "Pooling and Servicing Agreement," as one that creates "debt securities." *Nomura Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*, 19 N.Y.S.3d 1, 4 (1st Dep't 2015), *aff'd as modified sub nom. Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572 (2017); *see also Nomura Home Equity Loan, Inc., Series 2006-FM2*, 30 N.Y.3d at 597 (Rivera, J., dissenting) (explaining that a "pooling and service agreement" was utilized to allow "the depositor [to] sell[] the debt securities (known as certificates) to investors (the certificate holders)").  Indeed, "the weight of the case law" regards

"the certificates as debt instruments," and "not equity."  *Policemen's Annuity*, 907 F. Supp. 2d at

556 (collecting cases); *Ellington Credit*, 837 F. Supp. 2d at 182 (applying New York law to

claims involving REMICs and stating "as many courts have observed, pass-through certificates

are structurally similar in form and function to bonds issued under an indenture").  Accordingly,

"applicable local law" regards the At-Issue Certificates as interests "treated as indebtedness."  §

2510.3(b)(1).

Attempting to rebut this conclusion, Plaintiffs cite language from the REMIC Trusts'

prospectuses.  However, "[a] prospectus, or a prospectus supplement, is indeed not a contract"

and thus cannot alter the nature of debt securities created within the four corners of the REMIC

Trusts' governing agreements.[9]  *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, 966

N.Y.S.2d 349 (Sup. Ct. N.Y. Cnty. 2012) (citing *Greenapple v. Detroit Edison Co.*, 618 F.2d

198, 210 (2d Cir. 1980)).  Indeed, Plaintiffs do "not dispute the non-contractual nature of the

[prospectuses]," *Pac. Life Ins. Co. v. Bank of New York Mellon*, 17-CV-1388 (KPF) (RWL),

2021 WL 673479, at *7 (S.D.N.Y. Feb. 22, 2021), *aff'd*, 17 Civ. 1388 (KPF), 2021 WL 5299193

(S.D.N.Y. Nov. 15, 2021), as they concede that "[o]ffering documents do not create

investments," (PSJ Reply 7).[10]  Given this, Plaintiffs have failed to make an argument suggesting

that "applicable local law" would look to prospectuses instead of, or even in addition to, the

contracts governing the At-Issue Securities.

Even if the prospectuses could alter whether the At-Issue Certificates qualify as equity,

that still would not aid Plaintiffs, as none of the language suggests that the At-Issue Certificates

---

[9] The prospectuses at issue here provide that they are offered "solely to provide [prospective purchasers] with
information about the offering of the offered notes . . . and to solicit an offer to purchase the offered notes.  Any
such offer . . . will not constitute a contractual commitment . . . until we have accepted [the prospective purchaser's]
offer."  (Doc. 239-57 at 3.)

[10] "PSJ Reply" refers to Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary
Judgment.  (Doc. 255.)

qualify as equity interests.  For example, Plaintiffs cite prospectus language for CFSB stating that "[e]ach certificate will evidence the undivided interest, beneficial interest[,] or notional amount specific in the related prospectus supplement in a mortgage pool," and that "[t]he certificates will evidence the entire beneficial interest in the trust."  (PSJ 8 (citations omitted)).[11] However, these words mean that the "certificates" issued by CFSB can be something other than a "beneficial interest," since they may evidence a "notional amount," and they state that the totality of the "certificates" issued by CFSB "will evidence the entire beneficial interest in the trust," not that any particular certificate entitles its holder to a beneficial ownership in the trust.  The language Plaintiffs identify thus only poses the question of which certificates issued by the REMIC trusts may be equity interests.  It does not answer the question.

By contrast, as with all the REMIC Trusts, CFSB's governing agreement does create an interest that amounts to beneficial ownership:  the "[c]ertificates [that] represent" the "residual interest[s]."  (Sidman Decl. Ex. 13 at 1; *see also* Sidman Decl. Ex. 15 at 1–3 (discussing the "Residual Certificates" issued by MASTR); Sidman Decl. Ex. 24 at 16 (discussing the "Residual Certificates" issued by GSR).)  As is common in differentiating creditors from holders of equity, holders of residual interest certificates are paid "any remaining Available Distribution Amount" that is left over once the holders of regular interest certificates—like Plaintiffs' Class VIII-A-1 Certificates—are paid what they are due from CFSB.  (Sidman Decl. Ex. 13 at 130, 134–39.)  In other words, it is these certificates that hold any "upside potential" in the REMIC Trusts once holders of regular certificates—which the At-Issue Certificates are—are paid what they are due; and "upside potential" is one of the common features that distinguishes equity from debt.  *See TIFD III-E, Inc. v. United States*, 459 F.3d 220, 233 (2d Cir. 2006); *see also Bolt v. Merrimack*

---

[11] "PSJ" refers to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment.  (Doc. 225.)

*Pharms., Inc.*, 503 F.3d 913, 916 (9th Cir. 2007) ("equity by definition equals the residual interest in the assets after subtracting liabilities").  Thus, to the extent that any certificate issued by a REMIC Trust were to constitute an equity interest under the Plan Asset Regulation, it would be the residual certificates, not the At-Issue Certificates that the Fund held.

