23-999
*Powell v. Ocwen Fin. Corp.*

# United States Court of Appeals
# For the Second Circuit

August Term 2024

Argued: September 5, 2024
Decided: March 26, 2026
Amended: April 22, 2026

No. 23-999

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/22/2026 __

RONALD E. POWELL, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, ROBERT O'TOOLE, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, ROBERT WILSON, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, BRIAN JORDAN, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, DONALD G. SCHAPER, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund, WILLIAM R. SEEHAFER, as Trustee of The United Food & Commercial Workers Union & Employers Midwest Pension Fund,

*Plaintiffs-Appellants*,

*v.*

OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, OCWEN MORTGAGE SERVICING, INC., ALTISOURCE PORTFOLIO SOLUTIONS, S.A., ALTISOURCE RESIDENTIAL CORPORATION, ALTISOURCE ASSET MANAGEMENT CORPORATION, ASSURANT, INC., STANDARD GUARANTY INSURANCE COMPANY, AMERICAN SECURITY INSURANCE COMPANY, VOYAGER INDEMNITY INSURANCE COMPANY, AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, HOMESURE SERVICES, INC., CROSS COUNTRY HOMES SERVICES, INC., HOMESURE OF AMERICA, INC., HOMESURE PROTECTION OF VIRGINIA INC., WELLS FARGO BANK, N.A., ALTISOURCE SOLUTIONS,

CERTIFIED COPY ISSUED ON 04/22/2026

INC., REALHOME SERVICES AND SOLUTIONS, INC., ALTISOURCE ONLINE AUCTIONS, INC., SOUTHWEST BUSINESS CORPORATION,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-1951, Vernon S. Broderick, *Judge.*

---

Before:  CHIN, CARNEY, and SULLIVAN, *Circuit Judges.*

The Employee Retirement Income Security Act of 1974 ("ERISA") imposes fiduciary duties on those who control retirement-plan assets.  In this case, the trustees of an ERISA-regulated plan invested in residential mortgage-backed securities ("RMBSs") issued by six RMBS trusts.  Some of the RMBSs were issued as notes pursuant to indenture agreements while others were issued as trust certificates.  The plan trustees sued the servicers of the underlying mortgages for breach of fiduciary duties under ERISA.  The district court (Broderick, *J.*) granted summary judgment for the servicers and denied the trustees' cross-motion for partial summary judgment.  It held that the controlling regulation defined only the RMBSs themselves – and not the mortgages backing them – as plan assets regulated by ERISA.  With respect to the notes issued pursuant to the indenture agreements, we agree with the district court that the underlying mortgages are not plan assets because they lack substantial equity features.  But the mortgages underlying the trust certificates *are* equity interests because the certificates represent beneficial interests in the particular RMBS trusts.  We therefore affirm the district court's judgment in part, vacate in part, and remand for further proceedings.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

R. BRADLEY MILLER, R. Bradley Miller Law, Alexandria, VA, *for Plaintiffs-Appellants.*

Gary A. Gotto, Ron Kilgard, Keller Rohrback L.L.P., Phoenix, AZ, *for Plaintiffs-Appellants.*

YAAKOV M. ROTH, Jones Day, Washington, DC (Evan Miller, David T. Raimer, *on the brief*), *for Defendant-Appellee Wells Fargo Bank, N.A.*

Howard F. Sidman, Amanda L. Dollinger, Jones Day, New York, NY, *for Defendant-Appellee Wells Fargo Bank, N.A.*

ANTON METLITSKY, O'Melveny & Myers LLP, New York, NY (Jenya Godina, *on the brief*), *for Defendants-Appellees Ocwen Financial Corp.; Ocwen Loan Servicing, LLC; Ocwen Mortgage Servicing, Inc.*

Richard A. Jacobsen, Thomas N. Kidera, Aaron M. Rubin, Orrick, Herrington & Sutcliffe LLP, New York, NY, *for Defendants-Appellees Ocwen Financial Corp.; Ocwen Loan Servicing, LLC; Ocwen Mortgage Servicing, Inc.*

RICHARD J. SULLIVAN, *Circuit Judge*:

The Employee Retirement Income Security Act of 1974 ("ERISA") protects employee welfare benefit plans from mismanagement and self-dealing by imposing fiduciary obligations on those who exercise authority or control over plan assets. In this case, the trustees of an ERISA-regulated plan invested in six classes of residential mortgage-backed securities ("RMBSs"), which are financial instruments that pool large amounts of residential loans. The trustees now allege

3

that the companies responsible for servicing the underlying mortgages mismanaged the loans, engaged in self-dealing, and otherwise failed to act in investors' best interests.