In further support of their argument that the At-Issue Certificates qualify as equity, Plaintiffs cite to an exhibit to MASTR's PSA providing for the form of a class of certificates not at issue here, the Class 30-B-2 Certificates issued by MASTR, which states that "[t]his Certificate is one of a duly authorized issue of Certificates" from MASTR "of the Series specified on the face hereof . . . and representing a beneficial ownership interest in the Trust Fund created by the Agreement."  (Brooks Decl. Ex. 6 at 201–202 (*cited in* PSJ 10).)[12] However, each exhibit to the MASTR PSA providing for the form of each and every class of certificates contains this identical language.  (*See, e.g.*, *id.* at 129–30 (Class 1-A-1 Certificates); *id.* at 133–34 (Class 2-A-1 Certificates); *id.* at 210, 212 (Class 15-B-4 Certificates).)  This language also appears on the exhibit setting forth the form of the Class 4-A-1 Certificates held by the Fund, (*id.* at 142–143), and even on the exhibit providing the form of the Class A-R Certificates that represent the residual interest certificates issued by MASTR, (*id.* at 244, 247). This boilerplate language on each of MASTR's certificates goes on to say "[t]his Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Trustee."  (*Id.* at 144; *see also, e.g.*, *id.* at 247 (same for the Class A-R Certificates).)  In other words, not only does this boilerplate language not

---

[12] "Brooks Decl." refers to the Declaration of Justin S. Brooks in Support of Plaintiffs' Motion for Partial Summary Judgment and the exhibits thereto.  (Doc. 228.)

distinguish between regular interest and residual interests, it also disclaims its applicability by saying that one must "refer[] . . . to the Agreement," i.e., the MASTR PSA, to know what "interests, rights and limitations of rights" are "evidenced" by holding any given certificate. (*Id.*) By its own terms, then, the boilerplate language Plaintiffs cite cannot vary the rights of holders of At-Issue Certificates. It thus does not affect my analysis, consistent with that of the courts of New York, finding that "pass-through" certificates created by a "Pooling and Servicing Agreement" are "debt securities." *Nomura Home Equity Loan*, 19 N.Y.S.3d at *4.

Next, Plaintiffs argue that, under the doctrine of *Skidmore* deference, a 1996 DOL Advisory Opinion requires the At-Issue Certificates to be viewed as equity interests. (PSJ 14.) "*Skidmore* deference" is granted to "[a]gency interpretations in opinion letters . . . to the extent they have the 'power to persuade.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011) (quoting *Chirstensen v. Harris County*, 529 U.S. 576, 587 (2000)). In the Advisory Opinion cited by Plaintiffs, a representative from the "CBA Mortgage Corporation (CBA)" sought advice on whether "an employee benefit plan's investment in certain 'pass-through certificates' representing interests in the trust would constitute 'equity interests'" for the purposes of the Plan Assets Regulation. U.S. Dep't of Labor, Advisory Op. 1996-23A (Oct. 23, 1996). "CBA" bought "mortgage assets, establish[ed] trusts to hold the assets, and s[old] interests" in the trusts in the form of "various classes of certificates," which, "in the aggregate" made up "the entire beneficial ownership of the trust." *Id.* The Advisory Opinion assessed "a limited group of certificates" that "represent[ed] interests in a 'mortgage pool'" in the form of a "76% unsubordinated participation interest in a first priority mortgage loan . . . and a single second mortgage loan that is subordinate in lien priority to the lien of the first mortgage that underlies the 76% participation interest." *Id.* DOL advised that the 76% interest certificates,

which "represent[ed] a beneficial interest in [CBA']s trust . . . constitute equity interests within the meaning of the [P]lan [A]ssets [R]egulation." *Id.* To drive this conclusion home, DOL provided an example where "a Plan . . . acquires a 30 percent participation in a debt instrument that is held by a bank" such that the Plan had "[e]quity participation." *Id.*

This DOL Advisory Opinion does not apply to any of the At-Issue Securities. None of the At-Issue Securities provided the Fund with a percentage "participation interest" in an underlying "pool" of assets. Rather, each of the At-Issue Securities entitled their holders to payments based on an initial note principal and a note interest rate, (Defs.' 56.1 ¶ 12), and each "carried fixed interest rates and had legal final maturity dates," (*id.* ¶ 270). Moreover, the DOL Advisory Opinion took as established that the certificates it assessed "represent[ed] a beneficial interest" in the trust in question. By contrast, here, the operative question is whether any of the At-Issue Securities create a beneficial ownership interest under the terms of the contracts creating them. Therefore, for the reasons discussed *supra*, the answer under "applicable local law" is that they do not.