At summary judgment, the district court rejected the trustees' claims on the ground that none of the mortgages underlying the plan's investments were plan assets for purposes of ERISA. The court held that, under the Department of Labor's (the "DOL") controlling regulation defining plan assets, only the RMBSs themselves – and not the mortgages backing them – are assets belonging to the plan. On that basis, the district court granted summary judgment in favor of all defendants and denied the trustees' cross-motion for partial summary judgment on the plan-asset issue.

We agree in part and disagree in part with the district court's resolution. With respect to the plan's investments in three classes of notes issued under indenture agreements, the district court correctly held that because the notes lack substantial equity features, the mortgages backing those notes do not qualify as plan assets under the DOL's regulation. But as to the plan's investments in the three classes of trust certificates, we agree with the trustees that the certificates represent beneficial interests in those trusts and are therefore equity interests. We

therefore affirm the district court's judgment in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

ERISA imposes fiduciary obligations on those who exercise authority or control over the assets of employee welfare benefit plans.  29 U.S.C. § 1002(21)(A).  ERISA requires such fiduciaries to exercise reasonable care and avoid conflicts of interest when managing plan assets, and it creates a private cause of action for breach of those duties.  *Id.* §§ 1104–09.

Although "identifying a plan's assets is a critical step in identifying plan fiduciaries[,] . . . ERISA does not explicitly define what constitute 'plan assets.'"  Final Regulation Relating to the Definition of Plan Assets, 51 Fed. Reg. 41,262–63 (Nov. 13, 1986).  Instead, Congress largely delegated the task of defining the concept of plan assets to the DOL.  *See* 29 U.S.C. § 1002(42) (providing that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary [of Labor] may prescribe").

The DOL subsequently promulgated a plan-asset regulation, which provides the "general rule" that "when a plan invests in another entity, the plan's

assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity." 29 C.F.R. § 2510.3-101(a)(1)–(2). Thus, while the stock that a plan owns in a publicly traded widget company is a plan asset, the company's inventory of widgets is not. And although the plan's investment manager owes the plan a fiduciary duty in managing its investment in the widget company, the regulation imposes no such duty on the company's officers with respect to the widgets themselves.

For certain investments, however, the plan-asset regulation carves out a "look-through" exception from the general rule against treating underlying assets as those of a plan. 51 Fed. Reg. at 41,263–64. Under that exception:

> [I]n the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940[,] its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity.

29 C.F.R. § 2510.3-101(a)(2). The DOL created the look-through exception to extend ERISA's fiduciary protections to "investments that are vehicles for the indirect provision of investment management services," 51 Fed. Reg. at 41,264, such as "pooled investment funds," *id.* at 41,266.

The look-through exception's applicability hinges on, *inter alia*, whether a plan's investment in an entity is an "equity interest." 29 C.F.R. § 2510.3-101(a)(2).

The plan-asset regulation generally defines that term as "any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features." *Id.* § 2510.3-101(b)(1). The DOL did not further define the terms "indebtedness" or "substantial equity features." The regulation provides, however, that "[a] profits interest in a partnership, an undivided ownership interest in property[,] and a beneficial interest in a trust are equity interests." *Id.*; *see also* 51 Fed. Reg. at 41,265 (explaining that, under the look-through exception, "a profits interest in a partnership, an undivided ownership interest in property and a beneficial interest in a trust would be treated as equity interests").

### B. The Plan's Investments

Ronald E. Powell, Robert O'Toole, Robert Wilson, Brian Jordan, Donald G. Schaper, and William R. Seehafer (collectively, the "Trustees") are six trustees of the United Food & Commercial Workers Union & Employers Midwest Pension Fund (the "Plan"), an ERISA-regulated "employee welfare benefit plan." 29 U.S.C. § 1002(1). The Plan invested in notes and certificates offered by six RMBS trusts. The notes were issued under indenture agreements by three Delaware statutory trusts: American Home Mortgage Investment Trust 2004-4 ("AHM 2004-4"),

American Home Mortgage Investment Trust 2005-3 ("AHM 2005-3"), and RFMSII Home Loan Trust 2006-HI1 ("HLT 2006-HI1"). And the certificates were issued by three trusts governed under New York law and defined as real estate mortgage investment conduits ("REMICs") for tax purposes: Credit Suisse First Boston Mortgage-Backed Pass-Through Certificates Series 2003-27 ("CSFB 2003-27"), MASTR Alternative Loan Trust 2003-5 ("MASTR 2003-5"), and GSR Mortgage Loan Trust 2005-7F ("GSR 2005-7F").