Plaintiffs also cite *Retirement Board of Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014). (PSJ 15.) In that case, the Second Circuit was presented the question of whether certain "certificates" issued by mortgage trusts and governed by pooling and servicing agreements and indentures fell within the category of instruments regulated by the federal Trust Indenture Act ("TIA"). *Bank of New York Mellon,* 775 F.3d at 156, 163–64. The parties presented the question as one turning on whether the certificates were "equity" or "debt." *Id.* at 164–65. The Second Circuit found it "need not decide . . . whether the . . . certificates qualify as 'debt,'" because the TIA was structured to "necessarily presume[e] that at least some certificates of interest or participation subject to the

26

TIA will *not* be debt instruments.  At the same time, however, and contrary to [p]laintiffs'

position, this does not logically imply that a certificate of interest or participation *cannot* be a

debt instrument." *Id.*  Given that the Second Circuit was concerned with a construction of the

TIA, and not whether anything was "treated as indebtedness under applicable local law," §

2510.3-101(b)(1), it does not help Plaintiffs' case.  Moreover, as the above-quoted language

shows, the Second Circuit never decided whether the certificates at issue were equity or debt.

(*Contra* PSJ 15.)

    **C.**  ***"Substantial Equity Features"***

    The Plan Asset Regulation does not define or hint at what may constitute "substantial

equity features." *See* § 2510.3-101(b)(1).  However, the Second Circuit has previously sought to

"distinguish[] between debt and equity" by looking to factors set forth in an IRS notice to

ascertain "the 'total effect' of the transaction." *See TIFD III-E*, 459 F.3d at 233.  These factors

are

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum
> certain on demand or at a fixed maturity date that is in the reasonably foreseeable
> future; (b) whether holders of the instruments possess the right to enforce the
> payment of principal and interest; (c) whether the rights of the holders of the
> instruments are subordinate to rights of general creditors; (d) whether the
> instruments give the holders the right to participate in the management of the issuer;
> (e) whether the issuer is thinly capitalized; (f) whether there is identity between
> holders of the instruments and stockholders of the issuer; (g) the label placed upon
> the instruments by the parties; and (h) whether the instruments are intended to be
> treated as debt or equity for non-tax purposes, including regulatory, rating agency,
> or financial accounting purposes.

*Id.* at 235 n.15 (citing IRS Notice 94–47, 1994–19 I.R.B. 9 (Apr. 18, 1994)).  At least one court

looking to these factors has held that RMBS pass-through "certificates are debt." *Policemen's*

*Annuity*, 907 F. Supp. 2d at 557.  The Second Circuit has also said that whether "funds were

advanced with reasonable expectations of repayment" is a relevant consideration. *TIFD III-E*,

459 F.3d at 233 (citation omitted).

Here, although most of these factors do not appear applicable, the analysis would favor considering the At-Issue Securities to be debt.  Each has "fixed interest rates and . . . legal final maturity dates," (Defs.' 56.1 ¶ 270), and Plaintiffs consistently characterized the At-Issue Securities as debt for tax purposes, (*id.* ¶¶ 200–02).  The Second Circuit has indicated that a party's classification of assets in one manner in "tax and regulatory filings" may disable that party from being able to "seriously claim that" the asset should be classified differently for the purposes of a litigation position.  *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 735–36 (2d Cir. 2010).  Additionally, the At-Issue Securities all benefited from various payment enhancements to bolster the probability that their holders would be paid, (*id.* ¶¶ 237–50), and each was rated as investment grade debt by ratings agencies that rate only debt securities, not equity securities, (*id.* ¶¶ 12, 275–78, 282–293).

More to the point, Plaintiffs have failed to identify any features of the At-Issue Securities which could actually amount to "substantial equity features."  They do raise two arguments, but both must be rejected.  First, they argue that "the [At-Issue] Notes . . . were downgraded" by "rating agencies," seemingly as a means of asserting that ratings downgrades are a feature of equity.  (SJ Opp. 7.)  However, as just mentioned, these agencies rate only debt securities. (Defs.' 56.1 ¶¶ 277–78.)  Second, Plaintiffs say that "there has been variability in interest and principal payments over the years" on the At-Issue Securities, meaning that their "investment was at risk and compromised."  (SJ Opp. 8.)  However, it is not clear how this would support Plaintiffs' argument in any material way, since all investments have some risk to them, which is perhaps why the Second Circuit says to look to whether "funds were advanced with reasonable expectations of repayment," not whether any risk ever entered the picture.  *See TIFD III-E*, 459

F.3d at 233.  Furthermore, in making its variability argument, Plaintiffs cite a declaration from

one of the Funds' investment managers who says that he believes the At-Issue Securities never

"lost their status as debt instruments and became equity interests," and that in any case "[a]

determination of whether these securities had or have 'substantial equity features'" for purposes

of the Plan Asset Regulation "is outside the scope of" his firm's "engagement."  (Doc. 228-1 ¶

12.)  In other words, Plaintiffs have adduced no competent evidence that would allow a

reasonable factfinder to conclude that the At-Issue Securities have substantial equity features.

## V.      Conclusion

For the foregoing reasons, Moving Defendants' motion for summary judgment is

GRANTED and Plaintiffs' motion for partial summary judgment is DENIED.  The Clerk of

Court is respectfully directed to terminate the open motions on the docket, to enter judgment in

favor of all Defendants, and to close this case.

SO ORDERED.

Dated: June 1, 2023
       New York, New York


                                            _____
                                            Vernon S. Broderick
                                            United States District Judge