Specifically, the Plan acquired units of the following notes and certificates issued by the indenture and REMIC trusts:

- Class VI-A-1 Notes issued by AHM 2004-4;
- Class III-A-3 Notes issued by AHM 2005-3;
- Class M-3 Notes issued by HLT 2006-HI1;
- Class VIII-A-1 Regular-Interest Certificates issued by CSFB 2003-27;
- Class 4-A-1 Regular-Interest Certificates issued by MASTR 2003-5; and
- Class 2A-6 Regular-Interest Certificates issued by GSR 2005-7F.

The Class III-A-3 notes issued by AHM 2005-3 are representative of the Plan's investments in the three indenture trusts. AHM 2005-3 issued the Class III-A-3 notes pursuant to an indenture agreement governed under New York law. The notes carry a fixed rate of interest and have legal final maturity dates and are backed by an underlying pool of mortgage loans that AHM 2005-3 pledged to an

indenture trustee as security for the notes. The indenture notes are senior to trust certificates that AHM 2005-3 issued, which "evidenc[e] the beneficial ownership interest" in AHM 2005-3. J. App'x at 683. Distributions to certificate holders were therefore subordinated to the note holders.

The indenture trustee is responsible for paying principal and interest on the notes on behalf of AHM 2005-3 from payments made by borrowers on the underlying mortgage pool. The indenture followed a sequential-pay structure, with each class of notes being paid each month in order of priority. The indenture further provides that noteholders have an "absolute and unconditional" right "to receive payment of the principal . . . and interest" on the notes "on or after the respective due dates thereof" and grants noteholders the right to "institute suit for the enforcement of any such payment." Dist. Ct. Doc. No. 239-16 at 10–11.

The Class 4-A-1 regular-interest certificates issued by MASTR 2003-5 are typical of the Plan's investments in the three REMIC trusts. Consistent with its classification as a REMIC for federal tax purposes, MASTR 2003-5 issued two basic types of certificates: regular-interest certificates and residual-interest certificates. *See* 26 U.S.C. § 860D(a)(2). Like the indenture notes, the regular-interest certificates entitle their holders to receive interest payments at regular intervals

9

and at a fixed rate. The regular-interest certificates also have a stated principal balance and legal final maturity date.

Like AHM 2005-3's indenture notes, MASTR 2003-5's certificates are backed by an underlying pool of mortgage loans, which form the bulk of the trust's estate. The Class 4-A-1 regular-interest certificates stated that their holders would be paid monthly from amounts collected on those mortgages in order of priority, with the Class 4-A-1 certificates representing a higher priority of payment than several other regular-interest certificate classes. MASTR 2003-5's residual-interest certificates granted certificate holders an interest in the remaining amounts collected on the mortgage pool after the regular-interest certificate holders had been paid. Both the regular-interest and residual-interest certificates state that they represent a "beneficial ownership interest" in the trust's estate. *E.g.*, J. App'x at 108; Dist. Ct. Doc. No. 166-5 at 60.

Each trust appointed a master servicer to monitor the collection of payments on the underlying mortgages. Wells Fargo Bank N.A. ("Wells Fargo") acts as the master servicer for one of the indenture trusts, AHM 2005-3, and two of the REMIC trusts, MASTR 2003-5 and CSFB 2003-27. Ocwen Financial Corporation and its affiliates (collectively, "Ocwen") acquired the right to service the mortgages

10

underlying each of the six trusts and fulfilled that role – subject to Wells Fargo's oversight with respect to three of those trusts – during all times relevant to this case.

### C.    This Litigation

The Trustees filed this case as a putative class action on March 5, 2018.  The Trustees' operative complaint alleges that Ocwen breached its fiduciary duties under ERISA in its capacity as the servicer for the six trusts by mismanaging the mortgages held by the trusts.  The Trustees also claim that Ocwen engaged in prohibited transactions involving the mortgages and various other entities, including Altisource Solutions, Inc., Assurant, Inc. ("Assurant"), HomeSure Services, Inc., Southwest Business Corporation, and various subsidiaries and affiliates of those companies.  Finally, the Trustees allege that Wells Fargo breached its fiduciary duties to the Plan by failing to adequately supervise Ocwen and by failing to pursue litigation against Ocwen for breach of Ocwen's own fiduciary duties under ERISA.

Based on these allegations, the Trustees assert:  (1) claims against Ocwen for breach of fiduciary duty under 29 U.S.C. § 1109; (2) claims against Ocwen and its counterparties for engaging in prohibited transactions under 29 U.S.C. § 1106(a)–

(b); (3) a co-fiduciary claim against Wells Fargo under 29 U.S.C. § 1105 for failure to adequately supervise Ocwen's servicing of the mortgages; and (4) a claim against Wells Fargo for breach of fiduciary duty under 29 U.S.C. § 1109 based on its alleged failure to assert certain claims against Ocwen on behalf of the trusts.

On July 13, 2018, the defendants moved to dismiss the Trustees' then-operative complaint for lack of standing, lack of personal jurisdiction, and failure to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(1)–(2), (6). Ocwen and Wells Fargo, in particular, argued that the Trustees' complaint failed to state a claim because, among other reasons, (1) the mortgages held by the trusts were not plan assets for purposes of ERISA and (2) Ocwen did not act in a fiduciary capacity *vis-à-vis* the Plan in its role as the trusts' mortgage servicer.

The district court dismissed the Trustees' claims for lack of standing to the extent that the Trustees sought prospective relief against Assurant and its affiliates, but it otherwise rejected the defendants' standing arguments and declined to dismiss any claims for lack of personal jurisdiction. *See Powell v. Ocwen Fin. Corp.*, No. 18 Civ. 1951 (VSB), 2019 WL 1227939, at *12 (S.D.N.Y. Mar. 15, 2019). The district court further recognized that Ocwen's and Wells Fargo's motions to dismiss for failure to state a claim raised two threshold issues concerning ERISA's

12

applicability that could potentially dispose of the case as to all defendants.  *See id.* at *9.  But because Ocwen's and Wells Fargo's motions had relied in part on documents that the district court concluded could not properly be considered at the pleadings stage, the court converted the motions into ones for summary judgment.  *See id.* at *11 (citing Fed. R. Civ. P. 12(d)).  The district court then directed the parties to "engage in limited discovery with respect to" whether the underlying mortgages qualified as plan assets for purposes of ERISA and whether Ocwen acted in a fiduciary capacity under the statute.  *Id.*

After that discovery concluded, the Trustees, Ocwen, and Wells Fargo cross-moved for summary judgment on those same two issues.  The district court granted Ocwen's and Wells Fargo's motion and denied the Trustees' motion.  The court concluded that both the notes and the regular-interest certificates would be "treated as indebtedness under applicable local law" and had "no substantial equity features."  29 C.F.R. § 2510.3-101(b)(1).  Accordingly, the court concluded that the Plan's investments were not subject to the look-through exception and that, as a result, the underlying mortgages were not plan assets for purposes of

ERISA. The district court then directed the clerk of court to enter judgment in favor of all defendants, and judgment was so entered on June 2, 2023.

The Trustees timely appealed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's "grant of summary judgment when, as here, the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 177 (2d Cir. 2024); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y, FSB*, 982 F.3d 139, 141 (2d Cir. 2020). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Galloway v. County of Nassau*, 141 F.4th 417, 422–23 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)). In determining whether a party is entitled to summary judgment, we "constru[e] the evidence in the light most favorable to the non-movant." *Alberty v. Hunter*, 144 F.4th 408, 414 (2d Cir. 2025) (internal quotation marks omitted).

## III. DISCUSSION

The parties' dispute on appeal centers on whether the Plan's investments in the six trusts are "equity interests" under the DOL's plan-asset regulation.

14

29 C.F.R. § 2510.3-101(b)(1).  That issue turns on whether each investment:  (1) "is treated as indebtedness under applicable local law" and (2) "has no substantial equity features."  *Id.*  If we answer either question in the negative, then the investment qualifies as an equity interest for purposes of the regulation.[1]  The regulation also provides that an instrument qualifies as an equity interest if it represents "[a] profits interest in a partnership, an undivided ownership interest in property[, or] a beneficial interest in a trust."  *Id.* § 2510.3-101(b)(1).

On appeal, the Trustees principally argue that the Plan's investments in the three indenture trusts are equity by virtue of the plan-asset rule's idiosyncratic no-substantial-equity-features prong.  With respect to the three REMIC trusts, the Trustees further contend that the Plan's regular-interest certificates represent beneficial interests in those trusts under the second sentence of the equity-interest definition.  We address these arguments in turn.

---

[1] When a plan invests "in an equity interest of an entity," "each of the underlying assets of the entity" is a plan asset when (1) the plan's investment is not "a publicly-offered security," (2) the plan's investment is not "a security issued by an investment company registered under the Investment Company Act of 1940," (3) the entity is not "an operating company," and (4) the plan's "[e]quity participation in the entity by benefit plan investors" is "significant." § 2510.3-101(a)(2).  We address today only whether the plan's investments are equity interests and leave to the district court to decide in the first instance whether the assets underlying each investment in CSFB 2003-27, MASTR 2003-5, and GSR 2005-7F are plan assets.

### A.      The Indenture Trusts

The Trustees argue that the indenture notes have several substantial equity features.      Those features, the Trustees contend, include the trusts' thin capitalization and the fact that the proceeds from the sale of the notes were used to finance the trusts' acquisition of the underlying mortgages.  The Trustees also identify as substantial equity features the notes' subordination to the general creditors of the trusts and what the Trustees characterize as the contingent nature of the payments on the notes – *i.e.*, that as a practical matter, payment depended on the performance and value of the underlying mortgage pool.  We disagree.

The plan-asset rule nowhere defines the phrase "substantial equity features."  51 Fed. Reg. at 41,265 (noting that the DOL had decided not to "specify more precisely when equity features of a debt instrument become 'substantial'").  And we are aware of no caselaw interpreting that phrase for purposes of ERISA.  The DOL, however, has observed that "whether any particular investment has substantial equity features is an inherently factual question that must be resolved on a case-by-case basis."  *Id.* at 41,265–66.  As the modifier "substantial" indicates, "the mere fact that a debt instrument has some equity features does not require characterization of the instrument as an equity interest" for purposes of the plan-

16

asset rule.  *Id.*  To determine whether the factors identified by the Trustees are *substantial* equity features, we begin by surveying the traditional distinction between debt and equity.

Under the traditional debt-equity distinction, the quintessential attribute of equity is a "realistic possibility of upside potential" based on the success of a venture, typically as a consequence of holding a residual interest in a business or capital asset.  *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 234 (2d Cir. 2006); *see* Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* § 4.05[1][a] (Nov. 2025) (explaining that the classic equity interest "connotes an unlimited claim to the residual benefits of ownership and an equally unlimited subjection to the burdens thereof").  "The classic debt," by contrast, "is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof."  *Gilbert v. Comm'r of Internal Revenue*, 248 F.2d 399, 402 (2d Cir. 1957); *see also Hewlett-Packard Co. v. Comm'r of Internal Revenue*, 875 F.3d 494, 495 (9th Cir. 2017) ("The classic debt instrument . . . entitles an investor to preferred and limited payments for a fixed period.").  We have therefore said that the "vital difference" between an equity holder and a debt holder is that the former

17

"is an adventurer in the corporate business; he takes the risk, and profits from success," whereas the latter, "in compensation for not sharing the profits, is to be paid independently of the risk of success." *Comm'r of Internal Revenue v. O.P.P. Holding Corp.*, 76 F.2d 11, 12 (2d Cir. 1935).

When drawing this line, we look to a variety of criteria. In particular, we have previously borrowed eight factors identified as relevant by the Internal Revenue Service:

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments give the holders the right to participate in the management of the issuer, (e) whether the issuer is thinly capitalized; (f) whether there is identity between holders of the instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

*TIFD III-E, Inc.*, 459 F.3d at 235 n.15 (citing IRS Notice 94–47, 1994–19 I.R.B. 9 (Apr. 18, 1994). In addition to these factors, we have examined whether the instrument bears "a fixed percentage in interest payable to the creditor regardless of the debtor's income or lack thereof," the "reasonableness of expectation of payment," the "use to which the invested funds were put," and "whether payment

18

to the purported creditor can only be paid out of future profits." *Id.* at 239–40 (alterations adopted and internal quotation marks omitted). Our sister Circuits have adopted similarly sprawling multi-factor tests. *See, e.g.*, *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968) (setting out sixteen-factor test); *Est. of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972) (setting out thirteen-factor test).

As the Third Circuit has explained, however, these factors are merely "aids in answering the ultimate question of whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co.*, 398 F.2d at 697. The ultimate distinction between debt and equity, in other words, is fundamentally one of risk: are the investor's fortunes tied to the *performance* of the enterprise (*i.e.*, the risk that the enterprise will fail to turn a profit), or is the investor's exposure limited to the enterprise's credit risk (*i.e.*, the risk that the enterprise will become unable to satisfy its fixed obligations)? In assessing whether the attributes identified by the Trustees are *substantial* equity features under the plan-asset rule, we therefore ask whether those attributes

19

indicate a meaningful exposure to the indenture trusts' performance risk, as opposed to their viability risk alone.

To begin, the notes reflect a traditional debt structure, exposing the noteholders only to classic credit risks:  AHM 2004-4, AHM 2005-3, and HLT 2006-HI1 issued notes entitling the noteholders to receive fixed payments of interest and principal at regular intervals at fixed maturity dates.  And nothing in either the indenture agreements, the trust agreements, or the notes themselves grants noteholders anything resembling a residual interest in those three trusts or their estates – *i.e.*, the underlying mortgage pools.  To the contrary, the three trusts issued separate certificates that *do* represent residual interests in the trusts and which are subordinated to the notes.

Under these circumstances, the supposed equity features of the notes identified by the Trustees are, at best, insubstantial.  Although the thinness of the trusts' capitalization may increase the risk that noteholders will not be repaid, the fact remains that noteholders hold no residual interest in the trusts' estates. Similarly, the fact that the notes were subordinated to the trusts' general creditors and that proceeds from the sale of the notes were used to finance the mortgage pool are not enough to make them resemble equity more than debt.  We are

similarly unmoved by the Trustees' contention that the notes must be treated as equity because repayment of the notes was, as a practical matter, dependent on the trusts' ability to collect amounts due on the underlying mortgages and the value of those mortgages.  The risk that an enterprise may perform so poorly that it becomes insolvent, and that its remaining assets may be insufficient to cover all outstanding claims, is one typically shared by *all* investors, including creditors.  Universal credit risk is not – and cannot be – a substantial *equity* feature.

The Trustees' remaining arguments are similarly unpersuasive.  For starters, the Trustees argue that the mortgages must be treated as plan assets under the regulation's so-called "backstop provision."  Plan Br. at 26; *see* 29 C.F.R. § 2510.3-101(g) ("[W]here a plan jointly owns property with others, or where the value of a plan's equity interest in an entity relates solely to identified property of the entity, such property shall be treated as the sole property of a separate entity.").  But by its terms, that provision applies only to instruments that represent joint ownership or equity interests.  And as explained above, the notes represent neither.

The Trustees also argue that Ocwen's alleged misconduct justifies treating the mortgages as plan assets.  *See* Plan Br. at 60 ("The District Court erred by ignoring the critical importance of Ocwen's misconduct to the plan assets analysis

pertinent here."). In essence, the Trustees urge us to apply the Ninth Circuit's "twofold functional test as to whether an item in question constitutes an 'asset of the plan': (1) whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary, and (2) whether such use is at the expense of the plan participants or beneficiaries." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1467 (9th Cir. 1995); *see also Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir. 1991) ("To determine whether a particular item constitutes an 'asset of the plan,' it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries."). The Trustees also rely on our statement in *Lowen v. Tower Asset Management, Inc.*, that "[c]ourts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined." 829 F.2d 1209, 1220 (2d Cir. 1987).

We decline to resolve this case by applying the Ninth Circuit's two-part test. Setting aside whether that test has any basis in the language of ERISA, the fact remains that Congress delegated authority to the DOL to determine the meaning of "plan assets," 29 U.S.C. § 1002(42), and for the reasons discussed above, the mortgages underlying the three indenture trusts do not qualify as plan assets

22

under the DOL's controlling regulation, *see* 29 C.F.R. § 2510.3-101(a)(1)–(2), (b)(1). The Trustees have not argued that the DOL's plan-asset regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Nor have the Trustees identified any other basis to disregard the regulation. Our analysis therefore begins and ends with the plan-asset regulation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) (reaffirming that "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation").

We are also unpersuaded by the Trustees' reliance on *Lowen*. In that case, we held that "[n]either the separate corporate status of [a defendant] nor the general principle of limited shareholder liability afford protection where exacting obeisance to the corporate form is inconsistent with ERISA's remedial purposes." *Lowen*, 829 F.2d at 1220. Nothing in *Lowen*, however, supports the proposition that we may disregard the plain language of ERISA or its implementing regulations whenever we think that a different result would better serve the statute's purposes. Because the Plan's investments in the three indenture trusts are not equity interests for purposes of ERISA under the DOL's controlling plan-asset regulation, our analysis ends there.

23

## B.     The REMIC Trusts

We next consider whether the Plan's investments in the three REMIC trusts, which take the form of regular-interest certificates, are equity interests under the plan-asset regulation.  With respect to these certificates, the Trustees raise a distinct argument:  that the district court "erred by failing to acknowledge that the assets of a trust are always assets of any ERISA plan that holds a beneficial interest in the trust."  Plan Br. at 37.  We agree and conclude that the Plan's regular-interest certificates are equity interests for purposes of the plan-asset regulation.

As noted above, the second sentence of the equity-interest definition provides that "beneficial interest[s] in a trust are equity interests."  29 C.F.R. § 2510.3-101(b)(1).  That provision clearly acknowledges that "[p]lan assets manifestly include any property held in trust on behalf of the plan."  *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 741 (11th Cir. 2024) (quoting DOL Advisory Op. No. 93-14A (May 5, 1993)); *see* John Arnholz, Reed D. Auerbach & Edward E. Gainor, *Offerings of Asset-Backed Securities* § 12.01[E] (3d ed. 2018) ("[A] beneficial interest in a trust (such as a certificate) is always treated as an equity interest."); Patrick D. Dolan & C. VanLeer Davis III, *Securitizations: Legal and Regulatory Issues* § 18.05[2][d] (2014) (similar).  We must therefore determine

24

whether the Plan's regular-interest certificates represent beneficial interests in the three REMIC trusts.

Because New York law governs each of those trusts, we consider that state's law in determining whether the Plan holds a beneficial interest in the trusts. *See Hammond v. United States*, 764 F.2d 88, 98 (2d Cir. 1985). In interpreting the statutory phrase "persons beneficially interested in a trust in personal property," the New York Court of Appeals has held that "[a]ny right given by the trust instrument to receive a benefit from the trust in some contingency is a 'beneficial interest' in the trust." *Schoellkopf v. Marine Tr. Co. of Buffalo*, 267 N.Y. 358, 362 (1935); *see also* N.Y. Est. Powers & Trusts Law § 11-A-1.2(2), (5) (McKinney 2002) (defining "income beneficiary," for purposes of the New York Uniform Principal and Income Act, as including "a person to whom net income of a trust is or may be payable"). That approach aligns with "[t]he standard definition of a trust beneficiary," which is "'[a] person for whose benefit property is held in trust.'" *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 646 (8th Cir. 2017) (quoting Restatement (Third) of Trusts § 3 (A.L.I. 2003)); *see Hammond v. United States*, 584 F. Supp. 163, 172 (D. Conn. 1984) (Cabranes, *J.*) ("Under general and well-established principles of trust law, a 'beneficiary' is one who enjoys the advantages

25

of the administration of the trust by the trustee."), *aff'd*, 764 F.2d 88 (2d Cir. 1985); Amy Morris Hess, George Gleason Bogert & George Taylor Bogert, *Bogert's The Law of Trusts and Trustees* § 1 (2025) (explaining that a trust beneficiary is any person to whom "the trust document directs the trustee to distribute income and principal"). Here, the trust agreements for the three REMICs make clear that holders of the trusts' regular-interest certificates are beneficiaries of those trusts.

MASTR 2003-5 is illustrative. Pursuant to the trust agreement, a depositor "conveyed" the underlying mortgage pool "to the Trustee to create a trust for the benefit of the Certificateholders." Dist. Ct. Doc. No. 239-40 at 9; *see also* Dist. Ct. Doc. No. 238-41 at 22 (providing that the trustee and its custodians "hold[] or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders"). The defined term "Certificateholder" refers to the holder of a "Certificate," including the Class 4-A-1 regular-interest certificates that the Plan acquired. Dist. Ct. Doc. No. 238-40 at 18–19; Dist. Ct. Doc. No. 166-6 at 13. And the trust agreement requires the trustee, acting through its servicers, to collect interest and principal payments on the underlying mortgages and to deposit the proceeds into collection and distribution accounts maintained "for the benefit of the Certificateholders . . . in trust." Dist.

26

Ct. Doc. No. 238-40 at 23; Dist. Ct. Doc. No. 238-41 at 36–37. Finally, the trust agreement directs the trustee to pay holders of the regular-interest certificates their share of the proceeds collected in the distribution account, based on the stated rate of interest and principal balance of the certificates, and the amount available in the distribution account. The governing documents for CSFB 2003-27 and GSR 2005-7F similarly include the holders of those trusts' regular-interest certificates (and the holders of the Class VIII-A-1 and Class 2A-6 certificates in particular) among the beneficiaries of those trusts.

Ocwen and Wells Fargo largely dodge the question of whether the regular-interest certificates represent beneficial interests in the REMIC trusts, focusing instead on whether other features of the certificates are more suggestive of debt or equity. But the regulation makes clear that for purposes of ERISA, "beneficial interest[s] in a trust are equity interests." 29 C.F.R. § 2510.3-101(b)(1). And Ocwen and Wells Fargo's contention that only "holders of residual certificates are beneficiaries of the trust," Appellants' Br. at 31 (internal quotation marks omitted), is belied by the trust agreements' plain language, which, as explained above, clearly identifies holders of the regular-interest certificates as among the trusts' beneficiaries and provides those holders a "right to receive trust income"

27

generated by the mortgages. *BlackRock Fin. Mgmt. Inc. v. Segregated Acct. of Ambac Assur. Corp.*, 673 F.3d 169, 173 (2d Cir. 2012); *cf. Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 165–70 (2d Cir. 2014) (holding that such an arrangement qualifies as a "certificate of interest or participation" in the underlying mortgages for purposes of the Trust Indenture Act).

Finally, we observe that treating regular-interest certificates as equity interests for purposes of the plan-asset regulation is consistent with the broader structure of the regulation. Section 2510.3-101(i)(1) creates an exception to the look-through rule for "guaranteed governmental mortgage pool certificate[s]," which are defined as "certificate[s] backed by, or evidencing an interest in, specified mortgages or participation interests therein and with respect to which interest and principal payable pursuant to the certificate is guaranteed by the United States or an agency or instrumentality thereof." 29 C.F.R. § 2510.3-101(i)(1)–(2). When that exception applies, "the plan's assets include the certificate and all of its rights with respect to such certificate under applicable law, but do not, solely by reason of the plan's holding of such certificate, include any of the mortgages underlying such certificate." *Id.* § 2510.3-101(i)(1). Such an exception

28

makes sense only if a certificate that entitles its holder to payments of interest and principal, and which is "backed by" an underlying pool of mortgages, could otherwise qualify as an equity interest under the regulation.

* * *

Accordingly, we conclude that the Plan's investments in the regular-interest certificates issued by CSFB 2003-27, MASTR 2003-5, and GSR 2005-7F qualify as equity interests for purposes of the plan-asset regulation's look-through exception, while the notes issued by AHM 2004-4, AHM 2005-3, and HLT 2006-HI1 do not.

### C.    Ocwen's Fiduciary Status

Finally, Ocwen and Wells Fargo argue that even if the mortgages are plan assets, we should nonetheless affirm the district court's judgment on the alternative ground that Ocwen's servicing of the mortgages does not qualify as a fiduciary function for purposes of ERISA.  The district court, however, did not reach the question of Ocwen's fiduciary status.  And although "[w]e may affirm on any ground with support in the record," *Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) (internal quotation marks and citation omitted), our "preferred" and "usual" practice "is to allow the district court to address arguments in the first instance," *New York ex rel. James v. Niagara-Wheatfield Cent.*

*Sch. Dist.*, 119 F.4th 270, 284 (2d Cir. 2024) (alteration adopted and internal quotation marks omitted).

We see no compelling reason to depart from that practice here. We therefore remand to allow the district court to consider in the first instance whether Ocwen acted in a fiduciary capacity with respect to the mortgages underlying the three REMIC trusts.

## IV. CONCLUSION

For these reasons, we affirm the district court's judgment with respect to the Plan's investments in AHM 2004-4, AHM 2005-3, and HLT 2006-HI1, vacate the district court's judgment with respect to the Plan's investments in CSFB 2003-27, MASTR 2003-5, and GSR 2005-7F, and remand the case for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

30